No. 25-7689

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

OCEANA, INC.,

*Plaintiff-Appellant,*

v.

NATIONAL MARINE FISHERIES SERVICE *et al.*,

*Defendants-Appellees,*

AT-SEA PROCESSORS ASSOCIATION *et al.*,

*Intervenor-Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Alaska
No. 3:24-cv-00180-SLG
Hon. Sharon L. Gleason

---

## APPELLANT'S OPENING BRIEF

---

Katharine S. Glover
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
T: 907.586.2751
E: kglover@earthjustice.org
E: ejorgensen@earthjustice.org

Maile Tavepholjalern
EARTHJUSTICE
310 K Street, Suite 508
Anchorage, AK 99501
T: 907.277.2500
E: mtave@earthjustice.org

Andrea A. Treece
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
T: 415.217.2089
E: atreece@earthjustice.org

*Attorneys for Plaintiff-Appellant Oceana, Inc.*

February 26, 2026

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... iii

INTRODUCTION ............................................................................1

JURISDICTIONAL STATEMENT ......................................................3

STATEMENT OF ISSUES ...............................................................3

STATEMENT REGARDING ADDENDUM............................................4

STATEMENT OF CASE ..................................................................4

I.    Statutory and regulatory framework...........................................6

    A.    The Magnuson Stevens Act and the 1996 Sustainable Fisheries Act amendments ........................................................6

    B.    Regulatory requirements for designating and protecting essential fish habitat ...............................................11

II.    Benthic habitat and the adverse impacts of fisheries ...................13

III.    Essential fish habitat in Alaska................................................16

    A.    The Fisheries Service's prior actions on essential fish habitat ...........16

    B.    The 2023 five-year essential fish habitat review ................................18

IV.    Procedural history................................................................24

SUMMARY OF ARGUMENT ...........................................................25

ARGUMENT ...............................................................................27

I.    Standard of review...............................................................27

II.    Oceana has standing. ...........................................................29

III.    The Fisheries Service violated the Magnuson Stevens Act by using a fishing effects analysis that is inconsistent with the plain language of the statute. .......................................................................32

A.   The Magnuson Stevens Act and implementing regulations require the Fisheries Service to practicably minimize any adverse fishing effects on all designated essential fish habitat...........34

  1.   The statutory language and structure are clear. ........................34

  2.   Agency regulations confirm that the statutory obligation to minimize adverse fishing effects applies to any adverse fishing effects and all designated essential fish habitat. ...................................................................................36

B.   The Fisheries Service unlawfully narrowed its evaluation of fishing effects to include only a portion of the designated essential fish habitat and linked minimization of adverse fishing effects to overfished thresholds..........................................................38

  1.   The Fisheries Service cannot limit its review of fishing effects to a subset of "core" essential fish habitat. ...................39

  2.   The Fisheries Service cannot lawfully use the overfished threshold to assess adverse effects on habitat...........................47

IV.   The Court should remand the decision to the Fisheries Service to correct its unlawful analysis. ........................................................53

CONCLUSION...............................................................................................55

CERTIFICATE OF COMPLIANCE FOR BRIEFS ...............................................57

ii

# TABLE OF AUTHORITIES

**CASES**

*A.P. Bell Fish Co. v. Raimondo*,
94 F.4th 60 (D.C. Cir. 2024)...................................................................29

*Alaska Dep't of Fish & Game v. Fed. Subsistence Bd.*,
139 F.4th 773 (9th Cir. 2025) ...........................................................28, 29

*Am. Oceans Campaign v. Daley*,
183 F. Supp. 2d 1 (D.D.C. 2000)....................................7, 16, 30, 31

*Anglers Conservation Network v. Pritzker*,
139 F. Supp. 3d 102 (D.D.C. 2015)....................................................47

*Bates v. United States*,
522 U.S. 23 (1997).................................................................................35

*Corley v. United States*,
556 U.S. 303 (2009).............................................................................50

*E. Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2021) ..............................................................28

*Flaherty v. Bryson*,
850 F. Supp. 2d 38 (D.D.C. 2012)........................................................6

*Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*,
528 U.S. 167 (2000).............................................................................29

*Glacier Fish Co. v. Pritzker*,
832 F.3d 1113 (9th Cir. 2016) .............................................................53

*Hibbs v. Winn*,
542 U.S. 88 (2004)................................................................................51

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2004) ...............................................................27

*Khatib v. Cnty. of Orange*,
639 F.3d 898 (9th Cir. 2011) ...............................................................34

*Lofstad v. Raimondo*,
117 F.4th 493 (3d Cir. 2024) ........................................................6

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ...............................................................28, 29, 33

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...............................................................30, 31

*Meyers v. Birdsong*,
83 F.4th 1157 (9th Cir. 2023) ........................................................34

*Midwater Trawlers Coop. v. Dep't of Com.*,
282 F.3d 710 (9th Cir. 2002) ........................................................28

*Mont. Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ........................................................54

*N.C. Fisheries Ass'n v. Gutierrez*,
518 F. Supp. 2d 62 (D.D.C. 2007)........................................................6

*N.C. Fisheries Ass'n v. Gutierrez*,
550 F.3d 16 (D.C. Cir. 2008)........................................................7

*Nat'l Ass'n of Mfrs. v. Dep't of Def.*,
583 U.S. 109 (2018)........................................................50

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
524 F.3d 917 (9th Cir. 2008) ............................... 28, 33, 39, 49, 52, 53

*Oceana, Inc. v. Bryson*,
940 F. Supp. 2d 1029 (N.D. Cal. 2013)........................................................10

*Oceana, Inc. v. Evans*,
384 F. Supp. 2d 203 (D.D.C. 2005)........................................................8

*Oceana, Inc. v. Ross*,
483 F. Supp. 3d 764 (N.D. Cal. 2020)........................................................47

*Or. Trollers Ass'n v. Gutierrez*,
452 F.3d 1104 (9th Cir. 2006) ........................................................27

*Pit River Tribe v. U.S. Forest Serv.*,
469 F.3d 768 (9th Cir. 2006) ........................................................27

*Pollinator Stewardship Council v. U.S. Env't Prot. Agency*,
  806 F.3d 520 (9th Cir. 2015) ................................................................54

*Pulsifer v. United States*,
  601 U.S. 124 (2024) ...........................................................................50

*Renee v. Duncan*,
  686 F.3d 1002 (9th Cir. 2012) .............................................................31

*United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*,
  837 F.3d 1055 (9th Cir. 2016) ........................................................ 34-35

*Waterkeeper All. v. U.S. Env't Prot. Agency*,
  140 F.4th 1193 (9th Cir. 2025) ...........................................................53


**STATUTES**

5 U.S.C. §§ 701-06 ..................................................................................3

5 U.S.C. § 706(2)(A) ...........................................................................27, 28

5 U.S.C. § 706(2)(C) ...............................................................................28

16 U.S.C. §§ 1801-55 ................................................................................3

16 U.S.C. § 1801(a)(2)(C) .......................................................................49

16 U.S.C. § 1801(a)(5) ............................................................................49

16 U.S.C. § 1801(a)(6) ..............................................................................6

16 U.S.C. § 1801(a)(9) ..................................................................9, 35, 50

16 U.S.C. § 1801(b)(4) ............................................................................49

16 U.S.C. § 1802(10) ...................................................................8, 35, 40

16 U.S.C. § 1802(34) ...............................................................................10

16 U.S.C. § 1851(a)(1) ............................................................................50

16 U.S.C. § 1852(h)(1) ..............................................................................7

16 U.S.C. § 1853(a) ...................................................................................7

16 U.S.C. § 1853(a)(7)......................... 1, 8, 13, 32, 33, 34, 35, 36, 40, 41, 44, 49, 50

16 U.S.C. § 1853(a)(10).................................................................9, 10, 49, 50

16 U.S.C. § 1853(a)(15)...............................................................................49

16 U.S.C. § 1854...........................................................................................6

16 U.S.C. § 1854(a)-(b) ................................................................................6

16 U.S.C. § 1854(e) .........................................................................10, 49, 50

16 U.S.C. § 1855(f)........................................................................................7

16 U.S.C. § 1855(f)(1)-(2) ...........................................................................27

28 U.S.C. § 1291...........................................................................................3

28 U.S.C. § 1331...........................................................................................3

28 U.S.C. § 1361...........................................................................................3

28 U.S.C. § 2201-02......................................................................................3

Fishery Conservation and Management Act of 1976, Pub. L. No. 94-
265, 90 Stat. 331 (1976)...........................................................................7

Sustainable Fisheries Act, Pub. L. No. 104-297, 110 Stat. 3559 (1996)........... 7-8, 9

**REGULATIONS**

50 C.F.R. § 600.310(e)(2)(i)(A)..........................................................50, 51

50 C.F.R. § 600.310(e)(2)(i)(E) ....................................................10, 50, 51

50 C.F.R. § 600.310(e)(2)(i)(F) ....................................................10, 50, 51

50 C.F.R. § 600.310(j) ..................................................................................10

50 C.F.R. § 600.810(a).....................................................................12, 36, 37

50 C.F.R. § 600.815 .............................................................................5, 32

50 C.F.R. § 600.815(a)..............................................................................1, 13

50 C.F.R. § 600.815(a)(1) ................................................................11, 40, 41

50 C.F.R. § 600.815(a)(1)(ii)-(iv)(A) ...........................................................40

50 C.F.R. § 600.815(a)(1)(iv)(A) ................................................................11

50 C.F.R. § 600.815(a)(2) ...................................................................13, 40

50 C.F.R. § 600.815(a)(2)(i) ...........................................................11, 12, 45

50 C.F.R. § 600.815(a)(2)(ii) ....................................... 11, 12, 37, 38, 45, 48

50 C.F.R. § 600.815(a)(10) ........................................................................11

50 C.F.R. § 679.2 ......................................................................................16

## FEDERAL REGISTER NOTICES

62 Fed. Reg. 66531 (Dec. 19, 1997) ...........................................................37

67 Fed. Reg. 2343 (Jan. 17, 2002) .......................... 13, 36, 37, 38, 45, 48

## LEGISLATIVE HISTORY

142 Cong. Rec. H11418-02 (daily ed. Sep. 27, 1996) ...............................9

142 Cong. Rec. S10794-02 (daily ed. Sep. 18, 1996) ...............................9

H.R. 39, 104th Cong. (1995) ......................................................................9

S. 39, 104th Cong. (1996) ..........................................................................9

## RULES

Fed. R. App. P. 4(a)(1)(B)(ii) ....................................................................3

**INTRODUCTION**

At issue in this case is a simple legal question. In the Magnuson Stevens Fishery Conservation and Management Act ("Magnuson Stevens Act"), Congress recognized that sustainable fisheries depend on healthy habitat and therefore required the National Marine Fisheries Service ("Fisheries Service") to identify and protect "essential fish habitat" that is necessary to sustain healthy fish populations throughout all life stages. 16 U.S.C. § 1853(a)(7). To accomplish this, the Act obligates the Fisheries Service to "minimize to the extent practicable adverse effects on [essential fish habitat] caused by fishing . . . ." *Id.* That language is simple and unqualified—it requires evaluating and minimizing *any* adverse fishing effects *on all of the habitat* that has been identified as essential. The Fisheries Service's regulations likewise require the agency to identify essential fish habitat, evaluate the effects of fishing on all of that habitat, and minimize any adverse effects. 50 C.F.R. § 600.815(a). But the process it uses in the North Pacific is unlawful because it allows the agency to determine no adverse effects exist, and thereby avoid its obligation to protect habitat, based on only two criteria that do not ensure consideration of *all* adverse effects on *all* designated habitat.

Essential fish habitat offshore of Alaska includes slow-growing, long-lived coral and sponge gardens that are important for numerous species of fish and crustaceans and are particularly vulnerable to the impacts of trawl fishing. The

1

industrial trawl fisheries that operate off Alaska's coast are some of the largest fisheries in the world, and they scrape, crush, and mow down acres of bottom habitat every year, destroying tons of slow-growing corals and sponges that would otherwise provide homes to fish and invertebrates.

In 2023, the Fisheries Service completed a review of the effects of fishing on essential fish habitat offshore of Alaska. Instead of evaluating in its review how fishing affects *all* of the designated essential fish habitat, as required under the Magnuson Stevens Act and the Fisheries Service's implementing regulations, the Fisheries Service used two main criteria to identify adverse fishing effects: a population indicator that measures when a stock is overfished, and an evaluation of a narrow portion of the designated essential fish habitat. Under this process, if the Fisheries Service did not find adverse effects under these two criteria, it was not required to look any further or take any action to minimize adverse effects. As a result, the agency concluded that there were no adverse effects that required minimization or conservation measures for any of the 103 fish stocks it analyzed.

Neither of the criteria the Fisheries Service relied on is consistent with the language of the Magnuson Stevens Act and the Fisheries Service's implementing regulations. Because it unlawfully narrowed its analysis and relied on inappropriate criteria, the Fisheries Service's conclusion did not satisfy its statutory

2

obligations to identify and minimize adverse effects of fishing on all essential fish habitat and is therefore unlawful under the Administrative Procedure Act ("APA").

## JURISDICTIONAL STATEMENT

Oceana's claims arise under the Magnuson Stevens Act, 16 U.S.C. §§ 1801-55, and the APA, 5 U.S.C. §§ 701-06. 5-ER-838–841. The district court had subject-matter jurisdiction to hear these claims and award appropriate relief under 28 U.S.C. § 1331 (federal question), *id.* § 1361 (mandamus), and *id.* § 2201-02 (declaratory judgment). The district court issued a final order and judgement dismissing Oceana's claims with prejudice on October 6, 2025. 1-ER-39; 1-ER-2.

Oceana filed its timely notice of appeal of the district court's order and judgment on December 5, 2025. 5-ER-895–900; *see also* Fed. R. App. P. 4(a)(1)(B)(ii). This Court has jurisdiction over Oceana's appeal of the district court's final order and judgment, which dispose of all claims, under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Can the Fisheries Service meet its obligation under the Magnuson Stevens Act to minimize, where practicable, any adverse effects from fishing to all designated essential fish habitat, if it evaluates fishing effects on only *some* of the designated habitat as one of two main criteria for determining whether adverse effects exist?

3

2.       Can the Fisheries Service meet its obligation under the Magnuson Stevens Act to minimize, where practicable, all adverse effects to all designated essential fish habitat by using an overfished threshold that signifies the crash of a fish population as the other of the two main criteria for determining whether adverse effects exist?

**STATEMENT REGARDING ADDENDUM**

All pertinent statutes and regulations are set forth in the addendum to this brief.

**STATEMENT OF CASE**

The action challenged in this litigation is the Fisheries Service's approval of five amendments to management plans for the federally managed groundfish, crab, and salmon fisheries in the Bering Sea and Aleutian Islands, Gulf of Alaska, and Arctic Ocean. 2-ER-182. The amendments are the conclusion of the Fisheries Service's five-year review of the components of those fishery management plans that identify and protect habitat essential for 103 fish stocks affected by the fisheries. As described below, in the five-year review, the Fisheries Service must review its description and identification of essential fish habitat for all fish stocks; evaluate the effects of fishing on all of the identified essential fish habitat to determine whether there are any adverse effects; minimize, to the extent practicable, any adverse effects to the identified essential fish habitat; and review

4

and update other essential fish habitat components of the plans. *See* 50 C.F.R. § 600.815. It is the second step of that process—the evaluation and determination of adverse fishing effects on essential fish habitat—that is at issue in this case.

The Fisheries Service evaluated the effects of fishing on essential fish habitat by considering disturbance to only a limited portion of the stock's designated essential fish habitat and looking at whether the stock was above or below its overfished threshold (referred to as the "minimum stock size threshold" or "MSST"). If, under these two criteria, the Fisheries Service determined that there were no adverse effects from fishing, the process it used did not require it to look any further or take any action to minimize effects. Even if a stock failed one of the two criteria (*i.e.*, there were adverse effects to a sufficient portion of the habitat the Fisheries Service considered, or the stock was overfished), the agency was not obligated under this process to adopt, and in this case did not adopt, minimization measures. Instead, it considered other information, such as life history parameters, to determine whether, even in the face of failing the primary tests for adverse effects, the agency could nevertheless avoid considering practicable minimization measures. Based on that evaluation, it adopted amendments that simply updated information and scientific references describing essential fish habitat, but did not take any action to minimize fishing effects or otherwise protect habitat. 2-ER-182.

## I.      Statutory and regulatory framework

### A.      The Magnuson Stevens Act and the 1996 Sustainable Fisheries Act amendments

The Fisheries Service is responsible for managing the federal fisheries at issue in this case under the Magnuson Stevens Act, with the North Pacific Fisheries Management Council ("Council") acting as an advisory body. 16 U.S.C. § 1854; *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 54 (D.D.C. 2012) (Magnuson Stevens Act gives the Fisheries Service "final responsibility for ensuring any [fishery management plan] is consistent with . . . the overall objectives of the Act" (citing *N.C. Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 71-72 (D.D.C. 2007)); *see also Lofstad v. Raimondo*, 117 F.4th 493, 500 (3d Cir. 2024) (explaining that councils may only constitutionally exercise advisory powers).[1] Among the overarching purposes of the Magnuson Stevens Act is to create a "program for the conservation and management" of fishery resources, including ensuring conservation of fish stocks and protecting essential fish habitats. 16 U.S.C. § 1801(a)(6). To that end, the Council and the Fisheries Service develop

---

[1] While the Council assists in preparation of fishery management plans, evaluating effects of fishing on essential fish habitat, and making recommendations to protect that habitat, the Fisheries Service adopts regulations implementing those measures and ensures that fisheries management decisions comply with the law. *See* 16 U.S.C. § 1854(a)-(b). Because the Fisheries Service is the final decisionmaker, in this brief, "Fisheries Service" is used regardless of whether the regulations assign a duty to the Fisheries Service or the Council.

6

fishery management plans that describe the regulated fish stocks and their essential habitat, set rules to prevent overfishing and conserve and enhance essential habitat, and establish how the fishery will comply with other Magnuson Stevens Act requirements. *See id.* §§ 1852(h)(1), 1853(a). The Fisheries Service's approval of a fishery management plan or an amendment to a plan is subject to judicial review under the APA. *Id.* § 1855(f); *Am. Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 11 (D.D.C. 2000) (Secretary's approval of essential fish habitat amendments constitute "rules" under the APA and are reviewable actions); *N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) (Fisheries Service's actions to implement fishery management plans are subject to judicial review).

Among the Magnuson Stevens Act's most fundamental mandates is an obligation to protect habitat from the effects of fishing and from other detrimental activities. When Congress passed the original legislation in 1976, its conservation requirements focused mainly on overfishing as the driver of declining fish populations. *See* Fishery Conservation and Management Act of 1976, Pub. L. No. 94-265, 90 Stat. 331 (1976) (codified at 16 U.S.C. § 1801(a)(2)-(6)). In the 1996 Sustainable Fisheries Act, however, Congress overhauled the Magnuson Stevens Act to prioritize protecting habitat, recognizing that loss and degradation of habitat by fishing and other activities was a separate, and equally critical, threat to fish populations. *See* Sustainable Fisheries Act, Pub. L. No. 104-297, § 101, 110 Stat.

7

3559, 3560-61 (1996) (codified at 16 U.S.C. § 1801); *see also Oceana, Inc. v. Evans,* 384 F. Supp. 2d 203, 237 (D.D.C. 2005), *order clarified*, 389 F. Supp. 2d 4 (D.D.C. 2005) (the Sustainable Fisheries Act "amended the [Magnuson Stevens Act] to make protection of [essential fish habitat] a priority").

To that end, the Sustainable Fisheries Act added the concept of "essential fish habitat," defined as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1802(10). It also added a requirement for the Fisheries Service to "describe and identify essential fish habitat" and then "minimize to the extent practicable adverse effects on such habitat caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat." *Id.* § 1853(a)(7).

The language Congress adopted is clear. The Fisheries Service must identify essential fish habitat, and once that habitat is identified, it must evaluate whether there are any adverse fishing effects to any of the identified habitat so that it can minimize those effects to the extent practicable. This mandate sets a low bar for determining whether there are adverse effects. It does not limit the requirement to only those effects that are significant or result in population declines, but requires the Fisheries Service to take practicable actions to minimize *all* adverse effects to *all* of the identified essential fish habitat.

8

This is consistent with Congress's finding in adopting the amendments that "[o]ne of the greatest long-term threats to the viability of commercial and recreational fisheries is the continuing loss of marine, estuarine, and other aquatic habitats." *Id.* § 1801(a)(9). To address those threats, Congress directed that "[h]abitat considerations should receive increased attention for the conservation and management of fishery resources of the United States." *Id.* Notably, both the House and the Senate recognized the central importance of conserving fish habitat in their respective bills to amend the Magnuson Stevens Act. *See* H.R. 39, 104th Cong. (1995) & S. 39, 104th Cong. (1996) (enacted). As one of the Senate bill sponsors summarized: "[I]f you destroy the habitat, you destroy the nurseries and you destroy the ecosystem on which those nurseries are dependent, which then diminishes the ability to have a sustainable fishery." 142 Cong. Rec. S10794-02, S10812 (daily ed. Sep. 18, 1996) (statement of Sen. Kerry). Similarly, Representative Gilchrest explained, "If we did not include [the habitat provisions] into the legislation, even if we had all the best regulations concerning the coastal fisheries possible, we could still lose, without protecting the habitat where the fish spawn." 142 Cong. Rec. H11418-02, H11443 (daily ed. Sep. 27, 1996).

In the same set of amendments, Congress also strengthened the requirements to prevent overfishing and rebuild overfished stocks. *See* Pub. L. No. 104-297, §§ 109(a)(5), 110(e) (1996) (adding 16 U.S.C. § 1853(a)(10) and amending

9

§ 1854(e) related to overfishing and rebuilding plans). Overfishing is "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34). In the 1996 amendments, Congress required the Fisheries Service to establish objective, measurable criteria to define when overfishing is happening and mandated rebuilding plans to end overfishing and ensure that overfished stocks recover as quickly as possible. *Id.* § 1853(a)(10); *see also* 50 C.F.R. § 600.310(j). Under the criteria the Fisheries Service has adopted, a stock is overfished when it drops below its minimum stock size threshold ("MSST" or "overfished threshold"), 50 C.F.R. § 600.310(e)(2)(i)(E), defined as "the level of biomass below which the capacity of the stock or stock complex to produce [maximum sustainable yield] on a continuing basis has been jeopardized." *Id.* § 600.310(e)(2)(i)(F); *see also Oceana, Inc. v. Bryson*, 940 F. Supp. 2d 1029, 1037 (N.D. Cal. 2013). Within two years of identifying a fishery as overfished or at risk of overfishing, the Fisheries Service and the Council must prepare a fishery management plan, amendment, or proposed regulations to prevent overfishing or to end it immediately. 16 U.S.C. § 1854(e).

Thus, Congress recognized two separate threats to fisheries in the Sustainable Fisheries Act amendments: overfishing, measured with reference to an overfished threshold, and destruction of habitat. It directed the Fisheries Service to

10

prioritize action addressing each of these threats and set a low bar that triggers the obligation for the Fisheries Service to adopt practicable measures to protect *all* of the habitat it identifies as essential fish habitat from *all* adverse effects.

**B.      Regulatory requirements for designating and protecting essential fish habitat**

To implement Congress's directives in the Magnuson Stevens Act, the Fisheries Service adopted regulations that set out sequential requirements for meeting the obligation to protect habitat from fishing.  First, the Fisheries Service must identify, describe, and map the habitat that is essential for each stock. 50 C.F.R. § 600.815(a)(1).  Second, it must evaluate the adverse effects of fishing on all of the identified essential fish habitat.  *Id.* § 600.815(a)(2)(i).  Third, it must minimize to the extent practicable adverse effects from fishing on the identified habitat.  *Id.* § 600.815(a)(2)(ii).

At the first step, the Fisheries Service must determine which habitat is essential for each life stage (*e.g.*, spawning, juvenile, adult) of a managed species, and then identify and describe that habitat in the fishery management plan.  To do so, it analyzes ecological, environmental, and fisheries data and "assess[es] the relative value of habitats."  *Id.* § 600.815(a)(1)(iv)(A).  It must review and update those descriptions, along with all the other essential fish habitat components of the fishery management plans, at least once every five years.  *Id.* § 600.815(a)(10).

11

At the second step, after the Fisheries Service has designated essential fish habitat, it must evaluate whether there are adverse fishing effects on that designated habitat. The Fisheries Service's regulations, consistent with the Magnuson Stevens Act, set a low bar for the initial determination of whether an effect is adverse. Under the regulations, an "adverse effect" is:

> *any impact that reduces quality and/or quantity of [essential fish habitat].* Adverse effects may include direct or indirect physical, chemical, or biological alterations of the waters or substrate and loss of, or injury to, benthic organisms, prey species and their habitat, and other ecosystem components, if such modifications reduce the quality and/or quantity of [essential fish habitat].

*Id.* § 600.810(a) (emphases added). To evaluate potential adverse effects, the Fisheries Service "should consider the effects of each fishing activity" on essential fish habitat and "provide conclusions regarding whether and how each fishing activity adversely affects" that habitat. *Id.* § 600.815(a)(2)(i).

Finally, if the Fisheries Service's evaluation shows evidence that fishing is adversely affecting essential fish habitat, the agency must take practicable steps to minimize those effects. The regulations broadly require the Fisheries Service to "prevent, mitigate, or minimize *any* adverse effects from fishing, to the extent practicable, if there is evidence that a fishing activity adversely affects [essential fish habitat] in a manner that is more than minimal and not temporary in nature." *Id.* § 600.815(a)(2)(ii) (emphasis added). As the Fisheries Service explained when

12

it adopted the regulations, the "more than minimal and not temporary" language is intended to clarify that changes that are merely "inconsequential" do not require minimization. *See* 67 Fed. Reg. 2343, 2354 (Jan. 17, 2002). Thus, if the Fisheries Service finds evidence of *any* adverse effects from fishing that are not inconsequential, it must identify and consider a range of measures to minimize those impacts and adopt any that are practicable. 16 U.S.C. § 1853(a)(7); 50 C.F.R. § 600.815(a)(2).[2]

## II. Benthic habitat and the adverse impacts of fisheries

The federally managed fisheries offshore of Alaska include large industrial trawl fisheries that drag giant nets across the seafloor (bottom trawls) or through the water column (pelagic trawls). Both types of trawls frequently scrape the seafloor and can be more than two times the length of a football field. *See* 3-ER-377–378 (Gulf of Alaska trawl gear 193 meters wide); 3-ER-380 (Bering Sea trawl gear 259 meters wide). This can crush and damage the seafloor and the fish, crustaceans, and structure-forming animals that live there, including sponges, corals, sea pens, and sea whips. 5-ER-817; 2-ER-60–75. Coral and sponge gardens provide immense ecological value and vital support to crustaceans and fish

---

[2] In addition to considering the effects of fishing on essential fish habitat, the Fisheries Service must include several other components related to the protection of essential fish habitat in its fishery management plans and five-year reviews. 50 C.F.R. § 600.815(a).

13

at various life stages for breeding, spawning, feeding, sheltering, and growth. 3-ER-396 ("Seafloor habitat features create structural complexity, providing protection from predators and forage opportunities for benthic organisms."); 3-ER-311–315 (hard corals especially important habitat based on their large size and long life spans); 4-ER-487 (juvenile fish and crabs use coral habitat as refuge and for feeding); 3-ER-314 (sea whips provide food and shelter to Pacific ocean perch); 3-ER-315 (sea onions provide habitat for juvenile red king crab).

Of all federal fisheries, the groundfish pelagic and bottom trawl fisheries are the most damaging to seafloor habitat. Both types of trawls are dragged along the seafloor. Although pelagic trawls are sometimes referred to as "midwater" trawls, the Fisheries Service estimates that 40 to 100 percent of the width of a pelagic trawl can be in contact with the seafloor for the full duration of a tow, 3-ER-411, 3-ER-423; 3-ER-377 (contact adjustments for pelagic trawls, designated "PTR," in the Gulf of Alaska ranging up to 100 percent); *see also* 3-ER-292 (acknowledging that "pelagic trawls are sometimes fished on the bottom"). Fishing "change[s] the abundance or availability of certain habitat features (e.g., prey availability or the presence of living or non-living habitat structure) used by managed fish species to accomplish spawning, breeding, feeding, and growth to maturity." 2-ER-78. Trawl fisheries scrape up and damage fragile corals, sponges, and other epifauna by crushing, burying, exposing, or completely

14

removing them, which degrades the structure and diversity of the seafloor. *See, e.g.*, 2-ER-174–175; 4-ER-494; 3-ER-396–397.

In addition to destroying and pulling up epifauna, trawl gear smooths the seafloor, flattening the landscape. 4-ER-494. Gear research studies have shown that the first pass of a bottom trawl has the most harmful effect on benthic habitat. 3-ER-305; 2-ER-112 (about 27 percent of original hard coral volume was removed by a single trawl tow).

This damage can take centuries to repair. Some corals, for example, are very long-lived and can take over 100 years to reach their full size. *See* 3-ER-299 (gorgonian corals are "very long-lived, easily damaged by fishing gear, and slow to recover"); *see also* 3-ER-311–312 (red tree corals, common in the Gulf of Alaska, may live over 100 years); 4-ER-485 (medium-sized coral aged at 112 years in the Gulf of Alaska); 4-ER-515 (corals and sponges have long recovery times); 4-ER-522 (same).

Despite the importance of benthic habitat for fish and crab populations, and the harms that trawling causes to this habitat, trawling is broadly permitted offshore in the Gulf of Alaska. For instance, only about nine percent of the central and western Gulf of Alaska is protected year-round from bottom trawls. 2-ER-45; 2-ER-152 (map showing most of the western and central Gulf of Alaska open to bottom trawling). None of these Gulf of Alaska habitat conservation areas are

protected from pelagic trawls, even though the Fisheries Service acknowledges that these trawls also sweep and damage the seafloor. *See* 2-ER-152–153 (closures apply to bottom contact gear and nonpelagic trawls); 50 C.F.R. § 679.2 ("Bottom contact gear means nonpelagic trawl, dredge, dinglebar, pot, or hook-and-line gear.").

## III. Essential fish habitat in Alaska

### A. The Fisheries Service's prior actions on essential fish habitat

The Fisheries Service first attempted to carry out the essential fish habitat mandates of the Magnuson Stevens Act in 1998, 3-ER-298, but that effort was challenged and found unlawful in *American Oceans Campaign*, 183 F. Supp. 2d at 20-21. *See also* 2-ER-41. As a result, the Fisheries Service completed an environmental impact statement in 2005, 3-ER-286, to "examine "how fishing practices and gear may damage corals, disrupt fish habitat, and destroy benthic life that helps support healthy fish populations." *Am. Oceans Campaign*, 183 F. Supp. 2d at 20-21. It has reviewed and revised the essential fish habitat components of its fishery management plans three times since then, in 2010, 2017, and 2023. 2-ER-192–193.

From its first actions in 2005, the Fisheries Service has recognized the importance of benthic habitat to federally managed fisheries in Alaska by designating large portions of these seafloor ecosystems as essential fish habitat for

16

a variety of fish stocks under the relevant fishery management plans. Nearly the entire Gulf of Alaska has been designated as essential fish habitat for one or more of the 46 stocks or stock complexes managed under the Gulf of Alaska fishery management plan. 2-ER-197; *see also* 2-ER-201 ("almost all waters are identified as [essential fish habitat] for at least one species"). The Fisheries Service's essential fish habitat descriptions for several types of rockfish, Atka mackerel, Pacific ocean perch, crab, and octopus, all recognize the importance of sea whips, hard and soft corals, sea anemones, and sponges for sustaining these species. 5-ER-671–672 (yelloweye rockfish); 5-ER-673 (sharpchin rockfish); 5-ER-677– 678 (Atka mackerel); 5-ER-680–681 (dusky rockfish); 5-ER-682–683 (northern rockfish); 5-ER-684–687 (octopus); 5-ER-688–689 (yelloweye rockfish); 5-ER-690 (pygmy rockfish); 5-ER-692–694 (Pacific ocean perch); 5-ER-695–697 (rougheye and blackspotted rockfish); 5-ER-698–700 (shortraker rockfish); *see also* 4-ER-636 (all Bering Sea and Aleutian Island crab species associated with corals); 4-ER-654–656 (showing coral associations for several species of rockfish, Atka mackerel, and Pacific ocean perch).

The Fisheries Service has long acknowledged that fishing causes impacts to essential fish habitat. In the 2005 essential fish habitat environmental impact statement, for example, the Fisheries Service recognized that fishing, and trawling in particular, can "alter or remove physical and biological structures, as well as

17

other organisms. These changes may affect the ability of fish to use these as prey, shelter from predators, spawning substrate or for other functions." 3-ER-318; *see also* 3-ER-327a (pelagic trawls in contact with bottom will likely damage animals anchored in the benthic substrate). In that review, the Fisheries Service recognized that fishing causes "persistent disturbance to certain habitats," 3-ER-282, and long-term effects on benthic features, 2-ER-202.

Despite having found these long-term, persistent effects in its 2005 review, the Fisheries Service concluded that those effects were minimal, and hence required no action to address them. The Fisheries Service explained that the effects "are minimal because the analysis found no indication that continued fishing activities at the current rate and intensity would alter the capacity of [essential fish habitat] to support healthy populations of managed species over the long term." 2-ER-202. Subsequent reviews have not resulted in different findings about the effects of fishing on habitat. 2-ER-190.

**B.    The 2023 five-year essential fish habitat review**

At issue in this case is the most recent review of essential fish habitat for Alaska's federal fisheries, completed in 2023 and implemented through fishery management plan amendments adopted in July 2024 ("2023 review"). 2-ER-182–183. As with each prior five-year review, the Fisheries Service evaluated whether fishing was adversely affecting designated essential fish habitat, and did so using a

"fishing effects analysis." The central steps of that analysis asked two questions: (1) was the stock overfished (below its MSST), and, if it was not, (2) was more than ten percent of what the Fisheries Service deemed the "core" essential fish habitat adversely affected by fishing? If the answer to both of those questions was no, the Fisheries Service could determine that there were no adverse fishing effects based on these two inquiries alone; its process did not require consideration of any other information, including any effects on the remaining non-"core" designated essential fish habitat. 3-ER-356–357. If the answer to either question was yes, the Fisheries Service considered other information, but even in those circumstances it did not use this additional information to evaluate whether there were adverse fishing effects to designated essential fish habitat outside of the "core" area. 3-ER-356–357. Instead, it used these additional considerations to rule out minimizing adverse effects even when a stock failed the first two criteria. 3-ER-357 (describing additional analysis used to assess whether overfishing or disturbance to the "core" essential fish habitat warranted considering minimization measures).

The following Fisheries Service graphic illustrates its approach to evaluating the effects of fishing on essential fish habitat.

19



2-ER-91 ("CEA" means core essential fish habitat area).

Under the first step, the Fisheries Service considered whether the stock was overfished (below MSST). 3-ER-385. Although not described in the graphic, even if the stock was overfished, Fisheries Service analysts did not have to recommend mitigation. They first assessed whether the stock's collapse was correlated with habitat degradation. 3-ER-357; 2-ER-103. If it was, the analysts could recommend minimization measures. 2-ER-103; 3-ER-356–357.

For stocks that were not overfished, or for which the Fisheries Service had not established an overfished threshold, the agency proceeded to the next step, by looking at the effects of fishing on a limited *subset* of the designated essential fish habitat. 2-ER-229; 3-ER-384. The Fisheries Service called this subset the "core" essential fish habitat, defined as the portion of the essential fish habitat where half of the adult population occurs in the highest abundance during the summer.

20

3-ER-384; 4-ER-626 (defining quantiles of essential fish habitat). This area was generally about half of the designated adult summer habitat and may not include habitat designated for other life stages or other seasons. *See, e.g.*, 5-ER-821 (showing more extensive essential fish habitat for subadult rougheye blackspotted rockfish than for adults). For example, in the map below, all four colors combined depict the area the Fisheries Service designated as essential for spiny dogfish, but habitat impacts only needed to be assessed under the agency process in the green and yellow "core" areas. Under the agency's process, fishing impacts to the blue and purple areas did not need to be considered at all, even though the Fisheries Service also designated those areas as essential fish habitat.



21

4-ER-629.

The Fisheries Service evaluated fishing effects to this limited portion of the essential fish habitat by estimating whether trawling and other fishing was causing significant, lasting damage to more than ten percent of the habitat in that limited "core" area. 4-ER-629. If habitat disturbance (in other words, adverse fishing effects) within the "core" area did not exceed ten percent, no further analysis was required under the Fisheries Service's process. The Fisheries Service used ten percent because it made an "assumption" that impacts below that threshold "represented minimal disturbance." 3-ER-389; 2-ER-92. Even when the Fisheries Service found evidence that more than ten percent of the "core" area was disturbed, or adversely affected, by fishing, it did not recommend minimization measures. Instead, it considered the stock's life history parameters to decide whether to minimize that disturbance. 3-ER-357.

Fisheries Service analysts could also choose to consider other information for stocks below ten percent disturbance to the "core" area or for which there were data limitations, but this analysis was not required under the Fisheries Service's process. *See* 3-ER-356–357; 3-ER-263.

In the 2023 five-year review, the Fisheries Service assessed fishing impacts to habitat for 103 stocks. 3-ER-358. Of those, 87 stocks did not exceed ten percent habitat disturbance to the "core" half of the essential fish habitat, and 101

22

stocks were above their MSST, or overfished threshold (meaning they were not overfished). 3-ER-359, 3-ER-362–367, 3-ER-373. Thus, no analysis beyond "core" essential fish habitat and overfished thresholds was required for the vast majority of the stocks assessed. *See* 3-ER-263 (explaining that additional analysis was requested "in three situations: if [the] stock is below the minimum stock size threshold (MSST), if the estimated habitat disturbed by fishing in the ["core" essential fish habitat] was ≥ 10%, and/or if [the analyst] preferred a qualitative analysis of the effects of fishing on their species' habitat rather than the quantitative assessment."). The Fisheries Service did not recommend minimization measures to address adverse fishing effects for any of the 103 stocks, not even the 16 stocks that exceeded ten percent disturbance to "core" essential habitat or the two that fell below their overfished threshold. 3-ER-359.

Throughout the five-year review process, Oceana submitted comments to the Council and the Fisheries Service raising concerns about the fishing effects evaluation. In particular, Oceana argued that the fishing effects evaluation ignored important habitat, did not accurately represent the effects of fishing on sensitive corals, relied on inappropriately narrow areas to assess habitat disturbance, used the overfished threshold to unlawfully avoid minimizing adverse fishing effects that did not cause population-level harm, and failed to consider conservation and enhancement measures. *See, e.g.*, 2-ER-151; 3-ER-401–418; 3-ER-419–422;

23

3-ER-434; 3-ER-438–441; 4-ER-463–464. Oceana also offered a proposal to freeze the footprint of bottom trawling in the Gulf of Alaska to protect corals and other fragile benthic habitat from the adverse effects of fishing. 2-ER-43–57. The proposal would have protected 90 percent of the Gulf of Alaska, while displacing only five percent of current trawl fishing. 2-ER-43.

The Council and the Fisheries Service ignored Oceana's concerns and its proposal, instead adopting a final action that updated essential fish habitat maps, but made no changes to mitigation measures and did not consider any additional conservation and enhancement measures. 2-ER-182–183; 2-ER-197–198, 2-ER-204.

## IV. Procedural history

The Fisheries Service adopted the final action amending five fishery management plans for federal fisheries and fish resources in the Bering Sea, Aleutian Islands, Gulf of Alaska, and the Arctic Ocean on July 19, 2024. 2-ER-182. Oceana filed a timely complaint challenging that action in Alaska district court on August 16, 2024. 5-ER-870–894. In the district court, Oceana challenged the Fisheries Service's fishing effects analysis as inconsistent with the Magnuson Stevens Act's requirements to evaluate adverse effects from fishing on all essential fish habitat, and the agency's failure to meet its separate obligation to conserve and enhance essential fish habitat. 4-ER-549–555. Oceana also argued

24

that the analysis was arbitrary because the agency failed to consider available evidence about coral depths and recovery times and information about habitat use of all life stages, and violated the National Environmental Policy Act by failing to consider a reasonable range of alternatives. 4-ER-555–562. The district court issued a decision on September 30, 2025, that deferred to the Fisheries Service and dismissed all of Oceana's claims. 1-ER-3–39.

Oceana timely filed a notice of appeal on December 5, 2025. 5-ER-896. On appeal, Oceana is pursuing only the argument that the Fisheries Service's method of evaluating adverse effects was inconsistent with the language and structure of the Magnuson Stevens Act.

**SUMMARY OF ARGUMENT**

The two main criteria the Fisheries Service used in the 2023 review for determining whether there were adverse fishing effects to essential fish habitat—one that considered only a limited subset of the designated essential fish habitat, and one that used overfished thresholds, a measure of stock population collapse—are inconsistent with the plain language and structure of the Magnuson Stevens Act. The first is unlawful because it does not meet the Magnuson Stevens Act's requirement to evaluate adverse fishing effects to *all* designated essential fish habitat. Instead, it focuses on only *some* of the designated habitat: the limited portion the Fisheries Service deems the "core" essential fish habitat. By limiting

25

its evaluation to only this narrow portion of the adult summer habitat, the Fisheries Service failed to consider whether there was damage to designated habitat areas outside the "core" area even though these non-"core" areas—areas the Fisheries Service apparently deemed non-essential essential fish habitat—may include habitat important for other life stages or fragile features like corals and sponges that take centuries to recover.

The second criteria is unlawful because using a measure of stock collapse as a trigger for minimizing adverse fishing effects conflates the Fisheries Service's obligation to address habitat degradation with its obligation to prevent overfishing, two distinct threats that are separately addressed under the Magnuson Stevens Act. Neither the statute nor the regulations permit the agency to decline—as it did here—to address adverse effects on designated habitat until the stock that relies on that habitat has collapsed.

Under the Fisheries Service's approach to evaluating adverse fishing effects, it could decline to consider any minimization measures on the basis of these two criteria alone. For most stocks, only if one of the two criteria were triggered did the Fisheries Service even consider minimizing adverse fishing effects. And even then, it first considered a stock's life history parameters to determine whether those criteria indicated adverse effects that should be minimized. It did not consider this

26

other information to evaluate whether there are adverse effects to the remaining non-"core" designated essential fish habitat.

Because it did not evaluate the effects of fishing on all essential fish habitat and used stock collapse as a substitute for an evaluation of habitat degradation, the Fisheries Service's did not meet its statutory duty to identify *any* adverse effects of fishing on *all* designated essential fish habitat. Its resulting decision that there were no adverse effects requiring minimization was therefore not in accordance with the law under the APA and the Magnuson Stevens Act. The Court should remand to the agency for a new analysis and decision consistent with the statute.

## ARGUMENT

### I.    Standard of review

This Court reviews a district court's summary judgement decision de novo. *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 778 (9th Cir. 2006).

Judicial review of agency decisions under the Magnuson Stevens Act is governed by the APA's standard of review. 16 U.S.C. § 1855(f)(1)-(2); *Or. Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1116 (9th Cir. 2006). An agency's actions violate the APA if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 638 (9th Cir. 2004).

The issues on appeal are legal questions that relate to the meaning of the Magnuson Stevens Act and whether the agency action met the statutory obligation. When reviewing legal questions, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and must use the traditional tools of statutory interpretation to find the "single, best meaning" of the statute. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13, 400-01 (2024); *see also Alaska Dep't of Fish & Game v. Fed. Subsistence Bd.*, 139 F.4th 773, 781 (9th Cir. 2025). An agency action that is inconsistent with a statute is unlawful, or "not in accordance with law" under the APA. 5 U.S.C. § 706(2)(A); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 927-29 (9th Cir. 2008) (affirming district court holding that agency action inconsistent with statute and implementing regulations is unlawful under APA); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 975-76 (9th Cir. 2021) (finding agency rule that was inconsistent with a statute was thus "not in accordance with law" and "in excess of statutory . . . limitations") (quoting 5 U.S.C. § 706(2)(A), (C)); *Midwater Trawlers Coop. v. Dep't of Com.*, 282 F.3d 710, 720-21 (9th Cir. 2002) (finding agency's fishery allocation decision unlawful under the APA because it conflicted with the Magnuson Stevens Act).

The district court erred by applying a deferential standard of review to the question of whether the two primary criteria the Fisheries Service used to identify

28

damage to habitat were consistent with the language of the Magnuson Stevens Act. 1-ER-31, 1-ER-32 (noting, with respect to the overfished threshold argument, that "deference is at its highest when reviewing" technical issues, and, with respect to core essential fish habitat argument, that agency's decision "is also entitled to substantial deference"). Whether an agency acts within its statutory authority is a question of law reviewed de novo. *Alaska Dep't of Fish & Game*, 139 F.4th at 781. The Court, on appeal, should apply its independent judgment to review the question and find the "best meaning" of the statute. *Loper Bright Enters.*, 603 U.S. at 400-01, 412-13; *see also A.P. Bell Fish Co. v. Raimondo*, 94 F.4th 60, 64 (D.C. Cir. 2024) ("in reviewing agency action directly," a court "affords no particular deference to the district court's view of the law" (citation modified)).

## II. Oceana has standing.

The district court correctly held that Oceana has standing to bring this case. *See* 1-ER-28. Oceana's members have standing in their own right, their interests are germane to Oceana's organizational purpose, and the lawsuit does not require the participation of its individual members. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180-81 (2000). Oceana's mission is to protect and restore ocean habitat, including through the conservation of essential fish habitat. 4-ER-564, 4-ER-565–566. Its members include "conservationists, fishermen, subsistence harvesters, scientists, and other ocean enthusiasts" who rely

29

on Oceana to advocate for their interests. 4-ER-564. The Fisheries Service's unlawful analysis harms Oceana's members' "aesthetic, environmental, and recreational interests" because, had it applied a lawful analysis, it might have chosen to adopt measures more protective of habitat important to Oceana's members. *See Am. Oceans Campaign*, 183 F. Supp. 2d at 9-10.

To prove standing, Plaintiffs must show: "(1) they have suffered a concrete, personal, and particularized injury in fact to a legally protected interest; (2) a causal connection between the injury and the action of the defendant, fairly traceable to the challenged action; and (3) a likelihood, as opposed to mere speculation, that the injury will be redressed by a favorable decision." *Id.* at 9 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Oceana's members and supporters live near and rely on areas of the North Pacific that are identified as essential fish habitat under the fisheries management plans at issue in this litigation. They boat, fish, scuba dive, conduct research, and enjoy observing coral gardens and watching marine mammals and seabirds in areas of the North Pacific ranging from Southeast Alaska to Dutch Harbor. *See* 4-ER-571–581; 4-ER-588–592; 4-ER-598–600. The fish and marine resources that Oceana's members harvest, including sablefish, crab, salmon, rockfish, and halibut, use a variety of habitats throughout their lives, including seamounts, corals, and nearshore and offshore waters. *See, e.g.*, 5-ER-675–676, 5-ER-671–

30

673; 4-ER-634–635; 2-ER-142; 2-ER-126, 2-ER-131, 2-ER-136, 2-ER-147; 3-ER-307, 3-ER-309.

The Fisheries Service's failure to adequately analyze the effects of fishing on these areas and its corresponding failure to consider any measures to minimize adverse fishing effects to these habitats harms Oceana's members and supporters. Continued trawling in essential fish habitat harms their interests in viewing healthy coral gardens, marine mammals and other ocean life, and in harvesting fish and other species to feed their families. *See, e.g.*, 4-ER-581–582, 4-ER-585–587; 4-ER-590–591, 4-ER-592–597; 4-ER-599–601.

These harms constitute concrete injury in fact, are fairly traceable to the actions taken by the Fisheries Service and challenged in this litigation, and are likely to be redressed by the relief sought. *See* 1-ER-28 (district court opinion finding that Oceana has standing); *see also Lujan*, 504 U.S. at 560-61; *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) ("Plaintiffs need not demonstrate that there is a guarantee that their injuries will be redressed by a favorable decision.") (citation modified); *Am. Oceans Campaign*, 183 F. Supp. 2d at 9-10 (finding harm to members' "aesthetic, environmental, and recreational interests" because of the Fisheries Service's failure to protect essential fish habitat).

**III.    The Fisheries Service violated the Magnuson Stevens Act by using a fishing effects analysis that is inconsistent with the plain language of the statute.**

The Magnuson Stevens Act and its implementing regulations require the Fisheries Service to (1) identify and designate essential fish habitat, (2) evaluate if there are any adverse fishing effects on any of that habitat, and (3) take practicable measures to minimize any adverse fishing effects on any of that habitat.  *See* 16 U.S.C. § 1853(a)(7); 50 C.F.R. § 600.815.  This case does not concern the first step, designation of essential habitat.  The only issue is what the agency, having designated those areas, must do to protect them from any adverse effects of fishing.  On this, both the statute and the agency's regulations are clear—and they do not permit the type of analysis that the Fisheries Service conducted here.

The statute and regulations establish a low bar for identifying and minimizing harm to all designated habitat:  any adverse fishing effects must be minimized to the extent practicable—not just significant effects or those large enough to cause a fish population collapse—and the obligation to minimize applies to all designated essential fish habitat, not just half, or a limited portion of it.  *See supra* pp. 7-13.  Contrary to the plain language of the statute, the Fisheries Service in its review of fishing effects on essential fish habitat used two criteria that set an impermissibly high bar that allowed the agency to conclude there are no adverse fishing effects if it answered "no" to two questions:  (1) has the population

32

collapsed, and (2) has there been significant damage to the limited part of the designated essential fish habitat the Fisheries Service chose to look at? These criteria are inconsistent with the plain language and structure of the Magnuson Stevens Act and therefore unlawful. *See* 16 U.S.C. § 1853(a)(7) (requiring practicable minimization of adverse fishing effects on identified essential fish habitat); *see also Nat'l Wildlife Fed'n,* 524 F.3d at 927-29 (agency action inconsistent with a statute and implementing regulations was unlawful under APA). By following this unlawful process for determining whether there were adverse fishing effects, the agency avoided its obligation to adopt practicable minimization measures limiting the effect of fishing on essential fish habitat.

Importantly, the scope of the required analysis is not an issue involving scientific debate where a court might defer to an agency; it is a legal question the court can resolve. *See Loper Bright Enters.*, 603 U.S. at 412-13 (requiring that courts not defer to agencies in determining statutory obligations). The statute does not allow the Fisheries Service to evaluate fishing effects on habitat by asking whether a stock is overfished. Nor does it allow the Fisheries Service to completely ignore adverse effects on much of the habitat the agency has already designated essential.

33

**A.** **The Magnuson Stevens Act and implementing regulations require the Fisheries Service to practicably minimize any adverse fishing effects on all designated essential fish habitat.**

**1.** **The statutory language and structure are clear.**

In the Magnuson Stevens Act and Sustainable Fisheries Act amendments, Congress recognized the importance of habitat, separate and apart from fishing pressure, to support healthy fish stocks and required proactive protection of habitat the agency deems essential for fish stocks. *See supra* pp. 7-10. Accordingly, it required the Fisheries Service to consider measures to minimize, where practicable, *any* adverse effects to *all* designated essential fish habitat.

Under the Magnuson Stevens Act, the Fisheries Service must "minimize to the extent practicable adverse effects on [essential fish habitat] caused by fishing, and identify other actions to encourage the conservation and enhancement of [essential fish habitat]." 16 U.S.C. § 1853(a)(7). "In statutory interpretation, the 'plain meaning of a statute controls where that meaning is unambiguous.'" *Meyers v. Birdsong*, 83 F.4th 1157, 1160 (9th Cir. 2023) (en banc) (quoting *Khatib v. Cnty. of Orange*, 639 F.3d 898, 902 (9th Cir. 2011)). Here, Congress chose to use broad language and included no qualifiers, like "significant" or "major," before "adverse effects" that would limit the scope or degree of adversity required before the Fisheries Service considers minimization measures. 16 U.S.C. § 1853(a)(7); *see United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1062

34

(9th Cir. 2016) ("We ordinarily resist reading words or elements into a statute that do not appear on its face." (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)). Nor does the language indicate the obligation to protect essential fish habitat is linked to the stock's population status.

To the contrary, in addition to the language, the structure and legislative history of the Magnuson Stevens Act demonstrate that Congress understood the importance of habitat to sustainable fisheries and the ecosystem at large. *Supra* pp. 7-10. In the Sustainable Fisheries Act amendments, Congress recognized that the loss of habitat is "[one] of the greatest long-term threats to the viability of commercial and recreational fisheries," 16 U.S.C. § 1801(a)(9). It added the requirements to identify essential fish habitat and protect it from adverse fishing effects to ensure that habitat would not continue to be damaged. *See supra* pp. 9-10 (discussing legislative history). In so doing, it mandated the protection of *all*, not just some, of the habitat deemed "essential," that is, the habitat "necessary . . . for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1853(a)(7); *id.* § 1802(10).

In the same Act, Congress strengthened the distinct overfishing and stock rebuilding provisions that command the Fisheries Service to prevent the collapse of fish stocks from excessive fishing. Critically, however, the Sustainable Fisheries Act amendments separately required protection of essential fish habitat without

35

reference to measures of overfishing or stock population status. *See supra* p. 8. Thus, the statute directs the Fisheries Service to protect habitat, *and* to prevent overfishing, but Congress recognized these as distinct threats and did not link the Fisheries Service's duty to protect habitat to stock collapse. Rather, Congress required proactive habitat conservation measures to ensure that habitat degradation did not lead to that very situation. 16 U.S.C. § 1853(a)(7); *see also supra* pp. 9-10 (congressional statements explaining the importance of habitat protection, in addition to regulating fishing).

> **2.** **Agency regulations confirm that the statutory obligation to minimize adverse fishing effects applies to any adverse fishing effects and all designated essential fish habitat.**

The Fisheries Service has long interpreted its obligation to protect essential fish habitat broadly. When it promulgated its final essential fish habitat regulations in 2002, it adopted a strong and unqualified definition of adverse effects consistent with its statutory obligation to minimize any adverse effects. 50 C.F.R. § 600.810(a). It specified that the term included "any impact that reduces quality and/or quantity of [essential fish habitat]." *Id.*; *see also* 67 Fed. Reg. at 2347. It rejected suggestions that would have narrowed or qualified the definition: "The [Fisheries Service] disagrees that only statistically significant adverse effects should be considered because the Magnuson Stevens Act contains no such limitations. A much more inclusive definition of 'adverse effect' is necessary in

36

the regulations to clarify what kinds of potential effects should be addressed in [fishery management plans]." *Id.* Further, the definition is not linked to the decline or collapse of a fish population; it is explicitly tied to reductions in quality or quantity of *habitat*. 50 C.F.R. § 600.810(a).

The unqualified definition of adverse effects is also reflected in the regulation explaining the duty to minimize adverse effects. That regulation requires the Fisheries Service to "prevent, mitigate, or minimize *any* adverse effects from fishing, to the extent practicable, if there is evidence that a fishing activity adversely affects [essential fish habitat] in a manner that is more than minimal and not temporary in nature." 50 C.F.R. § 600.815(a)(2)(ii) (emphasis added). The initial proposal for this provision would have limited the agency's minimization obligation to only "substantial" adverse effects, *see* 62 Fed. Reg. 66531, 66538 (Dec. 19, 1997). In an interim final rule, the Fisheries Service recognized the modifier could imply a constraint not in the statute, and rejected the "substantial" modifier. *Id.* at 66531, 66538. The Fisheries Service also considered "identifiable" but in the end adopted a final rule with no modifier at all. 67 Fed. Reg. at 2354. Relevant here, the Fisheries Service also refused to require a link between habitat impacts and declining fish populations, explaining, "[i]t is not appropriate to require definitive proof of a link between fishing impacts to [essential fish habitat] and reduced stock productivity before [c]ouncils can take

37

action to minimize adverse fishing impacts to [essential fish habitat]" because "[s]uch a requirement would raise the threshold for action above that set by the [Magnuson Stevens Act]." *Id.*

The final rule includes explanatory language that effects must be "more than minimal and not temporary," 50 C.F.R. § 600.815(a)(2)(ii), but the agency clarified that language merely made clear that "inconsequential changes" did not require minimization efforts, *see* 67 Fed. Reg. at 2354. It did not raise the threshold for the obligation to minimize adverse fishing effects beyond that established in the adverse effects definition—"any impact that reduces the quality and/or quantity of [essential fish habitat]," *id.* at 2347. Any other interpretation of the regulation— one that imposes an additional threshold before minimization of adverse effects is required—would be flatly inconsistent with the statute. Thus, for almost 25 years, the Fisheries Service has recognized that the Magnuson Stevens Act commands it to take practicable steps to minimize fishing effects for "any impact that reduces the quality and/or quantity of [essential fish habitat]." 50 C.F.R. § 600.815(a)(2)(ii); 67 Fed. Reg. at 2354.

**B.** **The Fisheries Service unlawfully narrowed its evaluation of fishing effects to include only a portion of the designated essential fish habitat and linked minimization of adverse fishing effects to overfished thresholds.**

Despite the clear statutory and regulatory commands, in this case, the Fisheries Service has constrained its analysis by, on one hand, ignoring impacts to

38

much of the habitat it has already determined is essential to fish for their survival, and, on the other hand, tying an adverse effects conclusion to stock collapse or overfishing. Because it erected these impermissible barriers, the Fisheries Service failed in its obligation to practicably minimize any adverse effects on all essential fish habitat, and its decision is therefore inconsistent with the law. *See Nat'l Wildlife Fed'n*, 524 F.3d at 927-29 (agency action inconsistent with statute and implementing regulations was unlawful under APA).

### 1. The Fisheries Service cannot limit its review of fishing effects to a subset of "core" essential fish habitat.

Contrary to the Magnuson Stevens Act's command to practicably minimize any adverse effects to all designated essential fish habitat, the Fisheries Service ignored adverse effects to essential fish habitat outside the area it defined as "core." Instead, the Fisheries Service assessed the effects of fishing on only about *half* of the adult summer habitat for each stock instead of considering its effects on all of the designated essential fish habitat. 2-ER-229 (explaining that the "core" essential fish habitat is the upper 50th percentile of abundance for adult summer habitat).

As explained above, *see supra* pp. 7-13, the Magnuson Stevens Act requires protection of *all* essential fish habitat, not a portion of it. The first requirement of the essential fish habitat provisions is to identify and describe the habitat that is "*necessary* to fish for spawning, breeding, feeding or growth to maturity."

39

16 U.S.C. § 1802(10) (emphasis added); *id.* § 1853(a)(7); *see also* 50 C.F.R.
§ 600.815(a)(1). The Magnuson Stevens Act thus recognizes that different habitat areas may be important to fish at different life stages or for different purposes. Consistent with that recognition, the Fisheries Service's regulations direct it to consider information about habitat use at different life stages; identify the areas that are *necessary* to sustain the fishery and ecosystem; and explain what distinguishes the identified essential fish habitat from other habitat used by the species. 50 C.F.R. § 600.815(a)(1)(ii)-(iv)(A).

In Alaska, the Fisheries Service described essential fish habitat for each stock in the relevant fishery management plan and revised those descriptions in the five-year review. 2-ER-182. Having designated this essential fish habitat, the Fisheries Service was required to evaluate adverse impacts from fishing to all of the designated habitat. Without evaluating all of the designated habitat, the Fisheries Service could not meet its obligation to minimize effects to all of that habitat. The Magnuson Stevens Act and its implementing regulations are unequivocal on that point. *See* 16 U.S.C. § 1853(a)(7) (requiring the Fisheries Service to identify essential fish habitat and "minimize to the extent practicable adverse effects on such habitat caused by fishing"); 50 C.F.R. § 600.815(a)(2). Evaluating less than all designated habitat is tantamount to narrowing the essential fish habitat designations the Fisheries Service just made without justifying the

40

change and going through the required process of analyzing relevant information and describing and mapping that narrower range of habitat. 50 C.F.R. § 600.815(a)(1). It undermines Congress's key reasons for requiring the agency to identify essential fish habitat in the first place: to compel the agency to assess threats to that habitat and take actions to protect it. *See* 16 U.S.C. § 1853(a)(7).

The Fisheries Service's narrow focus on "core" designated habitat means the agency did not look at adverse fishing effects in the rest of that habitat —even in cases where the overlooked habitat was known to contain important habitat types, was known to be intensively trawled, or both. The example of northern rockfish illustrates this deficiency. The essential fish habitat description for Gulf of Alaska northern rockfish states that juveniles use corals and sponges as refuge. 5-ER-806; 5-ER-683. As the maps below illustrate, the Fisheries Service's decision to consider only the half of northern rockfish essential fish habitat that it deems "core" excludes designated essential fish habitat where corals and sponges have been found in areas that are heavily trawled, like the Shelikof Strait region north and west of Kodiak Island. This fragile habitat is likely damaged by fishing, but those adverse effects to areas used for refuge by northern rockfish are not evaluated at all under the Fisheries Service's approach. *See* 3-ER-321–332 (2005 essential fish habitat environmental impact statement describing studies showing damage to sponges, sea whips, corals, and other benthic habitat from trawling).

41

This Fisheries Service map shows both the designated essential fish habitat for northern rockfish (all colors) and the "core" area—the yellow and green areas only—that was considered in the fishing effects analysis. Shelikof Strait, in blue and purple to the north and west of Kodiak Island (in the center of the map, between 56 and 59 degrees north latitude and 150 and 155 degrees west longitude) was not analyzed for adverse fishing effects because it is outside the "core" area.



5-ER-820.

But, as the following map illustrates, this is a heavily trawled area with documented corals and sponges, both of which provide essential habitat for northern rockfish and are easily damaged by trawling.

42



43



2-ER-43, 2-ER-53–54; *see also* 2-ER-104, 2-ER-106 (Fisheries Service maps confirming coral and sponge locations near Kodiak Island); 3-ER-316–317 (recognizing that various trawl fisheries take place around Kodiak Island).

By excluding this portion of the habitat, the Fisheries Service likely missed adverse effects from fishing and thus avoided its obligation to adopt practicable minimization measures for that habitat. Because the Fisheries Service only analyzed fishing effects to the "core" portion of the designated essential fish habitat, all of the habitat outside of the "core" half—plus ten percent of the "core"—could be entirely destroyed before the Fisheries Service even considered whether to recommend minimization measures.

This is inconsistent with the Magnuson Stevens Act's requirement to "minimize to the extent practicable adverse effects on [essential fish] habitat," 16 U.S.C. § 1853(a)(7), not a limited portion of the designated habitat. It is also inconsistent with the regulations' mandate that the Fisheries Service "evaluate the potential adverse effects of fishing on [essential fish habitat] designated under the

44

[fishery management plan]" and to the extent practicable "prevent, mitigate, or minimize any adverse effects from fishing" on that habitat that are not inconsequential. 50 C.F.R. § 600.815(a)(2)(i)-(ii); *see also* 67 Fed. Reg. at 2354. The Magnuson Stevens Act is broadly worded and does not allow a portion of a stock's essential fish habitat to be entirely destroyed while the harm is left unaddressed. *See supra* pp. 34-38.

The district court erred by giving a "high degree of deference" to the Fisheries Service's technical expertise rather than considering the plain language of the statute. 1-ER-31. The question at issue is not one of technical expertise; it is a question of statutory interpretation—whether the "best reading" of the Magnuson Stevens Act allows the Fisheries Service to take the approach it did. Instead of construing and applying the Magnuson Stevens Act's requirement to evaluate and minimize fishing effects to all designated essential fish habitat, the district court deferred to the Fisheries Service's factual explanation for why it ignored half the designated habitat. 1-ER-30–31. But the agency entirely failed to square its approach with the clear command of the statute: the Magnuson Stevens Act does not allow the Fisheries Service to effectively de-designate half the essential habitat by ignoring it in the evaluation of fishing effects. *See supra* pp. 34-38. The Fisheries Service's rationale—that considering only half the habitat would avoid excluding important areas or diluting effects, and that 90 percent of

45

the smaller, "core" area would remain undisturbed, 1-ER-30, is arbitrary and inconsistent with the statute. The Fisheries Service cannot pick and choose which designated essential fish habitat to consider. If effects are diluted or minimized when considering all essential fish habitat, it simply means the Fisheries Service has adopted a model that allows it to ignore adverse fishing effects by averaging them across a large area, instead of addressing all of the adverse fishing effects it identifies anywhere in the range of essential fish habitat. Its explanation does not address the legal problem with the Fisheries Service's approach—it fails to evaluate all of the designated habitat.

The district court also found the stock authors' discretion to consider other information important, 1-ER-29, but this option to consider other information does not remedy the unlawful evaluation framework the Fisheries Service adopted. As explained above, although analysts had discretion to consider other information, they were only required to do so under the Fisheries Service process if a stock failed one of the two primary criteria. *See supra* pp. 19-23. And, even then, the additional evaluation functioned as an off-ramp to avoid minimization measures, not as a broader consideration of designated essential habitat outside the "core."

In fact, according to the Fisheries Service's summary of the 2023 fishing effects evaluation, only 18 of the 103 stocks evaluated were either above ten percent disturbance to "core" essential fish habitat or below the overfished

46

threshold. *See supra* pp. 22-23. For any stock that did not meet one of these two criteria, no additional analysis was required. In the district court proceedings, the Fisheries Service was only able to point to one example of a fish stock, Kamchatka flounder, where neither criterion was met and additional analysis *was* performed. 4-ER-544. Allowing fisheries analysts discretion to consider other information does not rescue the Fisheries Service's unlawfully constrained analysis. *Cf. Anglers Conservation Network v. Pritzker*, 139 F. Supp. 3d 102, 111-12 (D.D.C. 2015) (rejecting agency's argument that its failure to meet Magnuson Stevens Act obligation to add stocks to a fishery management plan was cured by promising to consider adding them to the plan in a future action); *Oceana, Inc. v. Ross*, 483 F. Supp. 3d 764, 785 (N.D. Cal. 2020) (rejecting Fisheries Service's argument that unlawfully high fishing limits could be found lawful simply because actual fishing was lower than the limit and the target fish population had increased).

Nothing else the Fisheries Service considered as a part of its process—the overfishing threshold or any additional life history parameters—cures its failure to evaluate the entire area designated as essential fish habitat for adverse effects.

### 2. The Fisheries Service cannot lawfully use the overfished threshold to assess adverse effects on habitat.

The Fisheries Service's use of a stock's overfished threshold (MSST) as one of the criteria for determining whether there was damage to *habitat* is equally inconsistent with the plain language and structure of the Magnuson Stevens Act.

47

That approach conflated two distinct statutory requirements—one to protect essential fish habitat, and one to prevent overfishing—and failed to meet the agency's obligation to take practicable measures to minimize all adverse fishing effects, not just those that might cause population collapse. *See supra* pp. 34-38 (describing Magnuson Stevens Act's overfishing and essential fish habitat requirements). Under this criterion, the Fisheries Service did not consider minimizing adverse effects unless they had already led to stock collapse, a point when it may be too late to address the damage.

As described above, when Congress enacted the Magnuson Stevens Act, it chose broad language to require practicable minimization of adverse effects to essential fish habitat; it did not require minimization only for serious, substantial, statistically significant, or even identifiable adverse effects. Nor did it tie minimization to a stock's status, certainly not to population collapse. *See supra* pp. 36-38. Similarly, the Fisheries Service's regulations require practicable minimization of "any" adverse effect. 50 C.F.R. § 600.815(a)(2)(ii); *see also* 67 Fed. Reg. at 2354. The Fisheries Service explicitly rejected proposals to require "definitive proof of a link" between stock productivity and fishing impacts before considering minimization measures because that requirement would be inconsistent with the Magnuson Stevens Act. *See* 67 Fed. Reg. at 2354. By using overfished thresholds as one of two main criteria for deciding whether to minimize

48

adverse impacts to habitat, the Fisheries Service relied on a factor that the Act does not allow, and its decision was therefore inconsistent with the law. *See Nat'l Wildlife Fed'n*, 524 F.3d at 927-29 (agency action inconsistent with statue and implementing regulations was unlawful under APA).

This approach is also inconsistent with the structure of the Magnuson Stevens Act. Among the Fisheries Service's primary duties under the Act are the requirement to protect and conserve habitat and the mandate to prevent overfishing and rebuild overfished stocks. These are distinct obligations, and using a stock's overfished threshold—population collapse—as an indicator for adverse habitat effects improperly conflates them. *Compare, e.g.*, 16 U.S.C. § 1853(a)(7) (protecting essential fish habitat), *with id.* § 1853(a)(10), (15) (preventing and remedying overfishing). It is clear Congress prescribed these as separate duties by addressing their importance in distinct provisions of the Magnuson Stevens Act. *Compare id.* § 1801(a)(5) (discussing importance of preventing overfishing and maintaining optimum yield), *and id.* § 1801(b)(4) (discussing congressional purpose of achieving optimum yield "on a continuing basis"); *id.* § 1853(a)(10), (15) (requiring fishery management plans to specify objective and measurable criteria to identify when a fish stock is overfished, and annual catch limits that prevent overfishing), *and id.* § 1854(e) (requiring agency to adopt rebuilding plans for overfished stocks), *with id.* § 1801(a)(2)(C) (identifying habitat loss as a

49

distinct threat to fish stocks), *and id.* § 1801(a)(9) (prioritizing habitat considerations to protect the viability of all fisheries); *id.* § 1853(a)(7) (requiring fishery management plans to, among other things, identify and describe essential fish habitat and "minimize to the extent practicable adverse effects on such habitat caused by fishing").

Overfished thresholds—MSST—are not lawful or relevant indicators of *habitat* damage. The purpose of an overfished threshold is, by definition, to identify when a fish population is overfished, which triggers measures to prevent or to end overfishing. 50 C.F.R. § 600.310(e)(2)(i)(A), (E)-(F) (defining MSST as a threshold below which a stock is considered overfished); 16 U.S.C. §§ 1851(a)(1), 1853(a)(10), 1854(e). Substituting consideration of whether a fish population is overfished for consideration of whether a stock's essential habitat is harmed by fishing impermissibly renders the essential fish habitat requirement surplusage and nullifies the provision's effectiveness because no action will be taken to protect habitat until the stock has collapsed. *See, e.g.*, *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (the canon against surplusage applies "with special force" when a proposed statutory construction "render[s] an entire subparagraph meaningless" (alteration in original) (quoting *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 128 (2018))); *see also Corley v. United States*, 556 U.S. 303, 314 (2009) (discussing "one of the most basic interpretive canons,

50

that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant'" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004))).[3]

These overfishing and habitat requirements are separate because Congress recognized that fishing pressure and habitat damage are distinct threats that may require different preventive actions. Stock collapse, for example, may be the result of fishing pressure or other causes and unrelated to habitat loss. But even when the stock's decline is caused by habitat degradation, using the overfished threshold as a decision criterion to consider protecting habitat means waiting until the damage is so severe that the stock has collapsed. *See* 50 C.F.R. § 600.310(e)(2)(i)(A), (E)-(F) (defining MSST, the overfished threshold). By the time the fish stock has reached this point, it may be too late to recover either the fish population or any habitat that has been adversely affected by fishing. *See* 4-ER-514 ("[I]t could be difficult to detect a habitat influence on the stock for a while after the habitat was damaged,

---

[3] Experts reviewing an earlier, substantially similar, iteration of the Fisheries Service's approach to evaluating fishing effects on essential fish habitat expressed the same view as Congress: MSST, or overfished thresholds, are "completely inappropriate" for addressing habitat, 4-ER-529, and "problematic to apply" because "there could be no sign of a decline in biomass until a precipitous collapse occurs." 4-ER-534. Instead, reviewers suggested that the Fisheries Service use reports of bycatch (*i.e.*, corals and sponges), and changes in benthic community diversity and species composition as criteria for identifying adverse effects. 4-ER-530–531, 4-ER-526–527.

perhaps until it was too late, i.e. too much of the habitat was destroyed."). It certainly fails to meet the proactive habitat protection requirement of the Magnuson Stevens Act.

The district court erred, again, because it applied a "highly deferential" standard to reviewing the Fisheries Service's decision rather than using its independent judgment to review whether the Fisheries Service's population collapse criterion is inconsistent with the statute. 1-ER-31. The district court found that the Fisheries Service's use of the overfished threshold was not arbitrary because the agency also considered disturbance to "core" essential fish habitat for stocks that are not overfished. 1-ER-29–31. But, as demonstrated above, *see supra* pp. 39-47, that criterion is also unlawful. Neither of the two required considerations meets the statutory obligation.

The Fisheries Service's reliance on a measure of stock collapse to determine whether fishing has harmed essential fish habitat is inconsistent with the plain language and structure of Magnuson Stevens Act and is therefore not in accordance with the law. *See Nat'l Wildlife Fed'n*, 524 F.3d at 927-29 (agency action inconsistent with statute and implementing regulations was unlawful under APA).

**IV.  The Court should remand the decision to the Fisheries Service to correct its unlawful analysis.**

The Fisheries Service's decision approving the essential fish habitat amendments to the fishery management plans for federal fisheries off Alaska is unlawful because it conflicts with the Magnuson Stevens Act.  Oceana therefore requests that the Court declare the Fisheries Service's decision adopting the amendments unlawful, vacate the district court opinion, remand to the Fisheries Service to conduct a new fishing effects analysis consistent with the Magnuson Stevens Act, and impose a deadline of 18 months for the Fisheries Service to complete the new analysis.  *See, e.g.*, *Waterkeeper All. v. U.S. Env't Prot. Agency*, 140 F.4th 1193, 1228 (9th Cir. 2025) (remanding to agency to "reconsider its decision or provide more complete explanation"); *Glacier Fish Co. v. Pritzker*, 832 F.3d 1113, 1127 (9th Cir. 2016) (remanding to the Fisheries Service for action consistent with its own regulations); *Nat'l Wildlife Fed'n*, 524 F.3d at 937 (noting that the Fisheries Service did not "challenge the court's discretionary authority to impose a deadline for the remand proceedings").  The Fisheries Service's decision not to adopt any additional measures to protect essential fish habitat was based on an unlawfully narrow analysis.  An analysis consistent with the requirements of the Magnuson Stevens Act could lead the Fisheries Service to conclude that there are adverse effects on essential fish habitat, triggering its obligation to impose

practicable mitigation measures benefiting fish stocks important to some of the nation's largest fisheries.

Although vacatur is the default remedy under the APA, *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025), Oceana is not asking for that remedy in this case. Instead, Oceana requests a remand for a new fishing effects evaluation and decision. The new evaluation must correct the errors in the 2023 review by considering the effects of fishing on *all* essential fish habitat for all stocks instead of narrowing that analysis to a subset of that habitat or linking minimization measures to population status. Leaving the amendments in place is appropriate because Oceana has not alleged errors in the essential fish habitat maps and descriptions that were adopted in the fishery management plan amendments. Leaving that updated information in place will allow the Fisheries Service to rely on the updated essential fish habitat identifications and information when it completes the new analysis. Because the amendments the Fisheries Service adopted simply update maps, descriptions, and scientific references to include the most recent information, leaving them in place may have some benefits and is not likely to cause environmental harm that would necessitate vacatur or interfere with a new, lawful analysis by the Fisheries Service. *Cf. Pollinator Stewardship Council v. U.S. Env't Prot. Agency*, 806 F.3d 520, 532-33 (9th Cir. 2015)

54

(explaining that a court may choose not to vacate when equity demands, such as in certain instances where vacating could cause environmental harm).

## CONCLUSION

For the foregoing reasons, Oceana respectfully requests that the Court reverse and vacate the district court opinion and remand the Fisheries Service's decision for completion of a new analysis consistent with the Magnuson Stevens Act.

Respectfully submitted this 26th day of February, 2026.

s/ Katharine S. Glover

Katharine S. Glover (Alaska Bar No. 0606033)
Eric P. Jorgensen (Alaska Bar No. 8904010)
Maile Tavepholjalern (Alaska Bar No. 1611094)
Andrea A. Treece (California Bar No. 237639)
EARTHJUSTICE

*Attorneys for Plaintiff-Appellant Oceana, Inc.*

55

## STATEMENT OF RELATED CASES PURSUANT TO
## CIRCUIT RULE 28-2.6 AND FORM 17

**9th Cir. Case No. 25-7689**

The undersigned attorney states the following:

[X] I am unaware of any related cases currently pending in this court.

[ ] I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ] I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

**Signature:** *s/ Katharine S. Glover*        **Date:** 2/26/2026

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case No. 25-7689**

I am the attorney or self-represented party.

**This brief contains 12,134 words,** including 220 words manually counted in any visual images, and excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *s/ Katharine S. Glover*        **Date:** 2/26/2026