No. 25-7689

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

OCEANA, INC.,
*Plaintiff/Appellant*,

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,
*Defendants/Appellees*,

and

AT-SEA PROCESSORS ASSOCIATION, et al.,
*Intervenor-Defendants/Appellees*.

Appeal from the United States District Court for the District of Alaska
No. 3:24-cv-00180-SLG (Hon. Sharon L. Gleason)

**FEDERAL APPELLEES' ANSWERING BRIEF**

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
EZEKIEL PETERSON
ERIKA FURLONG
AMY E. COLLIER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-5360
amy.collier@usdoj.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................iv

GLOSSARY............................................................................................................ix

INTRODUCTION ...................................................................................................1

STATEMENT OF JURISDICTION.......................................................................2

STATEMENT OF THE ISSUES............................................................................3

PERTINENT STATUTES AND REGULATIONS...............................................3

STATEMENT OF THE CASE................................................................................3

     A.     Statutory and Regulatory Background.................................................3

          1.     Regional Councils.....................................................................4

          2.     Fishery Management Plans........................................................5

          3.     Essential Fish Habitat ..............................................................6

     B.     Factual Background................................................................................8

          1.     The Service's Identification and Conservation of
               Essential Fish Habitat in Alaska ..............................................8

          2.     The Service's Reviews of Essential Fish Habitat.....................10

               a.     The Service's Scientific Models...................................11

                    i.     Long-Term Effects Index ....................................11

                    ii.     Fishing Effects Model .........................................12

                b.     2023 Essential Fish Habitat Review..............................14

     C.     Proceedings Below.................................................................................17

SUMMARY OF ARGUMENT ..................................................................19

STANDARD OF REVIEW ...................................................................23

ARGUMENT .........................................................................................24

I.     Oceana lacks standing. ...............................................................24

II.    The Service complied with the Magnuson-Stevens Act. ...............29

       A.    The APA's deferential standard of review applies to the Service's analysis of adverse effects....................................30

           1.    Oceana did not raise a statutory-interpretation argument before the district court.............................31

           2.    Oceana challenges the Service's methodology and analysis, not its interpretation of any statutory term. ..................................................................32

                a.    *Loper Bright* retained agency discretion in this context.....................................................32

                b.    The Service's review of essential fish habitat information is owed deference under the APA. ..................................................................33

       B.    The Service rationally determined that adverse fishing effects are not more than minimal or temporary.................................36

           1.    Oceana misconstrues the Service's methodology....................37

           2.    The Minimum Stock Size Threshold is rationally related to evaluating fishing effects on essential fish habitat.............................................................43

           3.    The Service's use of the core EFH area was appropriate and adequately explained.......................47

III.    Vacatur is not appropriate..........................................................52

ii

CONCLUSION.......................................................................................53

CERTIFICATE OF COMPLIANCE....................................................55

ADDENDUM ......................................................................................56

iii

# TABLE OF AUTHORITIES

*Bolker v. Comm'r*,
    760 F.2d 1039 (9th Cir. 1985) ....................................................................31

*Cascadia Wildlands v. Bureau of Land Mgmt.*,
    153 F.4th 869 (9th Cir. 2025) ....................................................................37

*Chamber of Commerce of U.S. v. FEC*,
    76 F.3d 1234 (D.C. Cir. 1996) ...................................................................35

*Conservation L. Found. v. Evans*,
    360 F.3d 21 (1st Cir. 2004) ..................................................................35, 50

*Conservation L. Found. v. Ross*,
    374 F. Supp. 3d 77 (D.D.C. 2019) .............................................................35

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
    833 F.3d 1136 (9th Cir. 2016) ...................................................................23

*Ctr. for Biological Diversity v. Ilano*,
    928 F.3d 774 (9th Cir. 2019) .....................................................................23

*Ctr. for Food Safety v. Vilsack*,
    636 F.3d 1166 (9th Cir. 2011) ...................................................................29

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ...................................................................................32

*Food & Drug Admin. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ...............................................................25, 26, 28, 29

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ...................................................................................25

*Gulf Restoration Network, Inc. v. NMFS*,
    730 F. Supp. 2d 157 (D.D.C. 2010) ...........................................................29

*Kāpaʻa v. Trump*,
    794 F. Supp. 3d 793 (D. Hawaii 2025) .......................................................28

iv

*Kumar v. Koester,*
131 F.4th 746 (9th Cir. 2025) ...............................................................27

*Lands Council v. McNair,*
537 F.3d 981 (9th Cir. 2008) ...........................................................34, 36

*Loper Bright Enterprises v. Raimondo,*
603 U.S. 369 (2024)..............................................................32, 33, 35, 36

*Lopez-Martinez v. U.S. Att'y Gen.,*
149 F.4th 1202 (11th Cir. 2025) ...........................................................33

*Lujan v. Defenders of Wildlife,*
504 U.S. 555 (1992)...............................................................................28

*Lujan v. Nat'l Wildlife Fed'n,*
497 U.S. 871 (1990)...............................................................................27

*Marsh v. Oregon Natural Resources Council,*
490 U.S. 360 (1989)...................................................................24, 37, 51

*Midwater Trawlers Co-op v. Dep't of Commerce,*
282 F.3d 710 (9th Cir. 2002) ................................................................23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.,*
463 U.S. 29 (1983).................................................................................24

*Native Ecosystems Council v. Marten,*
883 F.3d 783 (9th Cir. 2018) ................................................................42

*Native Vill. of Point Hope v. Salazar,*
680 F.3d 1123 (9th Cir. 2012) ..............................................................36

*Natural Resources Def. Council v. Haaland,*
102 F.4th 1045 (9th Cir. 2024) .............................................................42

*N.C. Fisheries Ass'n v. Gutierrez,*
550 F.3d 16 (D.C. Cir. 2008)...............................................................5, 28

*N.C. Fisheries Ass'n, Inc. v. Gutierrez,*
518 F. Supp. 2d 62 (D.D.C. 2007).........................................................42

v

*Norton v. S. Utah Wilderness All.* ("*SUWA*"),
542 U.S. 55 (2004)......................................................................27

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
523 U.S. 726 (1998)....................................................................29

*Oregon Trollers Ass'n v. Gutierrez,*
452 F.3d 1104 (9th Cir. 2006 ........................................................4

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank,*
693 F.3d 1084 (9th Cir. 2012). ....................................................50

*Salmon Spawning & Recovery All. v. Gutierrez,*
545 F.3d 1220 (9th Cir. 2008) .....................................................28

*San Luis & Delta-Mendota Water Auth. v. Locke,*
776 F.3d 971 (9th Cir. 2014) .........................................24, 34, 48

*Save Bull Trout v. Williams,*
51 F.4th 1101 (9th Cir. 2022) ......................................................23

*Seven Cty. Infrastructure Coal. v. Eagle Cty.,*
605 U.S. 168 (2025)...............................................................24, 36

*Wash. Env't Council v. Bellon,*
732 F.3d 1131 (9th Cir. 2013) .....................................................26

*Westlands Water Dist. v. U.S. Dep't of Interior,*
376 F.3d 853 (9th Cir. 2004) .......................................................24

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008)........................................................................34

*Zimmer Radio of Mid-Missouri, Inc. v. F.C.C.,*
145 F.4th 828 (8th Cir. 2025) ......................................................33

## Statutes and Court Rules

Administrative Procedure Act
  5 U.S.C. § 702................................................................................2
  5 U.S.C. § 706............................................................................2, 33
  5 U.S.C. § 706(1)......................................................................25, 27
  5 U.S.C. § 706(2)...........................................................................25
  5 U.S.C. § 706(2)(A)......................................................................23

Magnuson-Stevens Fishery Conservation and Management Act
  16 U.S.C. § 1801..............................................................................2
  16 U.S.C. § 1801(a)(6) .....................................................................3
  16 U.S.C. § 1801(b)(1) ................................................................4, 44
  16 U.S.C. § 1801(b)(3) .....................................................................4
  16 U.S.C. § 1801(b)(4) ...................................................................44
  16 U.S.C. § 1801(b)(7) ...................................................................44
  16 U.S.C. § 1802(10)...................................................................6, 44
  16 U.S.C. § 1811(a) ..........................................................................3
  16 U.S.C. § 1851(a) ..........................................................................5
  16 U.S.C. § 1852(a) ..........................................................................4
  16 U.S.C. § 1852(a)(1)(G).................................................................4
  16 U.S.C. § 1852(b)(1) ......................................................................4
  16 U.S.C. § 1852(b)(2)(A)..................................................................4
  16 U.S.C. § 1852(g)...........................................................................4
  16 U.S.C. § 1852(h)(1) ......................................................................5
  16 U.S.C. § 1853(a)(1)-(15) ..............................................................5
  16 U.S.C. § 1853(a)(1) ......................................................................5
  16 U.S.C. § 1853(a)(7) ..........................................................6, 34, 50
  16 U.S.C. § 1853(b)(1)-(14) ..............................................................5
  16 U.S.C. § 1853(b)(2)(B)..................................................................5
  16 U.S.C. § 1854(a)(3) ......................................................................5
  16 U.S.C. § 1855(b)(1)(A).............................................7, 8, 34, 35, 52
  16 U.S.C. § 1855(f)..........................................................................23

28 U.S.C. § 1291 .................................................................................3

28 U.S.C. § 1331 .................................................................................2

42 U.S.C. § 4321 .................................................................................2

Fed. R. App. P. 4 ..............................................................................................3

## Other Authorities

*Magnuson-Stevens Act Provisions; Essential Fish Habitat (EFH)*,
  67 Fed. Reg. 2343 (Jan. 17, 2002) ...................................7, 8, 35, 45

50 C.F.R. § 600.310(e) ....................................................................................44

50 C.F.R. § 600.310(e)(2) ...............................................................................47

50 C.F.R. § 600.310(e)(2)(i)(F) .......................................................................47

50 C.F.R. § 679.2 ............................................................................................10

50 C.F.R. § 600.810(a) ......................................................................................7

50 C.F.R. § 600.815(a) ...................................................................................7, 9

50 C.F.R. § 600.815(a)(1) ..............................................................................6, 7

50 C.F.R. § 600.815(a)(1)(iii) .........................................................................44

50 C.F.R. § 600.815(a)(1)(iv) .........................................................................45

50 C.F.R. § 600.815(a)(2)(i) .............................................................................7

50 C.F.R. § 600.815(a)(2)(ii) ..........................................................7, 35, 49, 50

50 C.F.R. § 600.815(a)(2)(iii) .....................................................................8, 50

50 C.F.R. § 600.815(a)(2)(iv) ...........................................................................9

50 C.F.R. § 600.815(a)(6) ..................................................................................7

50 C.F.R. § 600.815(a)(10) ............................................8, 10, 11, 35, 52

73 Fed. Reg. 43,362 (July 25, 2008) .................................................................9

79 Fed. Reg. 2794 (Jan. 16, 2014) ..................................................................10

## GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| EFH | Essential Fish Habitat |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| MSST | Minimum Stock Size Threshold |
| NEPA | National Environmental Policy Act |
| SSC | Scientific and Statistical Committee |

**INTRODUCTION**

For over 25 years, the National Marine Fisheries Service (Service) and the North Pacific Fishery Management Council have engaged in an iterative process to identify and update essential fish habitat (EFH) in Alaska based on the best available science, consistent with the Magnuson-Stevens Fishery Conservation and Management Act (MSA or Act). During this time, the Service has conserved and enhanced EFH across hundreds of thousands of nautical miles in the waters off Alaska.

To ensure its management measures are current, the Service regularly reviews EFH information in an iterative and exhaustive years-long process that involves the collection and study of copious data across numerous subjects. The Service most recently reviewed EFH in 2023, concluding that no managed species are experiencing adverse fishing effects to EFH that warrant additional mitigation. The Service adopted minor amendments to fishery management plans to incorporate updated scientific data and EFH descriptions.

In this case, Oceana does not challenge the Service's regulatory interpretation of any statutory term. Nor does Oceana argue that the Service failed to minimize adverse effects to EFH to the extent practicable, or even that the Service incorrectly found that there were no adverse effects requiring mitigation.

1

Instead, Oceana quibbles with the scientific model and method the Service used to make that factual finding.

Oceana lacks standing to challenge these minor amendments to fishery management plans that cause no injuries to its members. Oceana's alleged injuries are tied to the status quo (or "continued trawling"), but the amendments here do not authorize trawling. As Oceana concedes, the amendments themselves are "not likely to cause environmental harm."

If the Court reaches the merits, it should affirm. The MSA and its regulatory guidelines give the Service flexibility in adopting a scientific methodology to conduct reviews of EFH information and effects. The Service provided a rational explanation for its choice of methodology, and the district court appropriately deferred to the Service's expertise in this highly technical and scientific field.

**STATEMENT OF JURISDICTION**

(a) Oceana asserted jurisdiction below under 28 U.S.C. § 1331 because Oceana raised claims under the MSA, 16 U.S.C. §§ 1801 *et seq*.; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq*.; and the Administrative Procedure Act (APA), 5 U.S.C. §§ 702, 706. 5-ER-822-23. However, the district court lacked jurisdiction because Oceana lacks standing.

2

(b)     The district court's judgment was final because it disposed of all claims against all defendants.1-ER-2; 1-ER-39. This Court has jurisdiction under 28 U.S.C. § 1291.

(c)     The judgment was entered on October 6, 2025. 1-ER-2. Oceana filed its notice of appeal on December 5, 2025. 5-ER-895-900. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether Oceana lacks standing to challenge fishery management plan amendments that do not alter any management regime and merely update EFH information.

2.     Whether the Service's choice of methodology for evaluating adverse effects to EFH is rational and warrants deference under the APA.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief or in the Addendum following Appellant's Opening Brief.

## STATEMENT OF THE CASE

### A.     Statutory and Regulatory Background

The Magnuson-Stevens Act establishes a national program for the conservation and management of the United States' fisheries. 16 U.S.C. §§ 1801(a)(6), 1811(a). The Act seeks to "conserve and manage the fishery

3

resources found off the coasts of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles." *Id.* § 1801(b)(1), (3). The Service, acting under authority delegated from the Secretary of Commerce (the Secretary), is the federal agency responsible for managing fisheries under the Act. *See generally Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1108 (9th Cir. 2006).

### 1. Regional Councils

The MSA established eight regional Fishery Management Councils that develop fishery management plans for fisheries within specific geographic regions. 16 U.S.C. § 1852(a). Each Regional Council includes federal, state, and territorial fishery management officials, as well as individuals "knowledgeable" about fishery resources in the relevant area, who are nominated by state governors and appointed by the Secretary. *Id*. § 1852(b)(1), (b)(2)(A). Each Region also has a scientific and statistical committee (SSC) that provides ongoing scientific advice to the council, as well as advisory panels that assist the council in carrying out its functions under the Act. *Id*. § 1852(g). At issue in this case is the North Pacific Fishery Management Council (Council), which makes recommendations concerning the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska. *Id*. § 1852(a)(1)(G).

### 2. Fishery Management Plans

The Act directs each Regional Council to prepare fishery management plans and plan amendments for each fishery under its authority that requires conservation and management, and to submit those plans and amendments to the Service. 16 U.S.C. § 1852(h)(1). Fishery management plans identify the measures that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(1). The Act establishes plan requirements, *id.* § 1853(a)(1)-(15), and identifies other, optional elements, *id.* § 1853(b)(1)-(14).[1] Fishery management plans and implementing regulations must also "be consistent" with the Act's ten "national standards for fishery conservation and management." *Id.* § 1851(a).

After receiving a fishery management plan or amendment from a council and holding a public comment period, the Service must approve, disapprove, or partially approve the plan or amendment based on consistency with law. *Id.* § 1854(a)(3). Fishery management plans are not self-executing—the plans are not enforceable without implementing regulations. *See N.C. Fisheries Ass'n v.*

---

[1] Among the discretionary provisions is the option for a Council or the Secretary to limit fishing "in areas where deep sea corals are identified" and "to protect deep sea corals from physical damage from fishing gear . . . after considering long-term sustainable uses of fishery resources in such areas." 16 U.S.C. § 1853(b)(2)(B).

5

*Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) (explaining that fishery management plans, even once approved by the Secretary, "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them").

### 3. Essential Fish Habitat

Among other requirements, a fishery management plan must "describe and identify essential fish habitat for the fishery based on the guidelines established" by the Service, "minimize to the extent practicable adverse effects on such habitat caused by fishing," and "identify other actions to encourage the conservation and enhancement of such habitat." 16 U.S.C. § 1853(a)(7). The MSA defines "essential fish habitat" as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." *Id.* § 1802(10). This broad definition encompasses the physical characteristics of the sea bottom (e.g., substrate such as rocks and mud, and terrain such as depth and slope), as well as the water itself (e.g., currents, temperature, dissolved gases, and biochemical interactions that support food chains). *See, e.g.*, 2-SER-370-78. Altogether, EFH is the collection of necessary habitat features in a defined geographic area that a species needs to survive. *See* 50 C.F.R. § 600.815(a)(1).

The Act directs the Service to establish guidelines to assist in the identification and description of EFH and in the consideration of actions to

conserve and enhance EFH. 16 U.S.C § 1855(b)(1)(A). Accordingly, the Service established non-binding guidelines that require each fishery management plan to contain ten components, two of which are at issue in this appeal. 50 C.F.R. § 600.815(a); *Magnuson-Stevens Act Provisions; Essential Fish Habitat (EFH)*, 67 Fed. Reg. 2343 (Jan. 17, 2002).[2]

Component 2 requires fishery management plans to contain an evaluation of the potential adverse effects of fishing on EFH. 50 C.F.R. § 600.815(a)(2)(i). "Adverse effect" is defined as "any impact that reduces quality and/or quantity of EFH." *Id.* § 600.810(a). Plans must describe each fishing activity, review and discuss all available relevant information, and provide conclusions regarding whether and how each fishing activity adversely affects EFH. *Id.* § 600.815(a)(2)(i). If there is evidence that fishing adversely affects EFH more than minimally and in a non-temporary way, any such effects must be minimized or mitigated to the extent practicable. *Id.* § 600.815(a)(2)(ii). The preamble to the final rule adopting these guidelines explains that "[m]inimal impacts are those that may result in relatively small changes in the affected environment and insignificant changes in ecological functions." 67 Fed. Reg. at 2354. "Temporary impacts are

---

[2] In this appeal, Oceana does not challenge the Service's compliance the other components, including Component 1 (which directs the Service to identify and describe EFH) and Component 6 (which directs the Service to identify actions to encourage the conservation and enhancement of EFH). 50 C.F.R. § 600.815(a)(1) & (6).

those that are limited in duration and that allow the particular environment to recover without measurable impact." *Id.* In assessing the practicality of mitigation, councils "should consider the nature and extent of the adverse effect on EFH." 50 C.F.R. § 600.815(a)(2)(iii).

Component 10 encourages the councils and Service to periodically review and revise the EFH provisions in fishery management plans, and further directs a complete review of EFH information every five years. *Id.* § 600.815(a)(10); *see also* 16 U.S.C. § 1855(b)(1)(A) (MSA directing the Service to set a schedule for amending fishery management plans "to include the identification of [EFH]" and to "review[] and update[] such identifications based on new scientific evidence or other relevant information").

## B. Factual Background

### 1. The Service's Identification and Conservation of Essential Fish Habitat in Alaska

For over two decades, the Service has regularly evaluated EFH in its fishery management plans for fisheries off the coast of Alaska. In 2005, the Service completed a comprehensive evaluation of EFH for Alaskan fisheries. *See* 2-SER-342-43. As part of that process, the Service prepared an environmental impact statement (2005 EIS) pursuant to NEPA that (1) described and identified EFH for the fisheries in the Bering Sea, Aleutian Islands, and Gulf of Alaska; (2) addressed each of the ten EFH components; (3) adopted an approach for the Council to

identify habitat areas of particular concern within EFH; and (4) minimized to the extent practicable the adverse effects of fishing on EFH. *See* 3-ER-273-327b; 2-SER-507-94. Based on this environmental analysis, the Council amended five fishery management plans to implement precautionary measures to protect EFH from adverse impacts from fishing, including area closures, trawling prohibitions in certain areas, and trawl gear modifications. *See* 2-SER-510; 3-ER-277-78; 2-ER-201-02. The Service adopted those amendments fulfilling the mandatory provisions of the EFH guidelines. *See* 50 C.F.R. § 600.815(a).

Since 2005, the Service has implemented management measures to conserve and enhance EFH and minimize the effects of fishing on EFH in Alaska. *See* 3-ER-267-72; *see* 50 C.F.R. § 600.815(a)(2)(iv). The Service has closed or imposed restrictions on fishing in sensitive areas to protect habitat. *See* 3-ER-270-71. For example, nearly 13,000 square nautical miles off the Alaskan coast are designated as habitat areas of particular concern, where fishing and other bottom-contact restrictions and monitoring requirements conserve and enhance EFH. 3-ER-267-72. In the Bering Sea and the Aleutian Islands, bottom trawling gear is prohibited in certain areas to protect seafloor habitat (across 277,100 square nautical miles in the Aleutian Islands alone). 3-ER-267-68; 73 Fed. Reg. 43,362 (July 25, 2008). All bottom contact fishing gear (*i.e.*, longlines, pots, trawls) is also prohibited in areas designated as coral gardens. 3-ER-267-68. In the Gulf of Alaska, all trawl gear is

9

prohibited in the Southeast Outside district, 1-SER-133-35, and 1,892 square nautical miles in the Slope Habitat Areas are closed to bottom trawling. 1-SER-136; 3-ER-272. Marmot Bay is closed to all fishing except pelagic trawling for pollock (*i.e.*, mid-water trawl gear, *see* 50 C.F.R. § 679.2) to protect Tanner crab. 3-ER-268; 79 Fed. Reg. 2794 (Jan. 16, 2014). The Service and the Council have also worked with the fishing industry to develop gear modifications that reduce fishing impacts to EFH, including modified trawl gear that reduces impacts on sponges, corals, and crab species. *See* 3-ER-268-69.

### 2. The Service's Reviews of Essential Fish Habitat

Pursuant to Component 10's direction to review EFH components, the Service has completed three reviews of the EFH provisions for Alaskan fisheries since 2005. *See* 50 C.F.R. § 600.815(a)(10). The EFH review process has multiple steps: First, the Service conducts a scientific review of new information and provides an analysis to the Council. Next, the Council considers whether to update fishery management plans with this new information. Finally, if the review reveals that further fishery management measures may be warranted, the Council and the Service consider potential management actions through notice-and-comment rulemaking. *See* 2-SER-339-44. Each EFH review takes three-to-five years to complete because of the amount of data and coordination involved. *See, e.g.*, 2-SER-339-44.

The Service completed its 2010 EFH review in 2012, *see* 2-SER-493-506; its 2017 review in 2018, *see* 2-SER-406-23; and the most recent review—which Oceana challenges here—in 2023, *see* 2-ER-186-247; *see also* 2-SER-338. During these reviews, the Service used the best available science and built upon analyses from prior reviews. At the conclusion of each review, the Council recommended fishery management plan amendments to update EFH information. *See* 2-SER-498; 2-SER-417-18; 2-ER-197-99. The Service then approved those amendments. *See, e.g.*, 2-ER-182-85.

### a.      The Service's Scientific Models

Consistent with the MSA and the Service's regulations, the Service uses the best available science to describe and map EFH and then determines if and where fishing is adversely affecting EFH. For the past two decades the Service and the Council have continually improved upon the scientific methods used to perform the fishing effects analysis and to describe and map EFH. *See* 2-SER-342-53; 2-SER-301-09; 2-SER-328-39; 3-ER-328-31. The Service uses this analysis to determine whether revisions to the fishery management plan EFH provisions are warranted. *See* 50 C.F.R. § 600.815(a)(10).

### i.      Long-Term Effects Index

In the 2005 EFH EIS review, the Service analyzed the potential adverse effects of fishing on EFH using the Long-Term Effects Index, a numerical model

11

that "estimated the proportional reductions in habitat features relative to an unfished state." 2-ER-79. The analysis indicated that fishing had long-term effects on seafloor habitat features but acknowledged that the consequences of such changes are uncertain. 2-SER-518. As a result, the Service adopted precautionary management measures to reduce adverse effects of groundfish fishing on habitat, including expanded closures for bottom-contact fishing gear in the Bering Sea, Aleutian Islands, and Gulf of Alaska. 3-ER-340; 2-SER-535-35; 2-SER-523. The Service reconsidered the effects of fishing on EFH in the 2010 EFH review and concluded that no changes to the 2005 conclusions were warranted based on new information. 2-ER-81.

### ii. Fishing Effects Model

During the 2017 EFH Review, the Service worked with technical experts to develop a new model to modernize the fishing effects analysis for EFH in Alaska. 3-ER-341. The model uses spatial–temporal fishing data and incorporates habitat susceptibility and recovery data from scientific studies, 3-ER-344-49, producing estimates of habitat disturbance using 25-square-kilometer grid cells across the Aleutian Islands, Eastern Bering Sea, and Gulf of Alaska, 3-ER-342. The new model combined features from a number of existing cumulative fishing impacts models (including the Long-Term Effects Index) by using a discrete-time framework, providing monthly tracking of fishing impacts and habitat disturbance,

12

applying a more accurate system for mapping fishing locations and fishing gear, and incorporating more information to estimate habitat susceptibility and recovery dynamics. 3-ER-341; *see also* 3-ER-348-49 (noting that the prior index analyzed four habitat types, while the new model defines 26 habitat features, including coral and sponge communities). The model's output provides an estimate of the proportion of disturbed habitat in each grid cell for each month of the model run. 3-ER-342. The SSC reviewed the fishing effects model prior to the 2017 EFH Review and approved its use while also identifying areas for future improvement. *See* 2-ER-88; 3-ER-355 (also approving with updates for the 2023 EFH Review).

Starting with the 2017 EFH Review, the Service has used a multistep method provided by the SSC to assist in the determination of whether there are fishing effects on EFH that should be elevated to the Council for possible mitigation. *See* 2-SER-454-70. During the first step, the Service's stock assessment authors—experts for each species—evaluate each species' population status and estimates of EFH disturbance. The Service determines whether the managed fish stock is below the minimum stock size threshold (MSST) and whether there has been a 10% or more reduction in the species' core EFH area based on the results of fishing effects model. 2-SER-466. If either threshold is triggered, then the stock assessment author performs the second step of analyzing estimates of habitat disturbance. 2-SER-469-70. However, meeting these thresholds does not preclude

13

the stock assessment authors from completing further analyses if other data suggest impacts may be affecting the population. 3-ER-357. The third and final step is for the stock assessment author to decide if the species should be elevated to the Council for possible mitigation measures. 3-ER-357.

Throughout the process, stock assessment authors have the option to provide a qualitative analysis if there are any data limitations or if they believe additional analysis is warranted based on their expertise. 3-ER-356-58. At the conclusion of the 2017 EFH Review, Oceana commended the Service on its approach and for leading "the effort to designate and protect [EFH]" and for "developing the maps and analyses to support updating the descriptions of EFH." *See* 2-SER-453.

### b. 2023 Essential Fish Habitat Review

For the 2023 review, the Service used a similar approach. The Service initiated the review process in April 2019. 2-SER-340. Over the next two years, the Service provided progress reports to the Council and obtained input from the Council's SSC. *See* 2-SER-340-41. In early 2021, the Service began meeting with thirty stock assessment authors and species experts who peer reviewed the best available science for 103 managed species and completed the evaluation of fishing effects on EFH. 2-SER-352-53; 2-SER-340-41. The stock assessment authors reviewed the updated EFH maps for each major life stage of the 103 managed species. *See* 2-SER-301-09. The stock assessment authors also reviewed the use of

14

updated adult life history stage EFH maps to overlay the estimates of habitat disturbance from the fishing effects model for each species. 3-ER-356. Most stock assessment authors determined that a quantitative assessment was the most appropriate approach. 3-ER-358-59.

After reviewing habitat disturbance from fishing events for 103 species or species complexes, the authors provided more detailed assessments for nineteen species: sixteen that exceeded 10% of the estimated disturbance in their core EFH area, two whose stock was below MSST, and one where the author chose to perform a qualitative assessment based on personal observations. 3-ER-358-59; 3-ER-373-74. For the sixteen species with more than 10% estimated disturbance in their core EFH area, the stock assessment authors looked for correlations between estimated disturbance in core EFH area and impacts on individual species throughout their life cycle, using life history parameters. 3-ER-357. Ultimately, no stock assessment author concluded that fishing effects were more than minimal and temporary for their species. 3-ER-359. None of the authors recommended any additional conservation and enhancement measures for EFH. 3-ER-359.

In February 2022, the Service presented the results of the stock assessment author reviews and the EFH fishing effects evaluation to the Council's SSC. *See* 3-ER-329; 2-SER-402. The SSC, Council, and the Service concurred with the

15

authors' determination that no additional EFH conservation and enhancement measures were warranted. *See* 2-ER-229; 1-SER-140.

At the February 2023 Council meeting, after nearly four years of analysis, the Service presented a draft summary report to the Council, in which it recommended that five of the nine EFH components be revised in four fishery management plans: description and identification of EFH (text and maps) (Component 1); fishing activities that may adversely affect EFH (Component 2); non-fishing activities that may adversely affect EFH (Component 4); prey species (Component 7); and research and information needs (Component 9). 2-SER-348-49. The Council again concurred with the Service's recommendation that further measures to conserve and enhance EFH (Component 6) and identification of additional habitat areas of particular concern (Component 8) were not warranted at this time based on a cumulative analysis of existing conservation measures and both fishing and non-fishing effects on EFH. *See* 2-SER-348-49; 2-ER-229.

The Service and Council staff prepared an environmental assessment pursuant to NEPA to analyze whether to adopt the amendments. 1-SER-154; 2-SER-300. In December 2023, the Council voted unanimously to recommend that the Service amend the Council's fishery management plans "to incorporate the updated EFH information based on the new and best available science information identified in the [2023 EFH review]." *See* 1-SER-157; 1-SER-154; 2-ER-197.

16

None of the recommended changes required regulatory action, as they were updates to descriptions, maps, and EFH information in existing EFH provisions of the plans. 1-SER-148.

On April 23, 2024, the Service published a notice of availability for the proposed EFH amendments to the fishery management plans in the Federal Register with a sixty-day comment period ending on June 24, 2024. 1-SER-137. The Service issued its Notice of Agency Decision in July 2024, approving the EFH amendments. *See* 2-ER-182-85.[3]

### C. Proceedings Below

Oceana brought claims under the MSA, NEPA, and the APA. 5-ER-822-49. For the MSA claims (a subset of which are at issue in this appeal), Oceana alleged that the Service violated the Act by inadequately analyzing adverse effects to EFH and failing to consider additional actions to minimize any adverse effects; violated its broader obligation to conserve and enhance EFH pursuant to the MSA; and failed to consider evidence about certain habitat features. *See* 1-SER-113-26. At-

---

[3] While the 2023 EFH Review was underway, Oceana submitted a "freeze the footprint" proposal to the Council to "initiate a conversation around establishing protections for corals, sponges, and other essential habitat features in the central and western Gulf of Alaska." 2-ER-43. Oceana submitted the comment during an agenda item called "staff tasking"—not during an EFH review discussion and not as a petition for rulemaking. 2-ER-43. Oceana's proposal envisioned vast area closures and gear prohibitions that would require regulatory action to implement. *See* 2-ER-48-51. The Council chose not to task staff with developing a discussion paper on this proposal.

17

Sea Processors Association, Alaska Groundfish Data Bank, and Groundfish Forum, Inc. (Intervenors) successfully moved to intervene, and the parties filed cross-motions for summary judgment. On September 30, 2025, the district court granted summary judgment to the Service. After finding that Oceana had standing, 1-ER-28, the court rejected each of Oceana's claims on the merits.

First, the court held that the Service complied with the MSA. 1-ER-28-36. For the fishing effects analysis claim, the court rejected Oceana's assertion that the Service used "MSST as a proxy for habitat loss," finding that the Service employed a "multi-tiered approach" that directed stock assessment authors to consider "a specific habitat metric for all stocks, regardless of whether their populations are above MSST." 1-ER-29-30. Applying the APA's "highly deferential" standard, the court held that the Service's "implementation of its obligation to minimize adverse fishing effects—by using a fishing effects model that examines MSST and implements a 10% threshold for [core EFH area] disturbance in its fishing effects analysis—is warranted a high degree of deference." 1-ER-31. And the court noted that Oceana "does not offer an alternative method to determine when fishing impacts are more than minimal and not temporary," nor "challenge the regulation itself as being inconsistent with the [Act]." 1-ER-31.

As for Oceana's other claims, the court concluded that the MSA does not require the Service to consider long-lived habitat features, the Service's inclusion of habitat areas in the model was entitled to deference, the Service's use of adult stocks to determine core EFH area was reasonable, and the Service reasonably decided not to adopt additional conservation and enhancement measures based on its expertise and the restrictions already in place. 1-ER-31-36. Finally, the court rejected Oceana's NEPA claims. 1-ER-38-39.

Oceana appeals judgment on only a subset of its MSA claims—whether the Service violated the Act by considering MSST and core EFH area disturbance as part of its broader analysis for the 2023 EFH Review.

## SUMMARY OF ARGUMENT

1.     Oceana lacks standing. To establish standing, a plaintiff must demonstrate that it has suffered an injury caused by the challenged action and that the injury would likely be redressed by the requested judicial relief. Oceana has failed to show that the action challenged here—minor amendments to fishery management plans that update EFH information—causes any concrete injury to its members.

Oceana contends that its members are harmed by the status quo or, in its words, "continued trawling" off the Alaska coast. But in this suit, Oceana challenges amendments to fishery management plans that updated EFH maps and

19

information, not any agency action that authorized trawling or continued trawling. In effect, Oceana attempts to use this suit to challenge the Service's methodology for evaluating adverse effects—even where the Service has taken no new action that injures Oceana's members.

Moreover, because the amendments do not authorize trawling, Oceana has failed to show that its requested relief—a new analysis—will redress any injury from trawling. Even if the Court finds some deficiency in the Service's analysis, a possible outcome could be new recommendations, and any change to fishing activities would require additional regulatory action separate from the EFH five-year review process.

2.     If the Court reaches the merits, it should affirm. In completing the 2023 EFH Review, the Service satisfied its duty under the MSA and its guidelines.

To begin, Oceana's challenge is properly characterized as one to the Service's methodology for evaluating adverse effects to EFH—not a dispute about the meaning of any statutory term. Oceana did not argue below that the Service misinterpreted any statutory term, nor does Oceana argue on appeal that the Service's EFH regulations conflict with the MSA. And both the MSA and the regulatory guidelines provide the Service with substantial discretion in evaluating EFH information as part of the five-year reviews. Thus, the district court

20

appropriately applied the APA's deferential standard in reviewing the Service's methodology and decisionmaking.

Like the 2017 EFH Review (which Oceana praised), the Service's 2023 EFH Review included a fishing effects evaluation that was robust and multi-tiered. The Service gathered extensive data about fishing activity and location, fishing gear, habitat type, habitat sensitivity, and habitat recovery time. The Service used an updated fishing effects model to estimate the percentage of habitat disturbance for each species' EFH. Stock assessment scientists and species experts then reviewed that data and those outputs and evaluated whether a species should be elevated for potential mitigation measures. The Service's approach relied on its technical expertise and was rational.

As part of its holistic evaluation, the Service reasonably considered whether a species was at or below MSST. Habitat disturbance can cause a decline in species population, so understanding possible links between gear impacts to EFH and a species' population health can provide insight into whether any adverse effects to EFH are more than minimal or temporary. And the Service considered MSST as one of several parameters in evaluating potential adverse effects, not as a threshold that conclusively determined whether further review was necessary, nor as a threshold that conclusively determined whether fishing effects were more than minimal and not temporary.

21

The Service also reasonably explained why it considered disturbance to a species' core EFH area and how it selected the appropriate quantitative metrics. The Service determined that focusing the fishing effects analysis on the habitat areas where species are most often found gives stock assessment authors a better understanding of where managed species obtain the most benefit from their habitat. In other words, use of the species' core EFH area for the fishing effects analysis avoids the likelihood that important areas are excluded (if using a smaller, more focused area) and avoids minimizing habitat reduction statistically by using a larger area (the full EFH area). Still, stock assessment authors applied their expertise throughout the evaluation and were not precluded from considering additional information if warranted.

In effect, Oceana asks the Court to determine what parameters agency experts should use, what weight those experts should give to different data, and what those experts should do in the face of incomplete data. The Court should defer to the Service's comprehensive and well-reasoned process for evaluating new EFH information.

3. Finally, if the Court finds any error in the Service's analysis, the Court should remand to the Service without vacatur and without a strict deadline for redoing the 2023 EFH Review. Oceana does not request vacatur, conceding that the amendments here do not cause any harm. And the Service has already initiated

22

the next five-year review of EFH information. Requiring the Service to reanalyze data that predates 2023 would conflict with the MSA's directive that the Service base reviews on new scientific evidence and with the guidelines' directive to use the best available information, and would unreasonably delay completion of the next review.

## STANDARD OF REVIEW

This Court reviews the district court's jurisdictional rulings and grant of summary judgment de novo. *Ctr. for Biological Diversity v. Ilano*, 928 F.3d 774, 779 (9th Cir. 2019); *Save Bull Trout v. Williams*, 51 F.4th 1101, 1105-06 (9th Cir. 2022).

The Service's compliance with the MSA is reviewed under the deferential standard of the APA. *See Midwater Trawlers Co-op v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002); 16 U.S.C. § 1855(f). Under the APA, a court may set aside agency action if the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA's standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1146 (9th Cir. 2016) (quotation omitted). This scope of review "is narrow and a court is not

23

to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

"This traditional deference to the agency is at its highest where a court is reviewing an agency action that required a high level of technical expertise." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989)). This Court "afford[s] the agency discretion to choose among scientific models" and "reject[s] an agency's choice of a scientific model only when the model bears no rational relationship to the characteristics of the data to which it is applied." *Id.* (quotation omitted); *see also Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 871 (9th Cir. 2004); *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 182 (2025).

## ARGUMENT

### I.     Oceana lacks standing.

As a threshold matter, Oceana fails to establish standing to bring its claims because it fails to link any concrete injury to any action by the Federal Defendants and fails to establish that any injury would be redressable through its requested relief.

To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be

24

caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). An association has standing "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).

Here, Oceana's complaint alleges that the Service's "actions and failures to act" violated both APA Section 706(1) (which authorizes claims to "compel agency action unlawfully withheld or unreasonably delayed") and Section 706(2) (which authorizes claims "[t]o hold unlawful and set aside agency action, findings, and conclusions…"). *See* 5-ER-840-42; 5 U.S.C. § 706(1), (2). To support its claim of injury, Oceana cites its members' aesthetic, environmental, and recreational interests in Alaska's waters. 5-ER-825; Opening Br. 29-31. Oceana argues that the Service's "failure to adequately analyze the effects of fishing" and "its corresponding failure to consider any measures to minimize adverse fishing effects" harms its members. Opening Br. 31. Oceana fails to set forth any factual basis for finding an injury that is traceable to the non-regulatory action at issue in this case.

The only potential concrete harm Oceana ties to its members' interests is "[c]ontinued trawling." Opening Br. 31 (asserting that "[c]ontinued trawling in essential fish habitat harms their interests in viewing healthy coral gardens, marine mammals and other ocean life, and in harvesting fish and other species to feed their families"). But "continued trawling" is not the challenged action, nor is it authorized by the challenged action. The action challenged here is a series of minor non-regulatory amendments to various fishery management plans that include newly available EFH science and updated maps. 2-ER-182-86; 1-SER-140. Neither the Amended Complaint nor Oceana's Opening Brief explain how the Service's approval of updated science would injure Oceana or its members. In fact, Oceana concedes that "[l]eaving that updated information in place . . . may have some benefits and is not likely to cause environmental harm." Opening Br. 54. Oceana must establish injury caused by the government action it challenges, not some prior or separate government action. *See Wash. Env't Council v. Bellon*, 732 F.3d 1131, 1142 (9th Cir. 2013) ("Plaintiffs must show that a causal connection exists between their asserted injuries and the conduct complained of."); *see also Hippocratic Med.*, 602 U.S. at 383-84 ("Without the causation requirement, courts would be virtually continuing monitors of the wisdom and soundness of government action." (quotation omitted)).

Nor can Oceana recast its claim as "agency action unlawfully withheld or unreasonably delayed" in order to rely on alleged injuries from "continued trawling" or from the failure to adopt additional conservation measures. *See* 5 U.S.C. § 706(1). First, Oceana must demonstrate standing for each of its claims, and it abandoned its § 706(1) claim in the district court. *See generally* 1-SER-082-131; Opening Br. (not citing Section 706(1)); *see also Kumar v. Koester*, 131 F.4th 746, 751 (9th Cir. 2025).

Second, failure to act claims (or claims designed to compel an agency to act) only prevail where a party demonstrates that the "agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004). Oceana has not done so. Oceana identifies no facts or law to support a claim that the Service failed to take a required action, or even failed to consider specific, scientific data in its EFH review. Oceana's attempt to dress up its alleged failure to act injuries to support standing for its claims challenging agency actions is best viewed as a generalized attack designed to entangle the court in the day-to-day management decisions that Congress entrusted to the Service. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891-94 (1990); *SUWA*, 542 U.S. at 66-67. If generalized allegations of inadequate analysis alone were sufficient to confer standing under the APA, that would create an exception that would swallow the rule.

27

Oceana has similarly failed to establish that any concrete injury is likely redressable by its requested judicial relief. *See Hippocratic Med.*, 602 U.S. at 380 (noting that "causation" and "redressability" are "often flip sides of the same coin" (quotation omitted)). To establish that its members' injuries are redressable, Oceana must show that it is "likely, as opposed to merely speculative, that [its members'] injur[ies] will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (quotations omitted).

Here, Oceana asks the Court to declare the Service's decision adopting the amendment unlawful and remand to the Service to conduct a new EFH review. Opening Br. 53. But even if the Court remands for further analysis and that analysis leads to different scientific conclusions, the ultimate product would be—at most—a recommendation. Any changes to fishing activities (or trawling) would require a new regulatory action because fishery management plans are not self-executing and are not enforceable without implementing regulations. *See N.C. Fisheries Ass'n*, 550 F.3d at 17. The plans "do not themselves have any regulatory effect" and create no legally binding obligations for fishery participants. *Id.*[4]

---

[4] Although the causation and redressability requirements are relaxed where a plaintiff seeking to enforce a procedural requirement establishes a concrete injury, *see Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008), Oceana has abandoned its procedural claim pursuant to NEPA and it nowhere argues that the Service violated some procedural requirement in the MSA, such as a failure to engage in required notice and comment rulemaking, *contra Kāpa'a v. Trump*, 794 F. Supp. 3d 793, 807-08 (D. Hawaii 2025). In any event,

Because the EFH amendments neither "require" nor "forbid" any action that could injure Oceana—and additional steps would need to occur before anyone (including Oceana) could be harmed by the actions at issue in this case—Oceana has failed to establish any concrete injury traceable to the challenged agency action. *See Hippocratic Med.*, 602 U.S. at 382; *Gulf Restoration Network v. Nat'l Marine Fisheries Serv.*, 730 F. Supp. 2d 157, 166 (D.D.C. 2010).[5]

## II.     The Service complied with the Magnuson-Stevens Act.

The Service's review of EFH information was consistent with the MSA and the agency's regulatory guidelines. In arguing otherwise, Oceana attempts to cast its criticism as a legal question of statutory interpretation and argues that the

---

even where the causation and redressability requirements are relaxed, a plaintiff must still show that the "the *challenged* [agency] action will threaten their concrete interests." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 (9th Cir. 2011) (emphasis added). Updating the EFH information in fishery management plans does not injure Oceana's members.

[5] Because the fishery management plan amendments challenged here are merely updated information that may be used in future implementation decisions, Oceana's claims are also not ripe. The amendments provide further descriptions of EFH but do not propose where future implementation actions will occur or how this information will be used in reaching any future decisions. *See Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 729-30 (1998). For that reason, it is premature to evaluate the implications of the scientific information included in the amendments. *See id.* at 732. If and when the Service relies on the scientific information in the amendments to support future implementation actions, Oceana will have ample opportunity to bring a later challenge when its harm is more imminent and certain. *See id.* at 734. Delaying review to the appropriate time prevents courts from engaging in "premature review" of "abstract disagreements over administrative policies," as Oceana requests here. *See id.* at 735-36 (quotation omitted).

district court erred in deferring to the Service's technical expertise. This Court should reject this newly crafted argument because Oceana's claims target the methods the Service used to evaluate impacts from fishing—not a faulty interpretation of the MSA. Oceana also misunderstands the context of the Service's review here. In this EFH five-year review, the Service was evaluating whether—under the current management provisions—there are any adverse effects that are more than minimal and not temporary and whether any fishery management plan requires amending. The stock assessment authors, the Council, and the Service reviewed the best available science, applied their expertise, and determined that no amendment was needed. Finally, Oceana misunderstands the methodology the Service used, which incorporated extensive data and involved a holistic, multi-tiered analysis. In this highly technical and scientific evaluation, this Court should defer to the Service's choice of methodology.

## A.    The APA's deferential standard of review applies to the Service's analysis of adverse effects.

On appeal, Oceana argues that the Service's errors were ones of statutory interpretation, not methodology, and that the district court thus erroneously deferred to the Service's technical expertise. Opening Br. 32-36. The Court should reject this newly revamped argument because Oceana forfeited it by never developing it below. In any event, Oceana is wrong on the merits because the MSA

and the Service's unchallenged regulations provide flexibility in conducting EFH reviews.

### 1.  Oceana did not raise a statutory-interpretation argument before the district court.

Before the district court, Oceana primarily argued that the Service failed to consider certain additional evidence that Oceana deemed important to the EFH review. *See, e.g.*, 1-SER117- 26 (Oceana's district court brief challenging the Service's consideration of specific metrics and failure to consider other evidence); *see also* 1-SER-043-45 (arguing that the Service's decision "to ignore evidence" was "arbitrary"). Oceana did not argue that the Service's guidelines conflicted with any statutory mandate or that the district court needed to interpret the MSA provisions anew.

On appeal, Oceana appears to shift course, arguing that the Court "should apply its independent judgment" and "find the 'best meaning' of the [MSA]." Opening Br. 29. As discussed more fully below, Oceana continues to attack the "type of analysis" and methodology used by the Service, not any statutory interpretation. *See* Opening Br. 32. The Court should decline to reach this new argument, which Oceana forfeited and which is unnecessary to resolve the present case. *See Bolker v. Comm'r of Internal Revenue*, 760 F.2d 1039, 1042 (9th Cir. 1985) ("As a general rule, we will not consider an issue raised for the first time on appeal, although we have the power to do so." (citation omitted)).

### 2. Oceana challenges the Service's methodology and analysis, not its interpretation of any statutory term.

In any event, Oceana's argument is a criticism of the "type of analysis that the Fisheries Service conducted," not the Service's interpretation of the MSA. *See* Opening Br. 32. As such, the district court correctly deferred to the Service's reasonable and well-explained decision regarding how to conduct reviews of EFH information.

### a. *Loper Bright* retained agency discretion in this context.

Rather than help Oceana's case, *see* Opening Br. 33, *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), demonstrates why the Service is owed deference in evaluating new EFH information.

In *Loper Bright*, the Supreme Court overruled the deference framework of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), holding that courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority" rather than deferring to an agency's reasonable construction of an ambiguous statute. *Loper Bright*, 603 U.S. at 412-13; *id.* at 394 (adding that courts may still "seek aid from the interpretations of those responsible for implementing particular statutes"). But the Court acknowledged that Congress can and does "confer discretionary authority on agencies." *Id.* at 404. The Court recognized specifically statutes that "'expressly

32

delegate[]' to an agency the authority to give meaning to a particular statutory term," or "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme" or to "regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Id.* at 394-95 (citations omitted). And the Court emphasized that APA "Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential." *Id.* at 392.

Thus, after *Loper Bright*, courts have distinguished between challenges to an agency's interpretation of a statutory term and challenges to an agency's decisionmaking process. *See, e.g.*, *Lopez-Martinez v. U.S. Att'y Gen.*, 149 F.4th 1202, 1207 (11th Cir. 2025) (while *Loper Bright* supplies the standard for legal statutory interpretation questions, the APA continues to "prescribe[] a deferential 'arbitrary and capricious' standard to govern a court's review of an agency's decisionmaking process"); *Zimmer Radio of Mid-Missouri, Inc. v. F.C.C.*, 145 F.4th 828, 846 (8th Cir. 2025) (explaining that, where parties did not dispute the "*meaning*" of a statutory word but rather the "*degree*" of its application, the decision was "appropriately delegated 'to the responsible agency'" granted discretion by Congress).

    b. **The Service's review of essential fish habitat information is owed deference under the APA.**

Oceana does not challenge any *legal* interpretation by the Service in the guidelines or in the amendments. Instead, Oceana argues that the "process" the

33

Service used was flawed, *see* Opening Br. 1; the Service used "inappropriate criteria" to evaluate whether fishing effects are minimal, *see* Opening Br. 2, 25-26; and the Court should "remand to the agency for a new analysis," Opening Br. 27, 54. This is a challenge to the agency's decisionmaking process and choice of methodology, which are owed substantial deference under the APA. *See Locke*, 776 F.3d at 994; *see also Lands Council v. McNair*, 537 F.3d 981, 993-94 (9th Cir. 2008) (en banc) (a court's role is to ensure the agency made no "clear error of judgment," not to "impose on the agency [its] own notion of which procedures are best," nor "impose procedural requirements not explicitly enumerated in the pertinent statutes" (cleaned up)), *rev'd on other grounds by Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008).

First, nothing in the MSA specifies what "process" or "criteria" the Service must use to review EFH information. The MSA directs the Service to "minimize to the extent practicable adverse effects on [EFH] caused by fishing"; "establish by regulation guidelines to assist the Councils" in identifying EFH and adverse impacts and in considering "actions to ensure the conservation and enhancement of such habitat"; and "set forth a schedule" for the review of EFH. 16 U.S.C. §§ 1853(a)(7), 1855(b)(1)(A). And while the MSA states that the Service should review EFH identifications "based on new scientific evidence or other relevant information," the Act does not prescribe any particular methodology for the

34

Service's review. *See* 16 U.S.C. § 1855(b)(1)(A). In this way, Congress directed the Service to adopt regulations to "fill up the details" of the MSA's statutory scheme, *Loper Bright*, 603 U.S. at 394-95, and gave the Service substantial discretion in deciding when adverse effects warrant minimization or mitigation. *See Conservation L. Found. v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004) ("[B]y using the term 'practicable' Congress intended . . . to allow for the application of agency expertise and discretion in determining how best to manage fishery resources.").

The Service exercised its discretion by adopting the unchallenged EFH guidelines. Those guidelines—like the MSA—do not require the Service to use any specific methodology in its EFH review. *See* 50 C.F.R. § 600.815(a)(2)(ii), (a)(10); *see also* 67 Fed. Reg. at 2348 (noting that the guidelines "provide[] sufficient flexibility to account for the variety of managed species and to address regional variations in the availability of scientific information and differences in Council operating procedures nationwide"). Accordingly, the Service has applied its expertise to develop a scientific model and iterative process to evaluate adverse fishing effects to EFH and has implemented vast closures and fishing restrictions in Alaska's fishery management plans. *See supra* pp.9-17. The "manner in which the Service implement[s] [this] established, but inherently discretionary, directive" is "'a garden variety APA arbitrary and capricious claim.'" *Conservation L. Found. v. Ross*, 374 F. Supp. 3d 77, 93 (D.D.C. 2019) (quoting *Chamber of*

35

*Commerce of U.S. v. FEC*, 76 F.3d 1234, 1235-36 (D.C. Cir. 1996); *see also Lands Council*, 537 F.3d at 1000; *Native Vill. of Point Hope v. Salazar*, 680 F.3d 1123, 1132 (9th Cir. 2012).

Second, to the extent Oceana disagrees with the Service's scientific conclusion that no managed species is experiencing more than minimal or non-temporary fishing effects on its EFH, such a "factbound determination" continues to receive "deferential review" after *Loper Bright*. *See Loper Bright*, 603 U.S. at 392; *see also Seven Cnty.*, 605 U.S. at 181-82 ("Black-letter administrative law instructs that when an agency" makes "predictive and scientific judgments in assessing the relevant impacts," a "reviewing court must be at its 'most deferential'").

In sum, Congress left to the Service the scientific task of determining whether fishing has caused adverse effects to EFH, and the Service has used its technical expertise to generate a scientifically robust model and rigorously synthesize large datasets to make that determination. The district court correctly held that the Service's technical choices here warrant substantial deference.

## B.    The Service rationally determined that adverse fishing effects are not more than minimal or temporary.

The Service's rigorous analysis was reasonable and adequately evaluated adverse impacts to EFH, and the Service "made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council*, 537 F.3d at 993

36

(quoting *Marsh*, 490 U.S. at 378). In arguing otherwise, Oceana provides an incomplete description of the Service's process and fails to offer any suitable alternative methodology. The Court should defer to the Service's expertise. *See Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*, 153 F.4th 869, 906 (9th Cir. 2025) ("We are not to act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty." (quotation omitted)).

### 1. Oceana misconstrues the Service's methodology.

To begin, Oceana misconstrues the framework used by the Service. Oceana contends that the Service "used two criteria that set an impermissibly high bar" and "allowed the agency to conclude there are no adverse fishing effects if it" determined that the species had not "collapsed" and there had been no "significant damage to the limited part of the designated [EFH] the Fisheries Service chose to look at." Opening Br. 32-33. This is an incorrect description of the Service's process for the 2023 EFH Review.

Fishing operations can change the abundance or availability of certain habitat features used by fish species. Those changes can reduce or alter the abundance, distribution, or productivity of the species. This in turn can affect the species' availability to support a sustainable fishery and contribute to a healthy ecosystem. 3-ER-338. This complex chain of events depends on several factors,

37

and evaluating the effects of fishing on EFH requires consolidating information from a wide range of sources and fields of study. 3-ER-338. Quantifying the effects of fishing on seafloor habitats also requires the application of professional judgment, particularly because of the number of unknown variables. 3-ER-338. As explained above, *supra* pp.11-16, the Service's fishing effects evaluation relies on extensive data and scientific research, outputs from the fishing effects model, and quantitative and qualitative analysis by expert stock assessment authors. 3-ER-342-58. The process is multi-tiered and takes several years to complete. *See* 2-SER-340-41 (showing timeline for 2023 review).

For the 2023 EFH Review, the Service's analyzed extensive data about fishing activity and effects. Inputs to the model included data about fishing gear (including size, depth, and type of trawls), 3-ER-377-82; spatial data showing where fishing occurs based on vessel monitoring system information and observer records, 3-ER-344-46; data about dozens of habitat types (including corals and sponges), how susceptible each habitat type is to different types of fishing activities, and how long it takes the habitat type to recover from disturbances from fishing activities, 1-SER-225-28; and data about where each habitat type occurs, 3-ER-346-47. Compared to the 2017 EFH Review, the Service in 2023 provided additional information to support assumptions about habitat recovery times, addressed concerns about unobserved fishing event data, and attempted to address

concerns about the readability of EFH data. 3-ER-353-55. The Service also included updated fishing data in the model, 3-ER-345, and used a new species distribution model ensemble approach to update the EFH maps used to analyze fishing effects on EFH, 2-SER-301-09; 2-SER-384; 2-SER-350-52. None of this data was restricted to core EFH area.

The Service incorporated these data about fishing activity and habitat susceptibility and recovery into the model, which estimates the habitat disturbance from fishing activities. 3-ER-341; 3-ER-344. The model tracks habitat transitions between disturbed and undisturbed states on a monthly basis within 25-square-kilometer grid cells across the North Pacific, taking into account overlapping fishing events for cumulative impacts. 3-ER-342. The primary output of the model is an estimated proportion of disturbed habitat in each grid cell for each month of the model run. 3-ER-342. The model produced maps showing all estimated habitat disturbance from fishing across the entire region. *See* 3-ER-342-43.

After the Service ran the model, the stock assessment authors used the model results to evaluate whether any species should be elevated for further review based on possible adverse fishing effects to EFH. 3-ER-357. The stock assessment authors followed the multi-tiered process used in the 2017 EFH Review. 3-ER-356. As part of this process, the stock assessment authors were asked to assess specific parameters, but nothing in the process precluded authors from engaging in further

39

analysis if any data suggested that habitat disturbance may be affecting the species. 3-ER-357.

First, the stock assessment authors reviewed whether each species is above or below MSST and conducted a written assessment for any stock below MSST to determine if EFH disturbance is a potential cause. 3-ER-356-57. Any written assessment was provided to the SSC and the Council for consideration of possible mitigation measures. 3-ER-385; *see also* 3-ER-391 (updated decision tree provided to stock assessment authors).[6]

Second, for all species—including those above MSST—the stock assessment authors reviewed maps showing estimated habitat disturbance to each species' EFH and time series data showing estimated habitat disturbance over time. 3-ER-356. Although the Service provided authors with results for the core EFH area (the upper 50th percentile of the EFH where the fish stocks are most concentrated), the Service offered authors the option to consider the upper 75th percentile, 3-ER-356, and authors had access to maps showing the upper 25th and 95th (full EFH area) percentiles as well, 3-ER-387.

---

[6] The graphic Oceana includes to "illustrate[]" the Service's "approach to evaluating the effects of fishing on [EFH]," *see* Opening Br. 19-20, is not the decision tree that was ultimately provided to the stock assessment authors for the 2023 EFH Review, *see* 3-ER-391.

For any species with more than 10% estimated habitat disturbance in its core EFH area, or for which the stock assessment author determined more analysis was needed, the author examined additional information, including time trends in the species' size at different ages, spawning success, breeding success, and feeding distributions. 3-ER-357. The author looked for any correlation between those additional parameters and trends in core EFH area disturbance estimates, and if a correlation was found, the author determined whether the correlation was significant and thus whether the species should be elevated for further review by the SSC. 3-ER-357. Had the SSC determined that any impacts were more than minimal and not temporary, it would recommend mitigation measures to the Council. 3-ER-357. Stock assessment authors were also asked to consider whether to elevate a species for possible mitigation based on other sources of information. 3-ER-357-58.

Finally, the stock assessment authors were asked if they had any concerns with the fishing effects model's adequacy in capturing effects on their species, what they considered to be the most appropriate approach to assessing fishing effect to their species' EFH, and whether they had any recommendations for future EFH research activities and priorities. 3-ER-391.

This process rationally assists the evaluation of EFH impacts by identifying high priority EFH (and dependent species) while also ensuring redundancy and

41

flexibility for the Service, the Council, and the fisheries experts to quantitatively and qualitatively analyze the potential adverse effects of fishing on EFH. The SSC found that the current EFH evaluation methodology is appropriate for the 2023 EFH Review, 3-ER-361, and this sort of "scientific determination" warrants the Court's "most deferential" review, *see Natural Resources Def. Council v. Haaland*, 102 F.4th 1045, 1067 (9th Cir. 2024) (quoting *Native Ecosystems Council v. Marten*, 883 F.3d 783, 791 (9th Cir. 2018)); *see also N.C. Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 80 (D.D.C. 2007) ("[C]ourts should generally defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the [MSA] charges with making difficult policy judgments and choosing the appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors." (quotation omitted)).

Moreover, although Oceana now disclaims its prior support for this approach, it points to no alternative approach that has been shown to effectively detect fishing effects that necessitate mitigation measures. *See* 1-ER-31; 1-SER-008-09; 2-SER-453. Nor does it "show that any disregarded scientific evidence would materially affect the agency's conclusion." *Haaland*, 102 F.4th at 1067.

The Court should defer to the Service's expertise in designing and using this robust fishing effects evaluation. But, as explained more thoroughly below, the

Service also rationally considered specific parameters—MSST and habitat disturbance in core EFH areas—in evaluating whether there were any "more than minimal and not temporary" adverse effects from fishing activities.

### 2. The Minimum Stock Size Threshold is rationally related to evaluating fishing effects on essential fish habitat.

As noted above, the stock assessment authors begin their evaluation of fishing effects by considering whether each managed species is above or below the MSST, which represents the level at which a stock can no longer produce its maximum sustainable yield. 3-ER-356-57. If the stock is below the MSST, stock assessment authors are asked to provide a written assessment addressing whether disturbances to EFH could be a contributing cause. 3-ER-385.

Oceana argues that the Service's use of a stock's MSST "as one of the criteria for determining whether there was damage to *habitat*" is "inconsistent with the plain language and structure of the [MSA]." Opening Br. 47. In Oceana's view, the Service's use of this metric "conflated" the MSA's requirement to "protect" EFH and to "prevent overfishing." Opening Br. 48. But the Service appropriately recognizes the value of MSST in evaluating a species' health and rationally used this metric as one factor in a multi-tiered analysis. *See* 1-ER-29-30. The Court should defer to the Service's expertise in developing a layered scientific framework to evaluate effects on EFH.

43

First, using MSST as part of the fishing effects analysis is consistent with the MSA, which recognizes the common-sense link between population status and EFH. The MSA identifies the need for a national program to prevent overfishing, rebuild overfished stocks, and facilitate protection of EFH. 16 U.S.C. § 1801(b)(1), (4), and (7). EFH is, by definition, tethered to the health and life history of managed species. *See id.* § 1802(10) (defining EFH as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity"). Because MSST measures species health, a species could fall below MSST due to overfishing, EFH degradation, or other environmental factors. *See* 50 C.F.R. § 600.310(e)(2). For that reason, it is appropriate to evaluate whether fishing may be adversely affecting EFH when a species falls below the MSST. *See* 2-SER-590; *see also* 50 C.F.R. § 600.815(a)(1)(iii) (recognizing that "[e]ssential habitats are those necessary to maintain fish production consistent with a sustainable fishery").

Nothing in the MSA or the guidelines restricts the Service's discretion to exercise its technical expertise and include MSST as one of several tools to evaluate fishing effects on EFH. *Contra* Opening Br. 48-49 (suggesting that the MSA "does not allow" the Service to rely on MSST but citing no statutory language that expressly curtails the Service's discretion to consider MSST). For example, although the guidelines do not "require definitive proof of a link between fishing impacts to EFH and reduced stock productivity before Councils can take

44

action to minimize adverse fishing impacts," the Service recognized that action to minimize adverse fishing effects may be "warranted to regulate fishing activities that reduce the capacity of EFH to support managed species." 67 Fed. Reg. at 2354; *see also* 50 C.F.R. § 600.815(a)(1)(iv) (stating that the Service and councils should use their judgment to identify EFH based on the habitat "necessary to maintain a sustainable fishery and the managed species' contribution to a healthy ecosystem"). Accordingly, the Service and the Council have used MSST as part of the fishing effects evaluation since 2005. *See* 2-SER-572; 2-SER-590-94 (2005 EIS discussing how a stock's MSST status "was one of several factors considered in the analysis" because it can aid in evaluating "whether habitat disturbance caused by fishing reduces the capacity of EFH to support [the] species").

Moreover, as noted above, *supra* Part II.B.1, Oceana incorrectly asserts that a stock's status above MSST precluded any further analysis of possible adverse effects on EFH. *See* Opening Br. 48 ("Under this criterion, the Fisheries Service did not consider minimizing adverse effects unless they had already led to stock collapse."). The stock assessment authors considered whether a stock was below MSST as one factor in their evaluations—not as a conclusive threshold to dictate whether any further analysis could occur. 3-ER-256-57; 3-ER-328-31; 3-ER-388-91; *see also* 1-ER-29-30 (describing the Service's process as "multi-tiered" and characterizing the MSST factor as a "starting point").

45

Under the framework, the authors applied their expertise and "conduct[ed] additional analyses for their stocks in three situations: if their stock is below the [MSST], if the estimated habitat disturbed by fishing in the [core EFH area] was ≥10%, and/or if they preferred a qualitative analysis of the effects of fishing on their species' habitat rather than the quantitative assessment." 3-ER-263. The use of MSST during the fishing effects analysis thus complemented the quantitative (and sometimes qualitative) habitat analyses that also occurred to evaluate EFH impacts. 3-ER-357; 2-SER-457 (noting that evaluations of effects are not limited to MSST but considered a full set of more detailed information on stock status).[7]

Finally, Oceana's characterization of MSST—as the threshold for stock "collapse"—is inconsistent with the MSA and its implementing regulations. *See* Opening Br. 51 (suggesting that the Service will not consider habitat degradation until the "damage is so severe that the stock has collapsed"). MSST represents the level at which a stock can no longer produce its maximum sustainable yield, which is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery

---

[7] During the 2023 EFH Review, stock assessment authors identified two species with stocks below MSST and provided written fishing effects evaluations. 1-SER-231 (identifying the species as Eastern Bering Sea blue king crab and Eastern Bering Sea snow crab). After robust quantitative correlation analyses of habitat disturbance and population health, the stock authors concluded that there was no causal link between the fishing impacts to EFH and stock status warranting elevation to the SSC. 1-SER-231; 1-SER-282-86; 1-SER-290-94.

technological characteristics (e.g., gear selectivity), and the distribution of catch among fleets." 50 C.F.R. § 600.310(e); *Id.* § 600.310(e)(2)(i)(F). Neither the MSA nor the Service has characterized a stock as "collapsed" solely because the stock fell below MSST. *See, e.g.*, 2-SER-539 ("Stocks below MSST are considered sufficiently small as to require an appropriate rate of rebuilding."). And, as discussed above, considering whether a stock has fallen below MSST can provide insight into species health.

In sum, the Service rationally evaluated whether habitat disturbance may have correlated with the health of the species as part of its holistic review of EFH information and potential adverse fishing effects.

### 3. The Service's use of the core EFH area was appropriate and adequately explained.

When pressed by the district court, Oceana conceded that an evaluation of core EFH area is an acceptable metric to assess impacts on EFH. *See* 1-SER-008-09 (stating that it would be "okay" if the Service "were allowed to use its current core essential fish habitat to assess habitat impacts" but arguing that it needs to consider additional other evidence about "corals and sponges at shallow depths").[8] Nevertheless, Oceana now criticizes the Service for failing to consider "all" EFH and argues that analyzing core EFH areas "missed" possible adverse effects.

---

[8] On appeal, Oceana has abandoned its argument that the Service ignored evidence about habitat features at shallow depths.

Opening Br. 39, 44. But nothing in the MSA dictates how the Service must conduct EFH reviews, *see supra* Part II.A.2.b, and the Service provided a "rational" explanation for why considering core EFH area disturbance assists experts in determining whether any adverse impacts are more than minimal or temporary. *See Locke*, 776 F.3d at 994.

A stock's entire EFH area is where 95% of the stock occurs. 2-SER-326. The core EFH area is where fish stocks are most concentrated and is defined as the top 50% of the EFH area. 2-SER-381; 2-ER-229. As discussed above, during the fishing effects analysis, if more than (or equal to) 10% of the core EFH area for a species is estimated to be disturbed, the stock assessment authors evaluate trends in the species' life history to look for correlations with habitat disturbance over time. 3-ER-385. All stock authors remain free to perform additional analyses and to recommend additional conservation measures independent of this threshold. *See* 2-ER-229; 3-ER-357 ("[T]he 10% threshold does not preclude stock assessment authors from completing the evaluation for levels of habitat disturbance less than 10%, if other data suggest that impacts may be affecting the population.").[9]

---

[9] Oceana suggests that core EFH areas is "half" of the entire EFH. *See, e.g.*, Opening Br. 45. But core EFH area represents the upper 50th percentile of the full EFH area, the area of occupied habitat where the fish population is most likely to be found, and does not equate to half of the EFH area or the area where half of the population is found. 2-SER-326.

The Service exercised its technical and scientific expertise in selecting the appropriate analytical percentages. In the 2017 review, the SSC considered using the upper 25% or 95% quantiles of EFH, rather than 50%. 3-ER-385. But after reviewing the information for several species, the SSC concluded that analyzing the upper 50% quantile was most appropriate "in order to avoid the likelihood that important areas are excluded (if using the smaller area, 25% quantile) and to avoid statistically minimizing the amount of habitat reduction by using the larger, 95% quantile." 2-SER-490; 3-ER-385. In other words, using a larger quantile, such as 95%, would understate impacts on the most important habitats and likely result in fewer species reaching the 10% threshold.

The Service also rationally explained why it selected a 10% threshold. The SSC determined that, if more than 90% of the core EFH area is preserved, then impacts to the remaining <10% likely represents a disturbance to EFH that is not more than "minimal" and "temporary." *See* 50 C.F.R. § 600.815(a)(2)(ii); 2-SER-452; 2-SER-469. Nevertheless, the Service ensured that stock assessment authors retain the ability to conduct additional evaluation if they determine that the 10% threshold does not appropriately capture potential adverse effects to their species' EFH. 3-ER-357.

In challenging the Service's consideration of core EFH area, Oceana asserts that the MSA "requires protection of *all* essential fish habitat," and suggests that

49

the Service failed to consider any potential adverse effects beyond the core EFH area. *See* Opening Br. 39. But nothing in the MSA requires the Service to "protect" "all" EFH in the review process, nor requires the Service to minimize "all" adverse effects from fishing. The MSA "require[s] [the Service] to balance conservation with yield, not favor one at the expense of the other." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1102 n.15 (9th Cir. 2012). Accordingly, the MSA directs the Service to minimize adverse effects "to the extent practicable," 16 U.S.C. §§ 1853(a)(7), and the guidelines direct councils to prevent, mitigate, or minimize adverse effects that are "more than minimal and not temporary," taking into account the "nature and extent of the adverse effect," 50 C.F.R. § 600.815(a)(2)(ii), (iii). Both standards require the Service to apply its expertise and discretion in determining whether adverse effects warrant mitigation. *See Conservation L. Found.*, 360 F.3d at 28 (noting that Congress used "to the extent practicable" to give the Service discretion in managing fishery resources). In the context of this five-year review and the existing fishery management plans, it was reasonable for the Service to consider the percentage of habitat disturbance in the species' most used areas when weighing whether any new information indicated that adverse fishing effects to EFH were more than minimal.[10]

---

[10] Oceana's contentions also reveal that it misunderstands the discrete issue before the Service in an EFH five-year review: whether to update the EFH provisions in fishery management plans based on new information. The fishery management

50

In any event, the Service *did* consider fishing effects in EFH more broadly, and nothing limited the stock assessment authors to considering only core EFH areas. The fishing effects model estimates habitat disturbance across the whole region, with data available for each 25-square-kilometer grid cell for each month of the model run. 3-ER-342-43 (showing maps of cumulative habitat disturbance). As part of the fishing effects evaluation, stock assessment authors are provided with habitat disturbance results for a species core EFH area, but the authors are also provided with the model's full results to get a comprehensive view of possible adverse effects. *See* 3-ER-342-43; 3-ER-387. And, if stock assessment authors have concerns about using the 50% core EFH area or if any species has limited data, the Service provided the authors with a mapped 75% quantile core EFH area as well. 3-ER-385; 3-ER-356.

The record establishes that the Service made no "clear error of judgment" in focusing the fishing effects evaluation on the top 50% of EFH, particularly because this approach gives stock assessment authors a better understanding of where managed species obtain the most benefit from their habitat. *See Marsh*, 490 U.S. at 378.

---

plans in Alaska already contain EFH provisions and numerous measures to prevent, mitigate, and minimize adverse effects from fishing. *See supra* pp.9-10.

## III.  Vacatur is not appropriate.

If the Court finds any error in the EFH review's methodology, it should remand to the Service without vacating the amendments or remand to the district court to determine the appropriate remedy in light of the Service's ongoing review.

In its Opening Brief, Oceana does not ask the Court to vacate the amendments adopted by the Service after the 2023 review. Opening Br. 54. Instead, Oceana seeks an order declaring the Service's decision adopting the amendments unlawful and a remand to the Service to conduct a new fishing effects analysis within 18 months. Opening Br. 53-54.

The Service has already initiated the next five-year review of EFH information. This review will include an evaluation of fishing effects to EFH and will take years to complete. Even now, the agency is collecting and synthesizing new data for managed groundfish and crab species to inform its review. It would be contrary to the guidelines and the MSA to require the Service to redo the 2023 review with stale data, rather than newly collected information. *See* 16 U.S.C. § 1855(b)(1)(A) ("The Secretary shall set forth a schedule . . . for the review and updating of such identifications based on new scientific evidence or other relevant information"); 50 C.F.R. § 600.815(a)(10) (Councils should review EFH provisions and revise or amend them as warranted "based on available information").

52

Moreover, in the 2023 EFH Review, the SSC identified some potential updates to the process for the next review. *See* 3-ER-355. Specifically, the SSC recommended reporting species-specific estimates of habitat disturbance from the model by major gear classes and continuing to assess long-lived habitat features and whether current inputs in the model are appropriate. 3-ER-355. Requiring a new analysis for the 2023 EFH Review could delay improvements to the model, including some that Oceana has supported. *See, e.g.*, 5-ER-842 at ¶ 97. If the Court finds any error in the Service's analysis, the Service respectfully requests that the Court remand to the district court to address remedy and decline to impose an 18-month deadline.

## CONCLUSION

For the foregoing reasons, the Court should dismiss for lack of standing or otherwise affirm the district court's judgment.

Respectfully submitted,

/s/ *Amy E. Collier*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
EZEKIEL PETERSON
ERIKA FURLONG
AMY E. COLLIER
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 305-5360
amy.collier@usdoj.gov

May 22, 2026
90-8-8-08741

54

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**        25-7689

I am the attorney or self-represented party.

**This brief contains 11,972 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    s/ Amy E. Collier

**Date**        May 22, 2026

# ADDENDUM

16 U.S.C. § 1855(b) ....................................................................................... 1a

**16 U.S.C. § 1855(b)**

**(b) Fish habitat**

**(1)(A)** The Secretary shall, within 6 months of October 11, 1996, establish by regulation guidelines to assist the Councils in the description and identification of essential fish habitat in fishery management plans (including adverse impacts on such habitat) and in the consideration of actions to ensure the conservation and enhancement of such habitat. The Secretary shall set forth a schedule for the amendment of fishery management plans to include the identification of essential fish habitat and for the review and updating of such identifications based on new scientific evidence or other relevant information.

> **(B)** The Secretary, in consultation with participants in the fishery, shall provide each Council with recommendations and information regarding each fishery under that Council's authority to assist it in the identification of essential fish habitat, the adverse impacts on that habitat, and the actions that should be considered to ensure the conservation and enhancement of that habitat.

> **(C)** The Secretary shall review programs administered by the Department of Commerce and ensure that any relevant programs further the conservation and enhancement of essential fish habitat.

> **(D)** The Secretary shall coordinate with and provide information to other Federal agencies to further the conservation and enhancement of essential fish habitat.

**(2)** Each Federal agency shall consult with the Secretary with respect to any action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by such agency that may adversely affect any essential fish habitat identified under this chapter.

**(3)** Each Council--

> **(A)** may comment on and make recommendations to the Secretary and any Federal or State agency concerning any activity authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by any Federal or State agency that, in the view of the Council, may affect the habitat, including essential fish habitat, of a fishery resource under its authority; and

1a

**(B)** shall comment on and make recommendations to the Secretary and any Federal or State agency concerning any such activity that, in the view of the Council, is likely to substantially affect the habitat, including essential fish habitat, of an anadromous fishery resource under its authority.

**(4)(A)** If the Secretary receives information from a Council or Federal or State agency or determines from other sources that an action authorized, funded, or undertaken, or proposed to be authorized, funded, or undertaken, by any State or Federal agency would adversely affect any essential fish habitat identified under this chapter, the Secretary shall recommend to such agency measures that can be taken by such agency to conserve such habitat.

**(B)** Within 30 days after receiving a recommendation under subparagraph (A), a Federal agency shall provide a detailed response in writing to any Council commenting under paragraph (3) and the Secretary regarding the matter. The response shall include a description of measures proposed by the agency for avoiding, mitigating, or offsetting the impact of the activity on such habitat. In the case of a response that is inconsistent with the recommendations of the Secretary, the Federal agency shall explain its reasons for not following the recommendations.

2a