IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

## NO. 25-7689

---

OCEANA, INC.,

*Plaintiff-Appellant*,

v.

NATIONAL MARINE FISHERIES SERVICE, *et al.*,

*Defendants-Appellees*,

AT-SEA PROCESSORS ASSOCIATION, *et al.*,

*Intervenor-Defendants-Appellees*.

---

On Appeal from the United States District Court
for the District of Alaska
The Honorable Sharon L. Gleason
District Court No. 3:24-cv-00180-SLG

---

## INTERVENOR-DEFENDANTS-APPELLEES' ANSWERING BRIEF

---

James C. Feldman
Eva Sharf Oliver
SUMMIT LAW GROUP PLLC
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Ph: (206) 676-7000

*Attorneys for Intervenor-Defendants-Appellees*
*At-sea Processors Association, Alaska Groundfish Data*
*Bank, and Groundfish Forum, Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS................................................................................................i

TABLE OF AUTHORITIES ......................................................................... iii

GLOSSARY OF TERMS ...............................................................................vi

I.     INTRODUCTION ...................................................................................1

II.    JURISDICTIONAL STATEMENT ......................................................3

III.   ISSUES PRESENTED ..........................................................................3

IV.   STATEMENT OF THE CASE ..............................................................4

     A.    The Magnuson-Stevens Act and the Regional Fishery Management Council Framework.........................................................4

     B.    The Sustainable Fisheries Act and the EFH Regulations. ...................6

     C.    NMFS Developed and Improved Upon the Methods by Which it Evaluates Fishing Effects Over the Course of Several Five-Year EFH Reviews for the Alaska FMPs. ..........................................10

          1.    The 2005 EFH review..........................................................10

          2.    The 2010 and 2017 EFH reviews. ...........................................11

          3.    The 2023 EFH review...........................................................15

     D.    Procedural Background.......................................................17

V.     SUMMARY OF ARGUMENT....................................................................19

VI.    STANDARD OF REVIEW.........................................................................20

VII.   ARGUMENT.............................................................................................22

     A.    Oceana's Appeal Presents Quintessential Questions of Deference to an Agency's Scientific Expertise, Not Questions of Statutory Interpretation. .......................................................22

          1.    Under *Loper Bright*, deference is still owed to agency factfinding and technical expertise. ..........................................22

          2.    Deference is owed to NMFS's scientific judgments here. .......24

          3.    Oceana did not contest this issue below. .................................27

     B.    NMFS Appropriately Used Minimum Stock Size Threshold and Core EFH Area to Evaluate Fishing Effects. .....................................28

i

1.	Oceana conceded at oral argument that no better alternative metrics exist. ...........................................28

2.	MSST and CEA are the same metrics that were used to assess fishing effects in the 2017 EFH review supported by Oceana.................................................................31

3.	Oceana's criticisms ignore the intricate modeling exercise in which MSST and CEA operate. ...........................32

C.	Vacatur Is Not the Appropriate Remedy.............................................42

VIII.	CONCLUSION.................................................................................43

STATEMENT OF RELATED CASES.................................................................44

CERTIFICATE OF COMPLIANCE FOR BRIEFS ...............................................45

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amberhill Prop. v. City of Berkeley,*
814 F.2d 1340 (9th Cir. 1987)....................................................................... 30

*American Oceans Campaign v. Daley,*
183 F. Supp. 2d 1 (D.D.C. 2000) ................................................................. 40

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
462 U.S. 87 (1983) ....................................................................................... 23

*Cascadia Wildlands v. BLM,*
153 F.4th 869 (9th Cir. 2025) ...................................................................... 25

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984)...................................................................................... 22

*Cnty. of Amador v. U.S. Dep't of the Interior,*
872 F.3d 1012 (9th Cir. 2017)...................................................................... 32

*Conservation Law Found. v. Evans,*
360 F.3d 21 (1st Cir. 2004)............................................................................ 7

*Conservation Law Found. v. Pritzker,*
37 F. Supp. 3d 234 (D.D.C. 2014) ................................................................. 7

*Conservation Law Found. v. Ross,*
374 F. Supp. 3d 77 (D.D.C. 2019) ............................................................. 5, 7

*Fishermen's Finest, Inc. v. Locke,*
593 F.3d 886 (9th Cir. 2010)................................................................... 37, 40

*Idaho Farm Bureau Fed'n v. Babbitt,*
58 F.3d 1392 (9th Cir. 1995)................................................................... 42, 43

*Kennecott Greens Creek Mining Co. v. Mine Safety and Health Admin.,*
476 F.3d 946 (D.C. Cir. 2007) ..................................................................... 21

*League of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen,*
615 F.3d 1122 (9th Cir. 2010)................................................................. 21, 38

*Loper Bright Enterprises v. Raimondo*,
603 U.S. 369 (2024) .................................................................. 19, 22, 23, 24

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989) ...................................................................... 24, 37, 38

*Massachusetts v. Daley*,
170 F.3d 23 (1st Cir. 1999) ................................................................... 30

*Midwater Trawlers Co-operative v. Dep't of Commerce*,
282 F.3d 710 (9th Cir. 2002) ................................................................ 20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ................................................................................ 20

*Nat. Res. Def. Council v. Haaland*,
102 F.4th 1045 (9th Cir. 2024) ....................................... 20, 22, 41, 42

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
475 F.3d 1136 (9th Cir. 2007) .............................................................. 21

*Oceana, Inc. v. Pritzker*,
24 F. Supp. 3d 49 (D.D.C. 2014) .............................................. 5, 6, 21

*Oceana, Inc. v. Raimondo*,
530 F. Supp. 3d 16 (D.D.C. 2021), *aff'd*, 35 F.4th 904 (D.C. Cir. 2022)............ 42

*One Indus., LLC v. Jim O'Neal Distrib., Inc.*,
578 F.3d 1154 (9th Cir. 2009) .............................................................. 27

*Oregon Trollers Ass'n v. Gutierrez*,
452 F.3d 1104 (9th Cir. 2006) .............................................................. 30

*Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*,
693 F.3d 1084 (9th Cir. 2012) ......................................................... 6, 20

*Seven County Infrastructure Coalition v. Eagle County, Colorado*,
605 U.S. 168 (2025) ............................................................................. 23

*Texas v. EPA*,
137 F.4th 353 (5th Cir. 2025) ............................................................. 22

iv

*The Ocean Conservancy v. Gutierrez*,
  394 F. Supp. 2d 147 (D.D.C. 2005), *aff'd sub nom. Oceana, Inc. v. Gutierrez*,
  488 F.3d 1020 (D.C. Cir. 2007) ................................................................ 40

*Wagner v. Prof'l Eng'rs in Cal. Gov't*,
  354 F.3d 1036 (9th Cir. 2004)................................................................. 30

**Statutes**

5 U.S.C. § 706(2) ................................................................................ 20, 23

16 U.S.C. § 1801 ........................................................................................ 4

16 U.S.C. § 1802 .................................................................................... 5, 6

16 U.S.C. § 1851(a) .................................................................................... 5

16 U.S.C. § 1852 ........................................................................................ 4

16 U.S.C. § 1853(a)(7).......................................................................... 6, 9, 26

16 U.S.C. § 1854 ........................................................................................ 4

16 U.S.C. § 1855(b)(2)............................................................................... 7

Pub. L. 104-297, § 108, 110 Stat. 3559 (1996) ......................................... 6

**Regulations**

50 C.F.R. § 600.305(a)(2)........................................................................... 4

50 C.F.R. § 600.310(e)(1)(i)(A).......................................................... 35, 36

50 C.F.R. § 600.815 ............................................................ 7, 8, 9, 10, 33, 34

67 Fed. Reg. 2343 (Jan. 17, 2002) ............................................................. 7

83 Fed. Reg. 31,340 (July 5, 2018)........................................................... 15

# GLOSSARY OF TERMS

| | |
|---|---|
| APA | Administrative Procedure Act |
| APU | Alaska Pacific University |
| CEA | Core Essential Fish Habitat Area |
| EA | Environmental Assessment |
| EFH | Essential Fish Habitat |
| EIS | Environmental Impact Statement |
| FE | Fishing Effects |
| FMP | Fishery Management Plan |
| LEI | Long-Term Effects Index |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| MSST | Minimum Stock Size Threshold |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| SFA | Sustainable Fisheries Act |
| SSC | Scientific and Statistical Committee |
| VMS | Vessel Monitoring System |

## I.    INTRODUCTION

Every five years, the National Marine Fisheries Service ("NMFS"), in consultation with the North Pacific Fishery Management Council ("the Council"), reviews the best available science to determine if it should update Essential Fish Habitat ("EFH") designations for the Fishery Management Plans ("FMPs") regulating fishing in U.S. federal waters off the coast of Alaska.  After completing the most recent five-year EFH review in 2023, the Council and NMFS amended the EFH provisions of the Alaska FMPs to incorporate new scientific information.  Upset that NMFS did not *also* adopt its unwarranted proposal to restrict fishing in 90 percent of the Gulf of Alaska, Plaintiff-Appellant Oceana, Inc., challenged the EFH amendments, alleging that NMFS violated the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), the Administrative Procedure Act ("APA"), and the National Environmental Policy Act ("NEPA").

Oceana's lawsuit advanced a host of meritless arguments—most of which it has abandoned on appeal—which primarily second-guessed the methodology and metrics supporting NMFS's scientific judgments regarding the effects of fishing on EFH.  At-sea Processors Association, Alaska Groundfish Data Bank,

1

and Groundfish Forum (collectively "Intervenor-Defendants-Appellees")[1] intervened in the case to defend the EFH amendments because Oceana's lawsuit, in addition to being irreconcilable with governing law and contradicted by a voluminous administrative record, threatened the ability of their members to harvest and process fish.

After briefing and oral argument, the district court issued a detailed decision rejecting all of Oceana's claims and dismissing its lawsuit. On appeal, Oceana abandons its NEPA claim and all but two of its MSA arguments from below. Fixating on two metrics used by NMFS as part of its sophisticated methodology for evaluating fishing effects on EFH—Minimum Stock Size Threshold ("MSST") and Core EFH Area ("CEA")—Oceana contends that by relying on these metrics, the agency acted inconsistently with its obligations under the MSA. Oceana's appeal asks this Court to disregard NMFS's scientific and technical expertise and conclude that the agency's consideration of these two metrics renders the EFH amendments unlawful. But judicial review of agency decision-making under the MSA and APA is highly deferential and does not permit the Court to substitute its judgment for that of NMFS in the manner

---

[1] Intervenor-Defendants-Appellees are two trade associations (At-sea Processors Association and Groundfish Forum) representing catcher-processor vessels and a member-based organization (Alaska Groundfish Data Bank) representing catcher vessels and shoreside processors harvesting groundfish in the North Pacific.

Oceana suggests. And there is no reason to doubt the agency's judgment here: NMFS rationally explained why it considers MSST and CEA as part of its multifaceted approach to evaluating fishing effects, and Oceana identifies no better alternative metrics. That Oceana disagrees with a particular metric or prefers that NMFS reach a different substantive conclusion regarding the effects of fishing is of no moment under the arbitrary and capricious standard of review applicable to Oceana's challenge.

Ultimately, the district court reviewed the administrative record, carefully weighed the parties' arguments, and correctly deferred to NMFS's scientific expertise regarding the methodology used to evaluate fishing effects. For the reasons articulated below and in the Federal Defendants-Appellees' brief, the Intervenor-Defendants-Appellees respectfully request that the Court affirm the district court's well-reasoned decision.

## II. JURISDICTIONAL STATEMENT

Intervenor-Defendants-Appellees agree with Federal Defendants-Appellees' statement of jurisdiction. Answering Brief at 2–3.

## III. ISSUES PRESENTED

1. Does NMFS's choice of metrics used to evaluate fishing effects invoke the agency's technical and scientific expertise such that it is entitled to deference under the APA's arbitrary and capricious standard of review?

2.      Did NMFS provide a rational explanation for considering MSST and CEA as part of its hierarchical three-tiered approach to help evaluate fishing effects?

## IV.    STATEMENT OF THE CASE

### A. The Magnuson-Stevens Act and the Regional Fishery Management Council Framework.

Marine fisheries management in U.S. Federal waters is governed primarily by the MSA.  16 U.S.C. § 1801 *et seq.*  Management under the MSA is an open, transparent, and effective process guided by science and collaboration among professional resource managers, regulators, and the public.  Enacted in 1976, the MSA established eight regional fishery management councils comprised of members from commercial and recreational fishing interests as well as environmental, academic, and government representatives.  *Id.* § 1852.  Among other responsibilities, the regional councils develop FMPs that comply with the MSA's requirements to promote sustainable fisheries.  *Id.* §§ 1852-1853. Relevant here, the North Pacific Fishery Management Council is the regional council with "authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska."  *Id.* § 1852(a)(1)(G).  In consultation with the Council, NMFS manages the highly productive and stable groundfish fisheries off the coast of Alaska and ensures the Council's proposed management measures comply with the MSA and its implementing regulations.  *Id.* § 1854; 50 C.F.R. §

4

600.305(a)(2).  The Council's fishery management program is widely considered to be among the best in the world and has resulted in over 40 years of sustainable fisheries.[2]

The MSA requires that FMPs meet ten "national standards" for fishery conservation and management.  16 U.S.C. § 1851(a)(1)-(10).  The first of these standards requires that conservation and management measures "prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."[3]  *Id.* § 1851(a)(1).  The second requires that conservation and management measures "be based upon the best scientific information available."  *Id.* § 1851(a)(2).  Implementing FMPs that comply with the MSA's ten national standards is a complicated process that requires that NMFS balance multiple objectives.  *Conservation Law Found. v. Ross*, 374 F. Supp. 3d 77, 90 (D.D.C. 2019); *see also Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d 49, 65 (D.D.C. 2014) ("courts have recognized [fishery management] is 'exceedingly complex.'").  Significantly, "[t]he National Standards, and the

---

[2] N. Pac. Fishery Mgmt. Council, N. Pac. Conservation and Spatial Mgmt. Areas in Alaska's EEZ (March 2023) at 2, https://www.npfmc.org/wp-content/PDFdocuments/Publications/Conservation_Area_Summaries.pdf.

[3] The "optimum yield" is the quantity of fish that "will provide the greatest overall benefit to the nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems[.]"  16 U.S.C. § 1802(33)(A).

MSA more generally, require NMFS to balance conservation with yield, not favor one at the expense of the other." *Pac. Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1102 n.15 (9th Cir. 2012); *see also Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d at 68 ("The somewhat conflicting nature of these standards shows that Congress delegated to NMFS the discretion to strike an appropriate balance, and that there is no statutory mandate that one National Standard be maximized at the expense of others.").

## B. The Sustainable Fisheries Act and the EFH Regulations.

In 1996, Congress passed the Sustainable Fisheries Act ("SFA"), which expanded the MSA's scope to include conservation measures aimed at protecting fish habitat in recognition of the significance of healthy habitats to productive commercial and recreational fisheries. Pub. L. 104-297, § 108, 110 Stat. 3559 (1996); 3-ER-273. The SFA directs regional councils to describe and identify EFH for each FMP, defined as "those waters and substrate necessary to fish for spawning, breeding, feeding or growth to maturity." 16 U.S.C. § 1853(a)(7); 16 U.S.C. § 1802(10). The SFA also directs NMFS to "minimize *to the extent practicable* adverse effects on [EFH] caused by fishing, and identify other actions to encourage the conservation and enhancement of such habitat[.]" 16 U.S.C. § 1853(a)(7) (emphasis added). The U.S. Court of Appeals for the First Circuit observed that "by using the term 'practicable' Congress intended . . . to allow for

6

the application of agency expertise and discretion in determining how best to manage fishery resources." *Conservation Law Found. v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004); *accord Ross*, 374 F. Supp. 3d at 91–92 ("Congress's inclusion of the term 'practicable' is thus critical; it is the means by which it delegated to the agency the discretion to weigh the relevant factors embodied in the MSA's competing objectives.") (internal quotations and citation omitted)); *Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 234, 251 (D.D.C. 2014).

Once NMFS has designated EFH for a species, federal agencies are required to consult with NMFS when authorizing, funding, or undertaking actions that may adversely affect EFH. 16 U.S.C. § 1855(b)(2). During consultations with federal action agencies, NMFS provides non-binding science-based conservation recommendations for mitigating potential project-related adverse effects on EFH. 3-ER-250; 1-SER-159.

After Congress enacted the SFA, NMFS developed regulations to assist the regional councils with describing and identifying, as well as conserving and enhancing, EFH. 67 Fed. Reg. 2343 (Jan. 17, 2002) (codified at 50 C.F.R. § 600.815). The EFH regulations specify ten "EFH components" required of every FMP.[4] 50 C.F.R. § 600.815(a)(1)–(10). The first nine components outline

---

[4] The ten EFH components applicable to FMPs are: (1) EFH descriptions and identification, (2) fishing effects on EFH, (3) non-MSA fishing activities that may adversely affect EFH, (4) non-fishing effects on EFH, (5) cumulative impacts

7

various mandatory contents of FMPs relating to EFH. *Id.* The tenth component directs NMFS and the regional councils to review and, as warranted based on available information, revise or amend EFH provisions "at least once every 5 years." *Id.* § 600.815(a)(10). If warranted based on the five-year review, NMFS will revise the EFH provisions of FMPs through amendments to the FMPs, which are subject to notice and comment rulemaking. 3-ER-250; 2-ER-182-85. That is what occurred here.

Oceana's appeal focuses on the second EFH component: "[f]ishing activities that may adversely affect EFH." 50 C.F.R. § 600.815(a)(2). As required by the second EFH component, "[e]ach FMP must contain an evaluation of the potential adverse effects of fishing on EFH designated under the FMP[.]" 50 C.F.R. § 600.815(a)(2)(i). Such evaluation considers the impacts of fishing on each type of habitat, describes each fishing activity, reviews and discusses available relevant information, provides conclusions regarding whether and how fishing activity adversely affects EFH, and lists any prior management actions that minimize potential adverse effects on EFH, among other considerations. *Id.*

---

analysis, (6) EFH conservation and enhancement recommendations, (7) prey species, (8) identification of habitat areas of particular concern, (9) research and information needs, and (10) review and revision of EFH components of FMPs. 50 C.F.R. § 600.815(a)(1)–(10).

8

The second EFH component also requires that the Council "act to prevent, mitigate, or minimize any adverse effects from fishing, ***to the extent practicable***, if there is evidence that a fishing activity adversely affects EFH in a manner that is ***more than minimal and not temporary in nature***[.]" 50 C.F.R. § 600.815(a)(2)(ii) (emphasis added). If fishing effects are more than minimal and not temporary, "FMPs should identify a range of potential new actions that could be taken to address adverse effects on EFH, include an analysis of the practicability of potential new actions, and adopt any new measures that are necessary and practicable." *Id.* If, however, the effects of fishing are minimal and temporary, no additional minimization measures are required. *Id.* Neither the MSA nor the EFH regulations specify what metrics NMFS must use in determining whether fishing effects are more than minimal and not temporary in nature, leaving that technical question to the agency's discretion. 16 U.S.C. § 1853(a)(7); 50 C.F.R. § 600.815(a)(2)(ii).

Under this framework, NMFS, in coordination with the Council, has implemented extensive habitat protections for EFH off the coast of Alaska. Existing measures include numerous Habitat Protection Areas, Habitat Conservation Areas, Research Areas, Conservation Zones, and modified gear zones across vast areas of the North Pacific where use of bottom contact fishing gear is restricted. *See* 2-ER-152-56 (EFH Areas Protected from Fishing in the

9

U.S. North Pacific). All told, the Council and NMFS have enacted over a dozen different management measures closing hundreds of thousands of square nautical miles to bottom trawling off the coast of Alaska. *Id.*

### C. NMFS Developed and Improved Upon the Methods by Which it Evaluates Fishing Effects Over the Course of Several Five-Year EFH Reviews for the Alaska FMPs.

#### 1. The 2005 EFH review.

NMFS and the Council completed the first EFH review for the Alaska FMPs in 2005. 2-SER-338. The review employed a new modeling tool, the Long-Term Effects Index ("LEI model"), to bring together available information on fishing gear types, fishing intensity, and gear impacts and recovery rates for different habitat types to help predict the effects of fishing on habitat. 2-ER-79-80. NMFS, the Council, and the Council's Scientific and Statistical Committee ("SSC") all concluded that the LEI model incorporated the best available science and provided a reasonable approach to estimate and understand the impacts of fishing on habitat.[5] *Id.* The 2005 Environmental Impact Statement ("EIS") considered numerous EFH management alternatives and the Council and NMFS

---

[5] The SSC is composed of leading scientists from government and academia in the fields of biology, economics, statistics, and social science that advise the Council on scientific and other technical matters. *See* North Pacific Fishery Management Council, Scientific and Statistical Committee, https://www.npfmc.org/about-the-council/advisory-groups/scientific-and-statistical-committee/.

ultimately adopted a series of FMP amendments. These amendments implemented a suite of EFH conservation measures restricting bottom fishing in particularly sensitive habitat areas in the Bering Sea, Aleutian Islands, and in the Gulf of Alaska. 2-ER-81.

### 2. The 2010 and 2017 EFH reviews.

NMFS completed subsequent five-year EFH reviews in 2010 and 2017. 2-SER-338; 2-ER-81-82. Both reviews examined all ten EFH components and determined that new information justified updating some, but not all, of the components for the Alaska FMPs. 2-SER-344. The 2010 review concluded that fishing was not affecting the capacity of EFH to support the life history processes of any species. 2-SER-432; 2-SER-483.

The 2017 five-year review (named for the year it was completed) was conducted in much the same way as the 2010 review, with the notable exception of two advances in the way that NMFS and the Council analyzed fishing effects on habitat. First, NMFS collaborated with scientists at Alaska Pacific University ("APU") to develop the Fishing Effects model ("FE model"), an iterative modeling tool tracking habitat transitions between disturbed and undisturbed states. 3-ER-258; 2-ER-82; 2-SER-486. Like the LEI model, the FE model estimates seafloor habitat disturbance from commercial fishing activities; however, several improvements in the FE model exponentially increased the

11

Council's and NMFS's ability to analyze the effects of fishing on habitat. 3-ER-258; 2-SER-436. The FE model incorporated Vessel Monitoring System ("VMS") data that tracked nearly all commercial fishing vessels in the North Pacific allowing for a more accurate evaluation of fishing effort, distribution, and the effects of fishing. 3-ER-341-44; 2-SER-436; 2-SER-486. The FE model also made significant advancements in habitat categorization, incorporated updated fishing gear parameters and information regarding habitat susceptibility and recovery dynamics, and allowed scientists to evaluate fishing effects and recovery over specific time intervals. 2-SER-486; 2-SER-441; 2-SER-423. The FE model was reviewed by the Council and its subcommittees, submitted for public comment, and ultimately celebrated by NMFS for having "greatly enhanced our ability to estimate and understand fishing impacts." 2-SER-423; 2-SER-448; 2-ER-85; 2-SER-479.

The second significant improvement in the 2017 five-year review involved the development and adoption of a hierarchical "three-tiered" approach to evaluate whether fishing is adversely affecting EFH in a manner that is more than minimal and not temporary—the legal threshold for whether mitigation measures are needed. 2-SER-434; 2-SER-473. This methodology was developed by an SSC subcommittee comprised of scientists and managers from the National Oceanic and Atmospheric Administration's Alaska Fisheries Science Center,

12

NMFS's Alaska Region Office, and APU, and was approved by the Council. 2-ER-91; 2-SER-471. The three-tiered approach considers impacts of commercial fishing, first, at the population level, and then uses objective criteria at the second and third levels to determine whether additional analysis is warranted to evaluate if habitat impacts are more than minimal and not temporary. 2-SER-434.

To assist with this analysis, NMFS's stock assessment authors—the agency's foremost experts tasked with monitoring the health of a particular fish population—first consider the overall health of the population by examining the Minimum Stock Size Threshold ("MSST").

Next, the stock assessment authors examine whether fishing activity is predicted to disturb more than ten percent of the species' most important "core" EFH area ("CEA").[6]

Finally, the stock assessment authors evaluate any relationships or plausible connections between species health (as measured by indices of growth-to-maturity, spawning success, breeding success, and feeding success) and reductions in habitat. 2-ER-91-92. If any of the three levels indicate a correlation between fishing impacts to EFH and effects on species health, stock assessment

---

[6] The SSC noted that at a ten percent habitat disturbance threshold, 90 percent of a species' most important CEA remains undisturbed, which suggests that impacts are minimal. 3-ER-357.

authors will elevate the relevant species to the SSC and the Council's Plan Teams for development of mitigation measures. 2-SER-489-91. Stock assessment authors are free to perform additional analysis or to recommend a species for mitigation measures even if a species is above its MSST and/or CEA disturbance is below ten percent. 2-ER-229; *see also* 3-ER-385 ("The SSC subcommittee also noted that the 10% threshold does not preclude stock assessment authors from completing the evaluation for levels of habitat disturbance less than 10%, if other data suggest that impacts may be affecting the population.").

After completing the 2017 five-year review and using the new FE model and hierarchical methodology, NMFS and the Council determined "the effects of fishing on EFH do not currently meet the threshold of more than minimal and not temporary, and mitigation action is not needed at this time." 2-SER-436. Nevertheless, the Council and NMFS concluded that the best available science still warranted updating several of the other EFH components and NMFS prepared an Environmental Assessment ("EA") and omnibus amendment package updating the relevant EFH components for the Alaska FMPs. *See* 2-SER-416 (2018 EA updating EFH components); 83 Fed. Reg. 31,340 (July 5, 2018) (Final Rule approving EFH amendments for five Alaska FMPs).

Notably, Oceana *supported* the 2017 EFH review—which used MSST and CEA as part of the hierarchical approach—and encouraged NMFS to update the

14

EFH provisions of the FMPs. *See* 2-SER-453 ("Oceana recommends that the Council select Alternative 2 for each of the 8 action items in the EFH Omnibus Amendment package…. We support the EFH conservation actions taken by the [North Pacific Fishery Management Council] thus far, and urge the agency to select Alternative 2.").

### 3. The 2023 EFH review.

In April 2019, NMFS and the Council began the fourth comprehensive five-year EFH review process. 2-ER-183; 3-ER-250. Like the previous reviews, the primary objective was to survey the ten EFH components for each of the Alaska FMPs and revise or amend those components as warranted based on available information. 1-SER-145. Building on the foundation of the prior EFH reviews, NMFS completed its review in February 2023. As part of the review process, NMFS and Council staff prepared a detailed 205-page analysis evaluating fishing effects on EFH and explaining several advancements in the FE model parameters. 3-ER-328-336. These advancements included incorporating additional VMS fishing effort data, updating species distribution models and maps to more accurately reflect the waters where managed species live, improving gear tables to better reflect the fishing gear types used in Alaska's commercial fisheries, and revising sediment and habitat information to incorporate longer recovery times. 3-ER-260-62; 3-ER-342-52. The improved

15

FE model resulted in robust information on fishing impacts, susceptibility, and recovery time for 103 species. 3-ER-329.

With a wealth of new data and applying the same hierarchical approach developed during the 2017 review, none of the stock assessment authors concluded that fishing effects on their species were more than minimal and not temporary.  3-ER-257; 3-ER-330.  Accordingly, none of the stock assessment authors recommended elevating any managed species for possible mitigation.  3-ER-257.  After careful review of the fishing effects analysis, the SSC recommended relying on "the current EFH methodology and FE estimates as a reasonable basis for the determination of fishing impacts," and concurred "that no species needs to be elevated for mitigation due to fishing impacts."  2-SER-399. The SSC concluded that the fishing effects evaluation "supports the continued conclusion that the adverse effects of fishing activity on EFH are minimal and temporary in nature."  *Id.*

Based on the 2023 five-year EFH review, "the Council concurred with the Plan Team and SSC consensus that the effects of fishing on EFH do not currently meet the threshold of more than minimal and not temporary, and that mitigation action is not needed at this time."  2-ER-229.  Even though the best available science did not support updating the fishing effects component of the Alaska FMPs, the Council concluded that substantial new information was available to

16

revise the EFH text and maps and several other EFH components for five of the Alaska FMPs and directed NMFS to prepare corresponding amendments for those FMPs. 2-ER-194.

### D. Procedural Background.

NMFS promulgated the final EFH amendments for the Alaska FMPs on July 19, 2024. 2-ER-182. Oceana filed the instant lawsuit a month later, alleging the EFH amendments violated the MSA, the APA, and NEPA. 5-ER-870; *see also* 5-ER-823 (Oceana's First Amended Complaint). Specifically, Oceana argued that NMFS violated the MSA and the APA when it (1) concluded adverse fishing effects were minimal and temporary such that it did not need to adopt additional mitigation measures (*i.e.*, the challenge to MSST and CEA); (2) declined to adopt additional conservation and enhancement measures; and (3) allegedly did not consider available evidence related to long-lived habitat features and species' reliance on structure-forming habitat across life stages. 1-ER-28-36. Oceana also argued that NMFS (4) failed to consider a reasonable range of alternatives under NEPA because it did not include Oceana's proposal to restrict commercial trawling in 90 percent of the Gulf of Alaska as an alternative in its EA. 1-ER-36-39.

The district court heard oral argument on September 12, 2025, and two weeks later issued a detailed 37-page decision dismissing all of Oceana's claims.[7] 1-ER-2-39. Relevant to this appeal, the district court found that NMFS's reliance on the FE model and its hierarchical methodology using MSST and CEA met its obligation under the MSA to minimize adverse fishing effects and invoked the agency's technical expertise and was therefore entitled to deference. 1-ER-31.

This appeal followed. 5-ER-895. On appeal, Oceana abandons its NEPA claim and the bulk of its MSA claims from below, pursuing only its argument that NMFS's use of the MSST and CEA metrics was unlawful. Opening Brief ("OB") at 25.

---

[7] The district court concluded that NMFS not only identified conservation and enhancement measures but reasonably determined using its scientific expertise that those measures, along with prior conservation and enhancement measures, were sufficient to protect EFH. 1-ER-35. With respect to Oceana's argument that NMFS ignored evidence, the district court found that neither the MSA nor its regulations require NMFS to consider long-lived habitat features in a particular manner and that the agency's decision to predominantly rely on adult life stages for its analysis was entitled to deference and reasonable considering the data limitations for juvenile and sub-adult stocks. 1-ER-32-33. Finally, with respect to Oceana's NEPA argument that NMFS did not consider a reasonable range of alternatives because it did not include Oceana's proposal to freeze trawling in a majority of the Gulf of Alaska, the district court held that the agency's consideration of a preferred alternative and a no-action alternative constituted a reasonable range of alternatives, especially where NMFS determined that the action would have no significant impact on the environment. 1-ER-36-39. Oceana does not appeal these aspects of the district court's decision. OB at 25.

18

## V.    SUMMARY OF ARGUMENT

In dismissing Oceana's lawsuit, the district court deferred to NMFS's expertise regarding the metrics and methodology used to evaluate the effects of fishing on EFH.  On appeal, Oceana attempts to recast its disagreement with these metrics as presenting questions of statutory interpretation to which no judicial deference is owed under *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  But *Loper Bright* did not change the traditional deference to agency factfinding and policymaking, nor did it curtail the deference afforded on matters involving an agency's scientific or technical expertise.  Oceana's attacks on the suitability of the MSST and CEA metrics do not present questions of statutory interpretation—they present quintessential questions of deference to agency expertise.  The district court appropriately deferred to NMFS's expertise as should this Court.

On the merits, Oceana's attacks on NMFS's fishing effects analysis fail. NMFS explained why MSST and CEA—the very same metrics used as part of the 2017 EFH evaluation supported by Oceana—are useful tools in the agency's hierarchical assessment methodology.  Oceana identifies no better way to measure fishing effects.  In fact, Oceana conceded at the summary judgment hearing that CEA *is* an acceptable metric, offered no alternative to MSST, and repeatedly disavowed that it was advocating for the agency to consider additional

19

metrics. Further, NMFS considered all the relevant factors and provided a rational explanation supported by the administrative record for its methodology and choice of metrics. Deference to agency decision-making "is at its highest where a court is reviewing an agency action that required a high level of technical expertise." *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1056 (9th Cir. 2024). Oceana offers no basis to question the agency's judgment here.

Because Oceana's arguments on appeal are irreconcilable with governing law and the administrative record, the Intervenor-Defendants-Appellees respectfully request that this Court affirm the district court's decision below.

## VI. STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment *de novo*. *Pac. Coast Fed'n of Fishermen's Ass'ns*, 693 F.3d at 1091.

The Court's review of NMFS's compliance with the MSA is governed by the APA's "arbitrary and capricious" standard of review. *See Midwater Trawlers Co-operative v. Dep't of Commerce*, 282 F.3d 710, 716 (9th Cir. 2002) (under the MSA, "regulations promulgated by the Secretary may be set aside only if they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'") (quoting 5 U.S.C. § 706(2)(A)). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

20

463 U.S. 29, 43 (1983). Review under the APA is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007). "This deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise." *League Of Wilderness Defs. Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1130 (9th Cir. 2010).

In addition, courts pay agencies "an extreme degree of deference" when decisions "involve complex judgments about sampling methodology and data analysis that are within the agency's technical expertise." *Kennecott Greens Creek Mining Co. v. Mine Safety and Health Admin.*, 476 F.3d 946, 956 (D.C. Cir. 2007)) (citation modified). "Thus, in the context of judicial review of an FMP, [i]t is therefore especially appropriate for the Court to defer to the expertise and experience of those individuals and entities—the Secretary, the Councils, and their advisors—whom the [MSA] charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors." *Oceana, Inc. v. Pritzker*, 24 F. Supp. 3d at 59 (internal quotations and citation omitted).

21

## VII.   ARGUMENT

### A. Oceana's Appeal Presents Quintessential Questions of Deference to an Agency's Scientific Expertise, Not Questions of Statutory Interpretation.

As a threshold matter, the Court should reject Oceana's attempt to evade deference to the agency's technical expertise by characterizing this appeal as presenting only questions of statutory interpretation.  This is not—and has never been—a dispute about the legal meaning of words in the MSA that the Court must decide independently under *Loper Bright*, as Oceana now claims.  OB at 33. This is a dispute about Oceana's disagreement with the scientific methods employed by an agency and its resulting scientific conclusions—classic examples of areas in which courts defer to an agency's technical expertise.  *Haaland*, 102 F.4th at 1056.  Oceana's argument otherwise fails.

### 1.  Under *Loper Bright*, deference is still owed to agency factfinding and technical expertise.

In *Loper Bright*, the Supreme Court held that the APA requires courts, not agencies, to "decide all relevant questions of law," precluding deference to an agency's interpretation of the law and overruling *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  But *Loper Bright* did not change the traditional deference to agency "policymaking and factfinding."  *Loper Bright*, 603 U.S. at 391–92; *see also Texas v. EPA*, 137 F.4th 353, 367 (5th Cir. 2025) ("It is not possible to interpret *Loper Bright* as discarding deferential review of agency *factfinding*. The Supreme Court relied extensively on the

22

provisions of the APA in its *Loper Bright* opinion. The Court distinguished a court's deferential standard for reviewing findings of fact under the APA from the absence of deference for legal conclusions[.]") (italics in original). Indeed, in reaching its conclusion, the Supreme Court distinguished provisions in the APA that plainly mandate deference to the agency, citing arbitrary and capricious review as an example. *See Loper Bright*, 603 U.S. at 392 ("[The APA] prescribes no deferential standard for courts to employ in answering those legal questions. That omission is telling, because Section 706 *does* mandate that judicial review of agency policymaking and factfinding be deferential.") (citing 5 U.S.C. § 706(2)) (italics in original)).

Less than a year after the Supreme Court issued its decision in *Loper Bright*, it reaffirmed in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025), that "when an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard." *Id.* at 179–80. "Black-letter administrative law" still "instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments . . . a reviewing court must be at its 'most deferential.'" *Id.* at 182 (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)).

23

### 2. Deference is owed to NMFS's scientific judgments here.

This case is not a dispute about "questions of law" that must be decided without deference to the agency. It is a challenge to NMFS's scientific judgments that warrant substantial deference. *Loper Bright*, 603 U.S. at 391–92.

Fundamentally, Oceana's lawsuit challenges the agency's scientific determinations: Oceana disputes the suitability of metrics selected by scientists and used by NMFS's subject matter experts as part of the science-based hierarchical approach by which they evaluate the impact of fishing on EFH. Although Oceana proposes no alternative method or metrics, it claims (mistakenly) that these metrics are flawed and led NMFS to underestimate adverse effects of fishing on habitat, thereby violating the MSA. OB at 25–27.

Thus, Oceana's challenge does not turn on the meaning of words in the MSA (or its implementing regulations), but on how these metrics work and why the agency selected them. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 377 (1989) ("The dispute thus does not turn on the meaning of the term 'significant' or on an application of this legal standard to settled facts. Rather, resolution of this dispute involves primarily issues of fact. Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies.'" (internal footnote and citations omitted)). Oceana's appeal *necessarily* asks the Court to

24

resolve complex scientific and technical issues without deference to the agency's expertise—an invitation this Court routinely declines. *See Cascadia Wildlands v. BLM*, 153 F.4th 869, 906 (9th Cir. 2025) ("We are not to act as a panel of scientists, instructing the agency, choosing among scientific studies, and ordering the agency to explain every possible scientific uncertainty. That is precisely what the Plaintiffs ask us to do here: don a lab coat, sharpen our peer-review pencils, and dissect [the agency's] conclusion…") (internal quotations and citations omitted).

Nevertheless, in hopes of avoiding deference to NMFS's scientific expertise, Oceana claims its appeal involves no "scientific debate." OB at 33. Not so. In fact, Oceana's argument presupposes the Court has already resolved the scientific debate in Oceana's favor; Oceana assumes, for example, that the Court will accept its position that these metrics "allow the Fisheries Service to completely ignore adverse effects on much of the habitat the agency has already designated essential." *Id.* But Oceana is wrong, and for reasons that are scientific and technical, not legal. *See infra*, Part VII.B.3.b.

Only one of Oceana's arguments *conceivably* raises a disputed question of statutory interpretation, and it is unsupported by the MSA. Oceana appears to argue that the MSA categorically prohibits NMFS from looking at a stock's overfished threshold when assessing fishing effects on EFH, no matter how it is

25

considered.[8]  *See* OB at 33 (claiming "[t]he statute does not allow the Fisheries Service to evaluate fishing effects on habitat by asking whether a stock is overfished").  The Court need not defer to the agency to reject this argument as Oceana's claim finds no support in the text of the MSA or caselaw interpreting it.  OB at 49.  As shown by Oceana's parentheticals, the statutory provisions Oceana cites for this argument support only the undisputed proposition that conserving habitat and preventing overfishing are "distinct obligations."  *See, e.g.*, OB at 49 ("*Compare, e.g.*, 16 U.S.C. § 1853(a)(7) (protecting essential fish habitat), *with id.* § 1853(a)(10), (15) (preventing and remedying overfishing)"); *id.* at 50 (citing provision defining what MSST is, not limiting the contexts in which it could prove useful).  Oceana's citations do not support its logical leap that because the agency has distinct obligations with respect to overfishing and habitat, considering MSST as an indicator of adverse fishing effects on habitat must "improperly conflate[] them."  *Id.*  And Oceana does not seriously dispute that population decline (captured by MSST) could indicate that fishing has adversely affected EFH, which shows the metric's utility as an indicator of adverse fishing effects on habitat.  OB at 48–49.  The MSA nowhere prohibits the agency from

---

[8] As discussed *infra*, Part VII.B.3.a, Oceana also misapprehends the role of MSST, overlooking that MSST is just one among several indicators of adverse effects on EFH.

26

considering MSST in assessing fishing effects on habitat, and it is a useful tool for doing so, as discussed more fully below. *See infra*, Part VII.B.3.a.

### 3. Oceana did not contest this issue below.

Tellingly, only on appeal has Oceana attempted to recast its claims as raising only questions of law that, under *Loper Bright*, must be decided without deference to the agency's interpretation of the statute.[9] In the district court below, Oceana argued its MSA claim under the arbitrary and capricious standard, mentioning *Loper Bright* only once in its lower court opening brief (not in an argument, but in a paragraph on the standard of review), and only once in its reply in response to hypothetical argument on an unrelated issue. *See* 1-SER-110-11; 1-SER-63. At the summary judgment hearing, during which counsel for Intervenor-Defendants-Appellees and counsel for Federal Defendants-Appellees each argued that deference is owed to the agency, Oceana's counsel argued nothing to the contrary. *See* 1-SER-30, 32, 38, 41, 48. On this uncontested point, the district court correctly observed "that NMFS's implementation of its obligation to minimize adverse fishing effects—by using a fishing effects model that examines MSST and implements a 10% threshold for CEA disturbance in its

---

[9] *See One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1158 (9th Cir. 2009) ("A party normally may not press an argument on appeal that it failed to raise in the district court.").

27

fishing effects analysis—is warranted a high degree of deference." 1-ER-31.

This Court should reach the same conclusion.

## B. NMFS Appropriately Used Minimum Stock Size Threshold and Core EFH Area to Evaluate Fishing Effects.

Oceana's appeal fails on the merits for several reasons. Chiefly, Oceana conceded at the summary judgment hearing that there are no better metrics than MSST and CEA to evaluate effects of fishing on EFH. But even setting that aside, Oceana's criticisms of MSST and CEA are misguided. As the administrative record demonstrates, NMFS rationally explained its methodology for evaluating fishing effects, including why it uses MSST and CEA as part of its hierarchical assessment process. At best, Oceana presents a difference of opinion on those scientific determinations. But NMFS is entitled to deference in selecting the appropriate methodology and metrics to assess fishing effects, and Oceana's difference of opinion as to the suitability of these metrics does not render the agency's methodology arbitrary or capricious.

### 1. Oceana conceded at oral argument that no better alternative metrics exist.

At oral argument, the district court directly asked Oceana what metrics it believed NMFS should have used instead of MSST and CEA. Oceana identified none:

> THE COURT: Okay. And if Oceana ran the Agency what would it do as a metric, or how would it assess EFH?

28

> MS. ARCE: We have provided comment letters encouraging the model that is currently used, how to improve that existing model. ***We're not advocating for additional metrics. We're simply advocating for the Agency to consider evidence available to it.***

1-SER-8 (emphasis added). Oceana also conceded that CEA *is* an acceptable metric for NMFS to use in evaluating fishing effects:

> THE COURT: Okay. So what metric are you proposing?
>
> MS. ARCE: To the extent that habitat is considered here, we're -- it's the use of it here is not appropriate, because that is waiting until --
>
> THE COURT: And I get that, but what are you proposing?
>
> MS. ARCE: ***If the Agency were allowed to use its current core essential fish habitat to assess habitat impacts, that's okay.*** However it needs to consider available evidence that goes into the model it applies.
>
> THE COURT: So what evidence wasn't considered?
>
> MS. ARCE: Evidence that wasn't considered is relating to the existence of corals and sponges at shallow depths.

1-SER-8-9.

Oceana unmistakably acknowledged it has no alternative metrics, that the current CEA metric is "okay," and argued that rather than using alternative metrics, NMFS need only consider additional evidence in its fishing effects model—specifically the existence of corals and sponges at shallow depths (an

29

argument Oceana lost below *and does not pursue on appeal*).[10]  *Id.*  This Court

has previously bound parties to concessions made at oral argument and Oceana

reasonably should be held to its stated position.  *See Amberhill Prop. v. City of

Berkeley*, 814 F.2d 1340, 1341 (9th Cir. 1987) (holding party's concession made

at oral argument is binding in any further proceedings); *see also Wagner v. Prof'l

Eng'rs in Cal. Gov't,* 354 F.3d 1036, 1043 n.3 (9th Cir. 2004) (party was

"judicially bound" to concession made at oral argument).

In its decision below, the district court correctly observed, "Oceana does

not offer an alternative method to determine when fishing impacts are more than

minimal and not temporary; nor does Oceana challenge the regulation itself as

being inconsistent with the MSA."  1-ER-31.  This Court and others have

similarly rejected challenges to the science relied on by an agency where the

plaintiff fails to propose a superior alternative.  *See*, *e.g.*, *Oregon Trollers Ass'n v.

Gutierrez*, 452 F.3d 1104, 1120 (9th Cir. 2006) (rejecting claim that NMFS failed

to use best available science where plaintiff did not offer contrary science);

*Massachusetts v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) (observing that plaintiff

may have "forfeited" its claim challenging agency's science by not proposing any

---

[10] The district court rejected Oceana's argument that the FE model ignored
evidence of structure forming benthic habitat features at shallow depths and
Oceana abandoned this argument on appeal.  ER-31-32; OB at 24–25.

better science).  Oceana's concessions at oral argument combined with its failure to identify any superior metrics supply ample reason to deny this appeal.

### 2. MSST and CEA are the same metrics that were used to assess fishing effects in the 2017 EFH review supported by Oceana.

In addition to failing to identify any superior metrics, Oceana has previously supported the agency in using these metrics, suggesting its true grievance here is with the outcome, not the methodology employed to arrive at the outcome.

Specifically, NMFS used these same metrics—as part of the same fishing effects methodology—in the previous five-year EFH review completed in 2017. *See* 3-ER-356 ("In 2016, an SSC subcommittee developed a process for [stock authors] to review the FE model results and conduct an FE assessment to meet the requirements of EFH component 2…. This process was used again for the 2022 EFH 5-year Review[.]"); *see also* 1-SER-6 (acknowledging at summary judgment hearing that the 2017 EFH review applied the same MSST and CEA metrics challenged by Oceana in the current lawsuit).  That year, Oceana *supported* the resulting EFH amendments even though they relied on the metrics Oceana now challenges.  *See* 2-SER-453 ("We support the EFH conservation actions taken by the [Council] thus far, and urge the agency to select Alternative 2, which would

31

*approve the proposed EFH amendments and complete the five-year review of EFH.*") (emphasis added).[11]

Moreover, this Court has previously cautioned against "construing a statute in a way that renders years of consistent agency practice unlawful." *Cnty. of Amador v. U.S. Dep't of the Interior*, 872 F.3d 1012, 1024 (9th Cir. 2017). The Court should decline Oceana's invitation to do so here, especially when Oceana itself functionally endorsed that practice in past years.

### 3. Oceana's criticisms ignore the intricate modeling exercise in which MSST and CEA operate.

Oceana's substantive criticisms are also fundamentally flawed. In second-guessing the agency's fishing effects analysis, Oceana myopically focuses on just two metrics—MSST and CEA—without considering their broader context as part of a comprehensive multi-year fishing effects evaluation. *See* OB at 2, 25 (arguing NMFS's evaluation of adverse fishing effects relies on "two main criteria"). In other words, while Oceana acknowledges these metrics are part of a more complex process, its criticisms of MSST and CEA assume the agency relied entirely on those metrics in isolation. *Compare* OB at 28 (showing the agency's multi-step hierarchical analysis), OB at 46 (acknowledging stock authors have

---

[11] Indeed, Oceana struggled to respond at the summary judgment hearing when the district court asked "[s]o what changed with regard to the metrics that you agreed with in 2017 and today, or the 2023, that made Oceana change its position?" 1-SER-7.

discretion to consider other information), OB at 55 (acknowledging MSST is just "one of the criteria for determining whether there was damage to *habitat*") *with* OB at 49 (arguing the agency is "narrow[ly] focus[ed] on 'core' designated habitat" and thus "did not look at adverse fishing effects in the rest of that habitat"), OB at 56 (arguing that by using MSST, the agency "did not consider minimizing adverse effects unless they had already led to stock collapse"). By divorcing these metrics from this context, Oceana largely disregards the processes and science underlying the fishing effects evaluation.

As described in greater detail below, MSST and CEA do not exist in a vacuum. They are part of an iterative assessment methodology which itself relies on the best available science in the form of the highly sophisticated FE model. 50 C.F.R. § 600.815(a)(2)(i); 2-SER-353. The FE model tracks habitat transitions between disturbed and undisturbed states by synthesizing data related to fishing effort, species distribution models, habitat maps, fishing gear parameters, and the susceptibility and recovery of habitat features. 3-ER-341-48.

Contrary to the implications of Oceana's argument, NMFS's fishing effects analysis does not rely on MSST or CEA alone. OB at 2. After surveying overall population health and analyzing disturbance to a species' most suitable habitat, NMFS's stock assessment authors proceed to consider a host of other factors and metrics, including indices of growth-to-maturity, spawning success, breeding

33

success, and feeding success. 3-ER-385-86. Oceana's critique of MSST and CEA as individual metrics oversimplifies a complicated process that considers various scientific data beyond these two metrics.

### a) *NMFS appropriately used MSST as one of multiple indicators of adverse fishing effects*.

Oceana argues that NMFS's use of MSST is inconsistent with the MSA because it conflates the agency's obligation to prevent overfishing with its separate obligation to conserve EFH, rendering the EFH provisions surplusage. OB at 48–50. According to Oceana, MSST is an indicator of whether a species is overfished only, and by using this metric the agency will never minimize adverse fishing effects unless a species' population has already collapsed. *Id.* Oceana's criticisms fundamentally misapprehend the role of MSST in the hierarchical impact assessment methodology.

In fact, MSST is *not* determinative of whether the agency will implement mitigation measures. It is just the first step of the three-tiered analysis. NMFS's stock assessment authors begin their analysis by considering whether the population is above or below the MSST—the level below which a stock is in jeopardy of not being able to produce its maximum sustainable yield on a continuing basis.[12] 2-SER-435; 2-SER-597; 3-ER-356-58. As NMFS explained,

---

[12] The MSA regulations define maximum sustainable yield as "the largest long-term average catch or yield that can be taken from a stock or stock complex under

"[t]he Fishing Effects analysis considers impacts of commercial fishing first at the *population level* [MSST]," precisely because "EFH is defined for *populations* managed by Council FMPs." 2-ER-91-93 (emphasis added). If the population is below MSST and there is a plausible connection to reductions of EFH as the cause, the stock assessment author recommends that the SSC and Plan Teams develop mitigation measures. 2-SER-466. If the population is above MSST, stock authors still proceed to the next steps of the hierarchical assessment: evaluating disturbance to CEA and then any relationships or plausible connections between species health (as measured by indices of growth-to-maturity, spawning success, breeding success, and feeding success) and reductions in habitat. 2-ER-91-92. Thus, even where a species has a seemingly healthy population above MSST, stock authors necessarily take additional steps to discern whether other indicators of adverse fishing effects nevertheless warrant mitigation measures.

Oceana's other criticisms of MSST likewise fail. For example, Oceana misleadingly implies that *Congress* opined that MSST is "completely inappropriate" for addressing habitat disturbance. OB at 51 n.3. Congress made

---

prevailing ecological, environmental conditions and fishery technological characteristics…, and the distribution of catch among fleets." 50 C.F.R. § 600.310(e)(1)(i)(A).

no such pronouncement and Oceana cites only the debunked decades-old criticisms from the 2004 peer review of the EFH EIS's fishing effects evaluation. 4-ER-522, 529. NMFS explained at length why it disagreed with those criticisms—primarily because the reviewers mistakenly assumed that MSST was the *only* metric used to assess impacts to habitat. 2-SER-457. NMFS noted, "the evaluations of habitat effects *were not limited to a[n] assessment of stock status relative to MSST, but considered a full set of more detailed information on stock status*," including information that was not provided to the reviewers. *Id.* (emphasis added). NMFS ultimately revised the draft EIS to address the misconception that the fishing effects evaluation would rely on MSST alone. *See* 2-SER-547 (2005 EFH EIS explaining "[g]iven the apparent confusion some commenters expressed over how [NMFS] considered stock status in the analysis, NMFS modified the analytical approach in the final EIS to address whether stock status and trends indicate any potential influence of habitat disturbance due to fishing.").

Likewise, MSST's utility is *not* limited to determining whether a species is overfished, as Oceana argues. OB at 49–50. NMFS explained how and why MSST is useful for evaluating effects on habitat. For example, downward trends in MSST (even where a stock sustains itself above MSST) can provide valuable information to scientists about habitat disturbances long before a stock is on the

36

verge of collapse. *See* 2-SER-592 ("Such trends should be evident long before the stock reaches its MSST. Hence, considering the ability of a stock to remain above MSST is not an insensitive measure of the response of the stock to habitat perturbations."). And, as Oceana concedes, a struggling population might well indicate adverse effects. OB at 48–49. Here, NMFS considered the relevant factors and explained why MSST is a useful metric at the first level of the three-tiered assessment. Nothing more is required. *See Fishermen's Finest, Inc. v. Locke*, 593 F.3d 886, 894 (9th Cir. 2010) ("In reviewing regulations promulgated under the Magnuson Act, our only function is to determine whether the Secretary [of Commerce] has considered the relevant factors and articulated a rational connection between the facts found and the choice made.") (internal quotations omitted).

In sum, NMFS rationally explained why MSST is a helpful tool for evaluating impacts to habitat. NMFS also explained that MSST's usefulness is not limited to whether a species is overfished, nor does a stock need to be on the verge of "collapse" to provide stock assessment authors and fishery managers with valuable data regarding the overall health of the population—which itself can be an indicator of habitat disturbance. 2-SER-592.

Oceana's disagreement as to the suitability of MSST does not render the agency's decision arbitrary or capricious. *Marsh*, 490 U.S. at 378 ("When

37

specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").  Because the fishing effects analysis involves the evaluation of complex scientific data within NMFS's technical expertise, the district court appropriately deferred to the agency's choice of metrics.  ER-28-31; *League of Wilderness Defs.*, 615 F.3d at 1130 ("This deference is highest when reviewing an agency's technical analyses and judgments involving the evaluation of complex scientific data within the agency's technical expertise.").

### b)  *NMFS appropriately used CEA in part to avoid statistically minimizing adverse effects.*

Oceana also attacks the second step in the hierarchical assessment, arguing that by considering CEA, NMFS impermissibly narrowed its evaluation of fishing effects.  OB at 39–41.  According to Oceana, the CEA metric allows NMFS to ignore fishing impacts to half of designated EFH and is therefore incongruent with the MSA's directive to conserve EFH.  *Id.* at 41.  Oceana's argument fails for several reasons.

To begin, Oceana is incorrect that CEA allows NMFS to ignore fishing effects for half of EFH and fundamentally misunderstands the agency's scientific rationale for establishing a 10% threshold for habitat disturbance in the "core" area—*i.e.*, the top 50% of EFH where most of a species is concentrated—as

38

opposed to using a higher percentage of EFH (*e.g.*, 95%) for this step in the analysis, an idea which the agency considered and rejected. 2-SER-381; 2-ER-229.

The CEA metric does not ignore fishing impacts to half of EFH but rather focuses on disturbances to the *most* suitable habitat for each species.[13] Almost all waters off the coast of Alaska are EFH for at least one species. 2-ER-201. Scientists at NMFS and the Council considered using other percentages of a species' EFH (25%, 50%, and 95%) for CEA and, after applying these different thresholds for several species, concluded that the 50% threshold was most reliable in terms of neither overstating *nor understating* habitat disturbance. 3-ER-385; *see also* 2-SER-466-68 (applying 25%, 50%, and 95% CEA quantiles to Pacific Ocean perch and red king crab); 2-SER-468 ("[t]he lower levels of apparent impact for the 25% and 50% quantiles are more representative of levels of impact to habitat truly essential for [the sampled species]."). Based on these

---

[13] By focusing on the most important EFH areas for each species, the CEA metric effectively *lowers* the habitat disturbance threshold for elevating a species for consideration of mitigation. For example, if a species had a total EFH area of 100 square miles, and mitigation were triggered by 10% habitat disturbance, 10 square miles of habitat would need to be disturbed before a species was automatically elevated for mitigation. The CEA—making up the most important EFH areas for that same species—would be 50 square miles and elevation for additional analysis and consideration of mitigation measures would be triggered if only 5 square miles of EFH is disturbed, making it a more sensitive metric that effectively lowers the threshold for consideration of mitigation.

39

observations, the SSC "continue[d] to recommend the 50% quantile to represent the 'core EFH' area to avoid the likelihood that important areas are excluded (if using the smaller area, 25% quantile) and to avoid statistically minimizing the amount of habitat reduction by using the larger, 95% quantile." 3-ER-385.[14] NMFS has rationally explained its decision to use the top 50% of a species' habitat for CEA at the second step of the hierarchical assessment. *Fishermen's Finest*, 593 F.3d at 894; *see also The Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005), *aff'd sub nom Oceana, Inc. v. Gutierrez,* 488 F.3d 1020 (D.C. Cir. 2007) (noting the deference due to the agency when it provides a reasoned explanation for its choice of data).

Although the Council and NMFS found using the top 50% of a species' "core" habitat as most reliable in terms of neither overstating nor understating habitat disturbance, this does not mean that fishing impacts occurring outside of a

---

[14] Oceana argues that if using the entire EFH area for CEA statistically minimizes habitat disturbance, it simply means that NMFS's FE model is flawed. OB at 46. Oceana's criticism ignores that the district court rejected its challenge to the inputs used in the fishing effects model—a decision that Oceana opted not to pursue in this appeal. 1-ER-31-33; OB at 25. Even had Oceana preserved its argument regarding the efficacy of the FE model, NMFS has no obligation to develop a different model just because Oceana thinks the current model is lacking. *See American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 13 (D.D.C. 2000) ("Since neither the [MSA] nor the [EFH] regulation requires the Councils to affirmatively conduct research to better identify EFHs and the adverse effects of fishing on them, reliance on the best *available* scientific information is sufficient.") (emphasis in original).

species' CEA are ignored. Indeed, the SSC explained that in addition to considering CEA, a species' entire EFH area is analyzed annually on a larger scale to ensure that "any areas that are used during specific seasons or for specific activities (spawning, feeding, settling, etc.) are not overlooked[.]" 2-SER-490.

Furthermore, CEA does not necessarily dictate whether a species qualifies for mitigation, as Oceana suggests. Each stock assessment author has discretion to elevate a species for additional analysis and consideration of mitigation measures. 2-ER-229; *see also* 3-ER-385 ("The SSC subcommittee also noted that the 10% threshold does not preclude stock assessment authors from completing the evaluation for levels of habitat disturbance less than 10%, if other data suggest that impacts may be affecting the population."). Additionally, stock assessment authors can request CEA modeling using different percentages of a species' EFH if they believe it may be helpful for assessing habitat disturbance. *See* 3-ER-356 (providing option to consider a 75% CEA overlay to help address concerns for data-limited stocks). CEA provides NMFS and the Council with a useful tool to gauge impacts to a species' most important habitat, not a hard line.

Finally, as was the case for MSST, the district court properly concluded that the agency's decision to use CEA warrants a high degree of deference given the scientific and technical expertise involved. 1-ER-30-31; *Haaland*, 102 F.4th at 1056 (noting deference "is at its highest where a court is reviewing an agency

41

action that required a high level of technical expertise.") (internal quotations omitted). Oceana may disagree with the metrics NMFS uses to assess fishing effects on EFH. But the MSA entrusts these decisions to NMFS's scientific expertise and Oceana's disagreement does not render the fishing effects analysis performed in support of the EFH amendments arbitrary or capricious. *See Oceana, Inc. v. Raimondo*, 530 F. Supp. 3d 16, 29 (D.D.C. 2021), *aff'd*, 35 F.4th 904 (D.C. Cir. 2022) ("it is well established that NMFS may choose between conflicting facts and opinions, so long as it justifies the choice.") (citation modified).

## C. Vacatur Is Not the Appropriate Remedy.

Oceana asks this Court to reverse the district court and remand to NMFS to conduct an entirely new fishing effects analysis within 18 months, despite failing to identify any superior metrics the agency should use. OB at 53–54. Tacitly conceding the beneficial effects of the very EFH amendments it targets in its lawsuit, Oceana asks the Court to forgo vacatur of the EFH amendments so NMFS can continue to rely on updated EFH information contained in those amendments. *Id.* at 54. If the Court finds any merit to Oceana's claims—and it should not—Intervenor-Defendants-Appellees agree that remand to the agency without vacatur would be appropriate. *See Idaho Farm Bureau Fed'n v. Babbitt*,

42

58 F.3d 1392, 1405 (9th Cir. 1995) ("[W]hen equity demands, the regulation can be left in place while the agency follows the necessary procedures.").

## VIII.  CONCLUSION

NMFS's five-year EFH review was supported by a comprehensive analysis of fishing effects utilizing the best available science.  The district court appropriately deferred to NMFS's scientific expertise in selecting the metrics and methodology by which to evaluate fishing effects.  Oceana's disagreement over the metrics used does not pose a question of statutory interpretation, nor does it provide grounds for overturning the agency's reasoned scientific analysis under the APA's deferential arbitrary and capricious standard.  For the reasons articulated above and in the Federal Defendants-Appellees' brief, the Intervenor-Defendants-Appellees respectfully request that the Court affirm the district court's decision below and dismiss Oceana's appeal.

DATED this 22nd day of May, 2026.

Respectfully submitted,

By *s/ James C. Feldman*
James C. Feldman, Washington Bar No. 51271
Eva Sharf Oliver, Washington Bar No. 57019
SUMMIT LAW GROUP PLLC

***Attorneys for Intervenor-Defendants-Appellees At-sea Processors Association, Alaska Groundfish Data Bank, and Groundfish Forum, Inc.***

43

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, the Intervenor-Defendants-Appellees represent that they are unaware of any related cases pending in this Court.

Dated: May 22, 2026

s/ James C. Feldman
James C. Feldman

**Counsel of Record for Intervenor-Defendants-Appellees At-sea Processors Association, Alaska Groundfish Data Bank, and Groundfish Forum, Inc.**

44

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number**: 25-7689

I am the attorney or self-represented party.

**This brief contains 9,578 words**, including <u>zero</u> words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** <u>*s/ James C. Feldman*</u>    **Date:** <u>May 22, 2026</u>
       James C. Feldman

45

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

**9th Cir. Case Number(s)** 25-7689

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are NOT Registered for Electronic Filing:**
[ ] I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)***:**

Intervenor-Defendants-Appellees' Answering Brief

**Signature** *s/James C. Feldman*     **Date:** May 22, 2026
James C. Feldman

46